**(UNREDACTED)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

---------------------------------------------------

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )
                                )
         VS.                    )    NO. 13-20067
                                )
ROBERT DREW,                    )
                                )
              Defendant.        )

---------------------------------------------------


TRIAL PROCEEDINGS

BEFORE THE HONORABLE JOHN T. FOWLKES, JR., JUDGE

TUESDAY MORNING AND AFTERNOON

APRIL 22, 2014


LYNN DUDLEY
OFFICIAL REPORTER
923-A FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

        EDWARD L. STANTON, ESQ.
        UNITED STATES ATTORNEY
        SUITE 800
        167 NORTH MAIN STREET
        MEMPHIS, TENNESSEE 38103
        BY:  C. DAVID BIGGERS, JR.
             SAMUEL R. STRINGFELLOW
             ASSISTANT U. S. ATTORNEYS


Appearing on behalf of the Defendant:

        DORIS RANDLE-HOLT
        FEDERAL PUBLIC DEFENDER
        200 JEFFERSON AVENUE
        SUITE 200
        MEMPHIS, TENNESSEE 38103
        BY:  MARY C. JERMANN-ROBINSON
             NEDDUM L. GERMANY, III
             ASSISTANT FEDERAL DEFENDERS

# W I T N E S S   I N D E X

| WITNESS | PAGE | LINE |
|---|---|---|

JERRY HARRIS

     DIRECT EXAMINATION

     BY MR. BIGGERS  .................73         6

     CROSS EXAMINATION

     BY MS. JERMANN-ROBINSON  .......109         20

     REDIRECT EXAMINATION

     BY MR. BIGGERS  ...............115         24

JAMES WILLIAM BOLDEN

     DIRECT EXAMINATION

     BY MR. BIGGERS  ...............120         6

     CROSS EXAMINATION

     BY MS. JERMANN-ROBINSON  .......129         20

JIMMY MAXWELL

     DIRECT EXAMINATION

     BY MR. BIGGERS  ...............136         6

     CROSS EXAMINATION

     BY MS. JERMANN-ROBINSON  .......169         1

     REDIRECT EXAMINATION

     BY MR. BIGGERS  ...............186         25

     RECROSS EXAMINATION

     BY MS. JERMANN-ROBINSON  .......190         7

# W I T N E S S   I N D E X

| WITNESS | PAGE | LINE |
|---|---|---|
| JASON CLARK | | |
| DIRECT EXAMINATION | | |
| BY MR. STRINGFELLOW ...........193 | 6 | |
| CROSS EXAMINATION | | |
| BY MS. JERMANN-ROBINSON .......213 | 7 | |
| REDIRECT EXAMINATION | | |
| BY MR. STRINGFELLOW ...........226 | 23 | |
| RECROSS EXAMINATION | | |
| BY MS. JERMANN-ROBINSON .......228 | 13 | |

# E X H I B I T   I N D E X

| EXHIBIT NUMBER | | PAGE | LINE |
|---|---|---|---|
| Exhibit Number 1 | Photograph ......78 | | 12 |
| Exhibit Number 2 | Photograph ......78 | | 14 |
| Exhibit Number 3 | Photograph ......78 | | 16 |
| Exhibit Number 4 | Photograph ......78 | | 18 |
| Exhibit Number 5 | Photograph ......78 | | 20 |
| Exhibit Number 6 | Photograph ......78 | | 22 |
| Exhibit Number 8 | Photograph .....102 | | 15 |
| Exhibit Number 9 | Photograph .....104 | | 24 |
| Exhibit Number 10 | Jacket ........160 | | 19 |
| Exhibit Number 11 | Mask ..........107 | | 21 |
| Exhibit Number 11 | Mask ..........162 | | 8 |
| Exhibit Number 12 | Gun ...........108 | | 16 |
| Exhibit Number 12 | Gun ...........164 | | 6 |
| Exhibit Number 13 | Photograph ....141 | | 19 |
| Exhibit Number 14 | Photograph ....141 | | 21 |
| Exhibit Number 15 | Photograph ....157 | | 1 |
| Exhibit Number 16 | Photograph ....157 | | 3 |
| Exhibit Number 17 | Photograph ....157 | | 5 |
| Exhibit Number 18 | Gloves ........162 | | 22 |
| Exhibit Number 19 | Ammunition ....164 | | 21 |
| Exhibit Number 20 | Photographs ...166 | | 19 |

# E X H I B I T   I N D E X

| EXHIBIT NUMBER | | PAGE | LINE |
|---|---|---|---|
| Exhibit Number 21 | Photograph ....202 | | 20 |
| Exhibit Number 22 | Photograph ....202 | | 22 |
| Exhibit Number 23 | Photograph ....202 | | 24 |
| Exhibit Number 24 | Photograph ....203 | | 1 |
| Exhibit Number 25 | Photograph ....203 | | 3 |

## **TUESDAY MORNING**

## **APRIL 22, 2014**

1

2

3          The trial of this case resumed on this

4   date, Tuesday, April 22, 2014, at 9:30 o'clock a.m.,

5   when and where evidence was introduced and

6   proceedings were had as follows:

7

8          ------------------------

9

10          **THE COURT:**  Okay, we will be in recess.

11          Let's get all of the parties in as far as

12   the trial is concerned so we can get back on it.

13          Let's be in recess.

14          **THE CLERK:**  Court is in recess.

15          **THE COURT:**  Do you have all of the jurors?

16          **COURT SECURITY OFFICER:**  I don't know,

17   sir.

18          **THE COURT:**  Just checking.

19          **COURT SECURITY OFFICER:**  They are all

20   here, sir.

21          (Recess.)

22          **THE COURT:**  All right, everybody ready?

23          **MR. BIGGERS:**  The government is ready,

24   Your Honor.

25          **THE COURT:**  Come back on the record.

1        All right, we will continue the trial

2  today with Mr. Drew.

3        Before we bring in the jurors and continue

4  the jury selection I just need to double-check and

5  see if there are any issues either side has before

6  we continue?

7        Government?

8        **MR. BIGGERS:**  No, Your Honor.

9        **THE COURT:**  And defense?

10       **MS. JERMANN-ROBINSON:**  Only -- I've got

11  two things.

12       One, I do have an issue of trying to

13  pickup my stepson, if we could break around 5:30

14  today --

15       **THE COURT:**  Okay.

16       **MS. JERMANN-ROBINSON:**  -- if that's okay,

17  if not I can figure out something else if it's too

18  difficult.

19       **THE COURT:**  All right.  If you can remind

20  me at around five o'clock or so, you know, then, you

21  know, I'm happy to accommodate you.

22       **MS. JERMANN-ROBINSON:**  Thank you, Your

23  Honor.

24       **THE COURT:**  All right.

25       **MS. JERMANN-ROBINSON:**  The only other

1  thing is, I think before we broke yesterday there

2  was some confusion about which jurors had or had not

3  been called.  I just want to make sure I have

4  everybody in order on -- on my list.  I think

5  Ms. Hensley was the last person called and that

6  would be in seat number 18.

7          THE COURT:  Right.  She needs to go into

8  seat number --

9          THE CLERK:  Number 13.

10          THE COURT:  She needs to go in number 13.

11          In other words, the other five need to

12  move down one chair and she needs to be in the first

13  chair on the front row.

14          The first one called was Ms. Blake to fill

15  the, I think it was Ms. Blake too fill the empty

16  chair.

17          And then the next one called was

18  Ms. Hensley, she didn't come up and she came up

19  later, she is right now in the 18th spot, she needs

20  to move over to the 13th spot and move the other

21  five down.  Okay.

22          MS. JERMANN-ROBINSON:  Thank you, Your

23  Honor.

24          THE COURT:  All right.  I'll make sure

25  that that is done prior to us getting started.

1              And the way we left it, I think it's time

2    for the government to continue questioning.  Okay.

3    Or get started with questioning this group.

4              You have identified the ones that have

5    been passed and the ones that we are moving forward

6    with.  Okay.

7              All right, bring them in if you would,

8    please.

9              Bring in the jurors, please.

10             (Jury panel present at 9:51 a.m.)

11             **THE COURT:**  Okay.  Folks, we're going to

12   have to do a little shifting before you get settled

13   and it's the folks in the front row.

14             Everybody in the front row stand up if you

15   would, please, stand up and just move down one

16   chair, move down one.  Okay.

17             There we got -- got it the way we need it

18   to be.

19             All right.  Okay.  I think we are ready to

20   get started now, ladies and gentlemen.

21             First, thank you for your patience about

22   us cutting yesterday afternoon.  Like I say, I had a

23   little talk that I gave panel discussion on ethics

24   in government.  I was the Chief Administrator

25   Officer for the county for a number of years before

1    I started, you know, my career as a judge.  And the

2    University of Memphis asked me to come out and talk

3    on that.

4           Appreciate your patience, and now that is

5    gone and behind us, and we're ready to move forward.

6           When we left off yesterday I had asked my

7    preliminary questions of everyone.  And so now it is

8    time for us to move on with the lawyers.

9           Now they are going to concentrate

10   primarily on the prospective jurors who were just

11   called, the six in the front along with Ms. Blake

12   here.

13          But the others who are there, although

14   we're concentrating on these folks, if something

15   else comes up that you forgot to tell us yesterday,

16   you know, a different angle on an answer or

17   something like that, free to involve yourselves, but

18   understand we are concentrating on these folks.

19   Okay.

20          All right.  And we are going to go ahead

21   and continue with Mr. Biggers.

22          **MR. BIGGERS:**  Yes, Your Honor.

23

24          (Voir Dire of the jury.)

25

1          **THE COURT:**  All right.  And for the ladies

2     and gentlemen in the audience section, I guess I

3     could say that you have dodged the bullet.  Okay.

4     We have the 12 jurors in place.  We do have an

5     alternate juror.  And so as far as this case is

6     concerned your jury service has been completed.

7          I truly appreciate you all coming down.  I

8     think you all saw how the process worked.  There's

9     no telling how many jurors we would use and as far

10    as I said this case is concerned you are excused and

11    free to go.

12         Double-check with the jury commissioner

13    before you leave today, and I hope you have the rest

14    of the day, it's a good day.

15         All right.  We're coming close to -- to

16    12:00 o'clock noon, so in just a few minutes we are

17    going to go ahead and break for lunch and we'll get

18    started, I'm going to say, at 1:30 this afternoon.

19    Okay.

20         I would like to explain to you all, just

21    kind of give y'all, just kind of give you an outline

22    of what's going to happen from this point forward,

23    and then there will be another oath that you to

24    take, actually there will be two oaths, one for the

25    jury and one for the alternate.  The language of the

1  oath is the same, but you all are kind of in a

2  little different position, so I separate them.  But

3  it's an oath that you will take in just a couple of

4  minutes and our clerk will administer the oath.

5          But after that and after our lunch break,

6  when you come back, remember that I told you that

7  sometimes I give you instructions orally, you know,

8  when I'm talking, but other times I'm required to

9  give to you written instructions.  In fact, I'm

10 required to actually read those instructions to you.

11 I have them here but I will wait until after lunch

12 to give them to you.  And those instructions will

13 carry you through the case, go over all those

14 rights, what reasonable doubt is.  I'll have a

15 definition of reasonable doubt, presumption of

16 innocence.

17         There will be some instructions in there

18 about credibility of witnesses, and how you consider

19 witness testimony, some suggestions as far as that

20 is concerned, you know, things like that.  Media,

21 how to handle that, some of the things that I have

22 already told you about, not investigating the case,

23 I will go over all that in the written instructions.

24         I will also give you basic definitions of

25 the offenses, explain to you just very briefly the

1   offenses that are contained in the indictment and

2   what the government has to prove in order for you to

3   return a verdict of guilty.

4           As I said, this is before I've heard any

5   proof, but they are general in nature.  I have more

6   specific instructions after I have heard the case

7   and those more specific instructions will be in the

8   written instructions at the end of the case.  Okay.

9           And so, and then after that, once I finish

10  reading the instructions to you, the next phase will

11  be the reading of the indictment.  I actually have a

12  point in the trial where the government

13  representative will actually read the charges in the

14  indictment, there are five counts in the indictment,

15  it won't take too long, it's just a few pages long.

16          Actually we will take a plea from the

17  defendant.  Okay.  One of his lawyers will enter a

18  plea to the indictment.  It will be not guilty, we

19  know that, and you may say it's even ceremonial, but

20  what it does it locks the issue or joins the issue

21  that ultimately you will have to make the decision

22  about, whether or not the defendant is guilty of one

23  or all of the charges.  Each of the counts in the

24  indictment is separate and you will have to make

25  findings as far as each count in the indictment is

1    concerned.

2            Now after we have the reading of the

3    indictment and the plea, then we will go to the

4    opening statements, both sides will have an

5    opportunity to make an opening statement to you.  I

6    call it an opening statement, really kind of a road

7    map, let you know where they're going, their theory

8    of the case.

9            Now they don't have to make opening

10   statements.  And remember, the defense, you know

11   they don't have to say anything if they don't want

12   to.  But once they give you the opening statement,

13   you know, kind of give you an outline of what they

14   intend to prove, then we will get into the proof of

15   the case.

16           Of course, the government has the burden

17   of proof.  They have to call some witnesses.  And so

18   the government will begin first calling their

19   witnesses.  And, of course, the defense will have an

20   opportunity to cross examine each of those

21   witnesses.

22           After the government calls their case,

23   then the defense will have an opportunity to put on

24   proof.  Remember, they don't have to if they don't

25   want to.  And if they decide not to put on any

1  proof, if the defendant decides not to testify, you

2  can't hold that against him, that's their right.

3  You have to base your decision on the evidence that

4  is presented in the case.

5          Now, after you've heard all the evidence,

6  then we get to what is called the closing arguments.

7  It's not an argument where they are going to argue

8  to you and you argue back.  It's not a back and

9  forth thing like that.  But both sides then will be

10  able to talk with you and make more conclusions,

11  their reasons why they think you should bring back a

12  certain verdict from their perspective.

13          Now in this part of the case, of course,

14  the government will go first, the defense will

15  argue, and then the government gets one last

16  argument, we call it the rebuttal, assuming the

17  defense makes an argument the government gets one

18  last chance to argue and that's because they have

19  that burden of proof.

20          Now after all that is done I will have the

21  final instructions that I will read to you and at

22  that point after the instructions are in, that's

23  when you will be able to talk about the case to

24  enter into your deliberations.

25          All deliberations will take place in the

1   jury room, okay, when all 12 are present.  If one

2   person is not present, then there is no

3   deliberations, no discussions.

4         When you're walking down the mall, there

5   is no discussion about the case or anything along

6   those lines.

7         But that's just a brief outline of what's

8   going to happen after lunch when we come back.

9   Okay.  So keep those things in mind so you know what

10  is coming step by step.

11        Now the oath that you have to take,

12  swearing the jury, we're at that point now.  And so

13  our 12 jurors, if you would, please, rise.

14        Raise your right hands, receive the oath.

15        **THE CLERK:**  Do you and each of you

16  solemnly swear or affirm that you well and truly try

17  the issues herein joined and true verdict render

18  according to the law and evidence, so help you God?

19        **THE JURY:**  (Responded affirmatively.)

20        **THE COURT:**  Thank you, and you may be

21  seated.

22        Now our alternate, Ms. Barnes, if you

23  will, please rise.

24        Raise your right hand and receive the

25  oath.

1          **THE CLERK:**  Do you solemnly swear or

2     affirm that you will well and truly try the issues

3     herein joined and a true verdict render according to

4     the law and evidence, so help you God?

5          **A JUROR:**  I do.

6          **THE COURT:**  All right, thank you very

7     much.

8          Why don't we go ahead, it's 12:00 o'clock

9     right now, let's go ahead and break for lunch a

10    little longer than normal seeing as how I think the

11    government will have to martial their proof, so we

12    will get started right at 1:30 sharp, give you just

13    a little extra time to find a place for lunch if you

14    need to leave the building for that.

15         Remember my instructions to you, don't

16    discuss the case amongst yourselves or allow anyone

17    to discuss it with you or in your presence.  No

18    investigations on your own.  And come back straight

19    and go into the jury room once you conclude your

20    lunch, there's nothing for you out in the hallway to

21    go around and look at and investigate or anything

22    like that.

23         The new jurors, of course, our officer

24    will show you how to get into the jury room once you

25    leave.

1          Okay.  Anything else from either side

2     before we break for lunch?

3          **MR. BIGGERS:**  Nothing from the government,

4     Your Honor.

5          **MS. JERMANN-ROBINSON:**  No, Your Honor,

6     thank you.

7          **THE COURT:**  All right, thank you very

8     much.

9          Okay, let's go ahead and we will be in

10    recess.

11         **THE CLERK:**  Court stands in recess.

12         **THE COURT:**  Folks on this side, if you

13    want you can come down around front, it may be a

14    little easier.  I just hate for someone to trip.

15              (Jury out at 12:00 o'clock p.m.)

16              (Lunch recess at 12:00 o'clock p.m.)

17

18

19

20

21

22

23

24

25

1 **TUESDAY AFTERNOON**

2 **APRIL 22, 2014**

3       The trial of this case resumed on this

4 date, Tuesday, April 22, 2014, at 1:30 o'clock p.m.,

5 when and where evidence was introduced and

6 proceedings were had as follows:

7

8                 ------------------------

9

10       **THE COURT:** All right. Anything we need

11 to take up before we bring in the jury?

12       **MR. BIGGERS:** Your Honor, just update the

13 court.

14       I told -- notified the court on yesterday

15 that we had a witness that could not be here until

16 possibly tomorrow afternoon.

17       **THE COURT:** Right.

18       **MR. BIGGERS:** That person no longer has a

19 conflict, so --

20       **THE COURT:** Oh, okay, great.

21       **MR. BIGGERS:** -- other than that, I just

22 needed to go on and report that to the court.

23       **THE COURT:** Thank you.

24       **MS. JERMANN-ROBINSON:** A couple of things.

25       One, I would remind the court that I would

1  like to leave at 5:30 today.

2  **THE COURT:** 5:30, yeah, I will tell the

3  jury that we're going to break at around 5:30 and

4  give you time to do what you need to do.

5  **MS. JERMANN-ROBINSON:** Okay. And the only

6  other thing is that, Your Honor, when I'm walking

7  around and the jury is around, I'd always avert my

8  eyes by looking down. Several look as if they are

9  trying to approach you, and I just don't want to

10 think I'm rude or I don't want to talk to them, I

11 don't like the, plus I'm going to want to tell them

12 I'm great, but, you know, if the court can give

13 them -- I know you instruct them, but maybe

14 emphasize --

15 **THE COURT:** I will tell them again.

16 **MS. JERMANN-ROBINSON:** -- tell them again.

17 Thank you.

18 **THE COURT:** Okay. Let's bring in -- both

19 sides are ready with openings, right?

20 **MS. JERMANN-ROBINSON:** Yes.

21 **MR. BIGGERS:** Yes, Your Honor.

22 **THE COURT:** Okay. I will give them my

23 instructions, read the indictment, plea and then we

24 will go straight into openings and proof.

25 Okay, bring them in.

1          (Jury present at 1:44 p.m.)

2          **THE COURT:**  Okay.  Ladies and gentlemen,

3    we're ready to go ahead and proceed with the trial.

4          I think I went over and gave you an

5    outline of how we are going to proceed.  So the next

6    step in our process are preliminary instructions.

7    This is one of the times when I have to actually

8    read them to you, so listen attentively.

9          And I will tell you, at the end of the

10   case I will also read the final instructions and you

11   will have a copy of those instructions with you in

12   the back in order to refer to it, so it's not like

13   you have to remember everything, but these

14   instructions will carry you through the proof and

15   the arguments so you will know, you know, what to

16   consider at certain times throughout the trial.

17         So let me go ahead and do this and then we

18   will go ahead with the plea and opening statements

19   and get right into the proof.  Okay.  Go bear along

20   with me.

21         This is the United States versus Robert

22   Drew Preliminary Instructions.

23         My responsibilities as the judge in this

24   trial are to make sure that the trial is run fairly

25   and efficiently to make decisions about the evidence

1  and to instruct you about the law that applies in

2  this case.

3          You must take the law as I give it to you,

4  even if you personally disagree with it.  Nothing I

5  say is meant to reflect my own opinion about the

6  facts of the case.  You, as the jurors, are the ones

7  who will decide this case.  Your responsibility, as

8  jurors, is to decide what the facts of this case

9  are.  This is your job and no one else's.

10          You must think about all of the evidence

11  and all the testimony and then decide what each

12  piece of evidence means and how important you think

13  it is.

14          This includes -- this includes how much

15  you believe what each of the witnesses said.  What

16  you decide about any fact in the case is final.

17          When it comes time for you to decide the

18  case, you're only allowed to consider the evidence

19  that was admitted in the case.

20          Evidence includes only the sworn testimony

21  of the witnesses, exhibits admitted into evidence,

22  and anything else I tell you to consider as

23  evidence.

24          The questions the lawyers ask the

25  witnesses are not evidence, only the answers are the

evidence.  You should not think that something is true just because one of the lawyers ask questions that assume or suggest that it is.

I may ask some of the witnesses questions myself.  But these questions are not meant to reflect my opinion about the evidence.  If I ask questions, my only reason would be to ask about things that may not have been fully explored.

During the trial the lawyers may object to certain questions or statements made by the other lawyers or by the witnesses.  I will rule on these objections according to the law.  And my rulings for or against one side or the other are not meant to reflect any opinion about the facts of the case.

Possible penalty should not influence your decision.  It is the duty of the judge to fix the penalty within the limits prescribed by our law.

You must not discuss the case with anyone including your family and friends.  You must not even discuss it with the other jurors until the time comes for you to decide the case.

When it is time for you to decide the case, I will send you to the jury room, then you should discuss the case among yourselves but only in the jury room and only when all 12 jurors are there.

1          When the trial is over, you may, if you

2   wish, discuss the case with whomever you choose.

3          If I call for a recess during the trial, I

4   will either send you back to the jury room or allow

5   you to leave the courtroom and go about your

6   business, but you must not discuss the case with

7   anyone or let anyone discuss it with you or in your

8   presence.  This includes electronic communications

9   between you and anyone else about the case.  If

10  someone tries to do that, tell him or her to stop

11  and explain that as a juror you are not allowed to

12  discuss the case.  If he or she persist, leave from

13  that discussion and report the incident to one of

14  the court security persons or to me and it will be

15  dealt with.  But you must not talk to the defendant,

16  the lawyers, or witnesses about anything at all even

17  if it has nothing to do about -- about the case.

18          Remember what I told you early on, if you

19  see these lawyers out in the hallway or even out on

20  the mall, they are not going to talk with you.  And

21  it's not because they're rude, they're officers of

22  the court and they know they are not to have any

23  contact with jurors while the case is going on.  So

24  don't approach them, don't try to talk with them

25  about anything.  Okay.  Keep that in mind as the

1    trial progresses.

2            It is very important that you only get

3    information about the case here in court when you

4    are acting as the jury, and when the defendant and

5    the lawyers and I are all here.

6            During the course of the trial you receive

7    all of the evidence that you may properly consider

8    to decide the case.  Because of this you shall not

9    attempt to do any research on your own or gather any

10   information on your own that you think might be

11   helpful.

12           Do not engage in any outside reading, or

13   Internet investigation, or visit any places

14   mentioned in the case, or try to learn about the

15   case outside the courtroom in any manner.

16           I do not know whether this case will have

17   any media reports, newspapers, TV or radio or on the

18   Internet, I doubt it will, but out of an abundance

19   of caution, as I told you before, I'm directing that

20   while you are serving on this case that you not

21   watch or listen to any local news pertaining to

22   crime.  You, as jurors, must base your decision

23   solely on the evidence and law that you hear here in

24   the courtroom.

25           After all of the evidence has been

presented and after the lawyers have given their
arguments I will give you detailed instructions
about the rules of law that apply in this case.  And
you should consider all of my instructions as a
connected series, taken altogether they are the law
that you must follow in this case.  And after
receiving the instructions of law, you will go to
the jury to decide your verdict, your verdict must
be unanimous.  That means that every juror must
agree on it, and it must reflect the individual
decision of each juror.  It is important that you
keep an open mind and not make any decision about
anything in the case until you go to the jury to
decide the case.

It is, therefore, incumbent upon the
government, before you can convict the defendant, to
establish to your satisfaction beyond a reasonable
doubt that the crimes charged in the indictment have

The law presumes that the defendant is
innocent of the charges against him.  Therefore,
you, as the jury, must enter upon this investigation
with the presumption that the defendant is not
guilty of any crime.  And this presumption stands
with the defendant unless it is rebutted and
overturned by competent and credible proof.

presented and after the lawyers have given their
arguments I will give you detailed instructions
about the rules of law that apply in this case.  And
you should consider all of my instructions as a
connected series, taken altogether they are the law
that you must follow in this case.  And after
receiving the instructions of law, you will go to
the jury to decide your verdict, your verdict must
be unanimous.  That means that every juror must
agree on it, and it must reflect the individual
decision of each juror.  It is important that you
keep an open mind and not make any decision about
anything in the case until you go to the jury to
decide the case.

The law presumes that the defendant is
innocent of the charges against him.  Therefore,
you, as the jury, must enter upon this investigation
with the presumption that the defendant is not
guilty of any crime.  And this presumption stands
with the defendant unless it is rebutted and
overturned by competent and credible proof.

It is, therefore, incumbent upon the
government, before you can convict the defendant, to
establish to your satisfaction beyond a reasonable
doubt that the crimes charged in the indictment have

1  been committed, that the defendant -- that the same

2  were committed within the Western District of

3  Tennessee before the indictment was returned and

4  that the defendant on trial committed the crimes in

5  such manner that would make him guilty under the law

6  as it has been defined and explained to you.

7        The government has the burden of proving

8  the guilt of the defendant beyond a reasonable

9  doubt.  And this burden never shifts but remains on

10  the government throughout the trial of this case.

11        The defendant is not required to prove his

12  innocence.  And the government must prove -- must

13  have proven beyond reasonable doubt all of the

14  elements of the crimes charged and that they were

15  committed before the finding and returning of the

16  indictment.

17        While the government's burden of proof is

18  a strict and heavy burden, it is not necessary that

19  the defendant's guilt be proved beyond all doubt.

20  It is only required that the government's proof

21  exclude any reasonable doubt.  A reasonable doubt is

22  a real doubt based upon reason and common sense

23  after careful and impartial consideration of all the

24  evidence in the case.  Therefore, proof beyond a

25  reasonable doubt is proof of such a convincing

1 character that you would be willing to rely and act

2 upon it without hesitation in the most important

3 affairs -- important of your own affairs.

4          It is your job to decide what the facts of

5 the case are.  You must decide which witnesses you

6 believe and how important you think their testimony

7 is.  You do not have to accept or reject everything

8 a witness said.  You are free to believe all, none,

9 or any part of any person's testimony.  In deciding

10 which testimony you believe, you should rely on your

11 own common sense and everyday experience.  There are

12 no fixed set of rules for judging whether you

13 believe a witness.  But it may help you to think

14 about these questions:

15          Was the witness able to hear or see

16 clearly?

17          How long was the witness watching or

18 listening?

19          Was there anything else going on that may

20 have distracted the witness?

21          Did the witness seem to have a good

22 memory?

23          How did the witness look and act while

24 testifying?

25          Did the witness seem to be making an

1  honest effort to tell the truth or did the witness

2  seem to evade the questions?

3        Has there been any evidence presented

4  regarding a witness' intelligence or respectability

5  or reputation for truthfulness?

6        Does the witness have any bias, prejudice

7  or personal interest in how the case is decided?

8        Had there been any promises, threats or

9  suggestions or any type of influences that may have

10  affected how the witness testified?

11        In general, does the witness have any

12  special reason to tell the truth or any special

13  reason to swear to a falsehood?

14        All in all, how reasonable does the

15  witness testimony seem when you think about all the

16  other evidence in the case?

17        Sometimes the testimony of witnesses just

18  will not agree and you must decide which testimony

19  you accept.

20        You should think about whether the

21  disagreement involves something important or not and

22  whether you think someone is lying or is simply

23  mistaken about what they testified to.

24        People see and hear things differently.

25  And witnesses may testify honestly but simply be

wrong about what they thought they saw or
remembered.

And it's also a good idea to think about
which testimony agrees best with all the other
evidence in the case. However, you may conclude
that a witness deliberately lied about something
that is important to how you decide the case. If
so, you may choose not to accept anything that
witness said. On the other hand, if you think a
witness lied about some things but told the truth
about others, you may simply accept the part that
you think is true and ignore the rest.

Some of you may have heard the term
"circumstantial evidence" and "direct evidence,"
these are two basic types of evidence that exist in
our law. Direct evidence is direct proof of a fact,
such as the testimony of an eyewitness.
Circumstantial proof is proof of facts from which
you may infer or conclude that other facts exist. I
will give you further instructions on these as well
as other matters at the end of the case, but the
court instructs you at this time that you may
consider both kinds of evidence, circumstantial and
direct, which are considered to be of equal value
under our law.

1          I'm going to give you the basic definition
2     of the offenses involved in the case.
3          The defendant is charged in counts one and
4     four that he unlawfully attempted to obstruct,
5     delay, and affect commerce by robbery.  Okay.  So
6     it's an attempt crime.
7          For you to find the defendant guilty of
8     these offenses, the government must prove beyond
9     reasonable doubt the following essentially elements:
10         One.  That the defendant knowingly
11    attempted to take the personal property of another
12    or from the presence of another; and
13         Two.  That the defendant attempted to take
14    the property against the -- against the victim's
15    will by actual or threatened force, violence or fear
16    of injury whether immediately or in the future; and
17         Three.  That as a result of the
18    defendant's actions interstate commerce or an item
19    moving in interstate commerce was delayed,
20    obstructed, or affected in someway or degree.
21         Now in order for you to deal with an
22    attempt crime, I will need to give you the elements
23    of a robbery affecting commerce.  Remember, this is
24    an attempt crime.
25         Okay.  So the government must prove that

the defendant intended to commit the crime of
unlawfully obstructing, delaying and affecting
commerce by robbery.  The government must prove that
the defendant did some act that was a substantial
step towards committing the crime of robbery.
Merely preparing to commit the crime is not a
substantial step.  The defendant's conduct must go
beyond mere preparation and must strongly confirm
that he intended to, in Count One, robbery Hickory
Center Market, and in Count Four rob the Kentucky
Fried Chicken.

But the government does not have to prove
that the defendant everything except the last act
necessary to complete the crime.  A substantial step
beyond mere preparation is enough.

The defendant is charged in counts two and
five that he did, during and in relation to a crime
of violence, knowingly use and carry a firearm.

For you to find the defendant guilty of
these crimes, you must find that the government
proved the following elements beyond reasonable
doubt:

One.  That the defendant committed the
crimes charged in counts one and four.  Those are
the attempt robbery counts.  And attempt robbery is

1  a crime of violence, which may be prosecuted in a

2  court of the United States; and

3        Two.  The defendant knowingly used,

4  carried, or brandished a firearm; and

5        Three.  That the use, carrying or

6  brandishing of the firearm was during and in

7  relation to the charges -- to the crimes charged in

8  counts one and four of the indictment.  Okay.

9        And the defendant is also charged in Count

10 Three of having previously been convicted of a crime

11 punishable by imprisonment for a term exceeding one

12 year after which he knowingly possessed in and

13 affecting commerce a firearm.  Okay.  That he

14 possessed a firearm.

15       To find the defendant guilty of this

16 offense the government must prove the following

17 elements beyond reasonable doubt:

18       One.  That the defendant was convicted of

19 any -- in any court of a crime punishable by

20 imprisonment for a term exceeding one year as

21 charged; and

22       Two.  That the defendant knowingly

23 possessed the firearm; and

24       Third or three.  That the possession was

25 in or affecting interstate commerce.

1        Now the court will not provide you with a

2   transcript of testimony at the end of the trial.

3   Therefore, you must listen carefully to the

4   testimony.

5        Each of you will be allowed to take notes

6   during the trial for your own use during

7   deliberations, but you are not required to take

8   notes.  Independent memory can be as precise as

9   written notes.  You will be provided with notebooks

10  and pens -- I think you all have them, okay --

11  should you decide to take notes.

12       Remember, you can have no sympathy or

13  prejudice or allow anything but the law and evidence

14  to have any influence upon your verdict.  And you

15  must render your verdict with absolute fairness and

16  impartiality.

17       This completes my opening instructions and

18  now we will proceed with the reading of the

19  indictment and the plea in the case.  Okay.

20       And the government, Mr. Biggers, you may

21  proceed.

22            **MR. BIGGERS:**  Yes, Your Honor.

23       The indictment charges in Count One that:

24       On or about December 7th, 2012, in the,

25  Western District of Tennessee, the defendant, Robert

1  Drew, did unlawfully attempt to obstruct, delay, and
2  affect commerce by robbery, in that Robert Drew did
3  attempt to rob the Hickory Center Market at 3305
4  Highway 64 Eads, Tennessee, a business then engaged
5  in interstate commerce, in violation of Title 18,
6  United States Code, Section 1951.
7           Count Two charges, that on or about
8  December 7th, 2012, in the Western District of
9  Tennessee the defendant, Robert Drew, did knowingly
10  use, carry, and brandish a firearm during and in
11  relation to a crime of violence, specifically the
12  attempted robbery of the Hickory Center Market, in
13  violation of Title 18, United States Code, Section
14  1951, as charged in Count One, all in violation of
15  Title 18, United States Code, Section 924(c).
16           Count Three charges, that on or about that
17  same date, December 7th, 2012, in the Western
18  District of Tennessee, the defendant, Robert Drew,
19  having previously been convicted of a crime,
20  punishable by imprisonment for a term exceeding one
21  year, did knowingly possess in and affecting
22  interstate commerce a firearm, that is, a Rossi,
23  R-o-s-s-i, .38 caliber revolver, in violation of
24  Title 18, United States Code, Section 922(g)(1).
25           Count Four charges, that on or about

December 7th, 2012, in the Western District of
Tennessee, the defendant, Robert Drew, did
unlawfully attempt to obstruct, delay, and affect
commerce by robbery, in that Robert Drew did attempt
to rob the Kentucky Fried Chicken restaurant,
commonly referred to as KFC, at 8995 Highway 64,
Memphis, Tennessee, a business then engaged in
interstate commerce, in violation of Title 18,
United States Code, Section 1951.

Count Five charges, that on or about
December 7th, 2012, in the Western District of
Tennessee, the defendant, Robert Drew, did knowingly
use, carry, and brandish a firearm during and in
relation to a crime of violence, specifically the
attempted robbery of a Kentucky Fried Chicken in
violation of Title 18, United States Code, Section
1951, charged in Count Four, all in violation of
Title 18, United States Code, Section 924(c).

**THE COURT:** Thank you, Mr. Biggers.

Ms. Robinson and Mr. Germany, how does
Mr. Drew plead to the indictment?

**MS. JERMANN-ROBINSON:** On behalf of Robert
Drew, he pleads not guilty of the counts one, two,
three, four and five.

**THE COURT:** All right. Thank you,

1  Ms. Robinson.

2          Both sides ready with openings?

3          **MR. BIGGERS:**  The government is ready to

4  proceed, Your Honor.

5          **MS. JERMANN-ROBINSON:**  Yes, Your Honor.

6          **THE COURT:**  All right, thank you.

7          And Mr. Biggers, I'm assuming, it will be?

8          **MR. BIGGERS:**  Yes, Your Honor.

9          **THE COURT:**  Go ahead with your opening

10  statement.

11          **MR. BIGGERS:**  Mr. Herrin, may I, please,

12  have the monitor up on the screen.

13          Good afternoon.

14          The evidence will show that on the evening

15  hours of December 7th, 2012, a bandit, dressed in

16  blue, a blue flannel jacket, a blue skull cap with

17  holes cut out for the eyes, went on a robbery spree.

18          The evidence will show that at

19  approximately 9:30 p.m. on that night that bandit,

20  dressed in blue, attempted to rob the Kentucky Fried

21  Chicken at 8995 Highway 64 in Memphis, Tennessee.

22          The evidence will show that that blue

23  bandit went into the KFC restaurant wielding a black

24  revolver and pointed it in the face of the cashier,

25  Jesse Baker and demanded that he open the register

1   and give him the money.

2          This bandit, despite his efforts, did not

3   obtain any money from that KFC.  He fled the scene

4   on foot.

5          Within an hour the bandit, dressed in

6   blue, entered the Hickory Center Market at 3305

7   Highway 64 in Eads, Tennessee and approached the

8   cashier, Jerry Harris.

9          As in the earlier incident, that bandit

10  attempted to prey on Jerry Harris, pointed that same

11  black revolver in Mr. Harris' face, demanded money

12  and threatened to shoot him.

13         Fortunately, Mr. Harris fled the front

14  area of the store, locked himself in the back

15  office.  The police were notified.

16         Evidence will show that within minutes

17  Oakland police responded to the store, obtained the

18  suspect description, and located that blue bandit

19  within approximately two thousand feet of the

20  Hickory Center Market hidden on the side of the road

21  in the woods laying prone on the ground facedown.

22         Oakland police obtained that blue bandit

23  from the woods.  In the leaves found a black

24  revolver, Rossi .38 caliber revolver.  And the blue

25  bandit was dressed in the same clothing.

1           And you will hear from the proof in this

2     case that that robber, that predator, that blue

3     bandit was none other than the defendant Robert

4     Drew.

5           I told you I was David Biggers.  And I

6     have the privilege to present the government's case

7     beyond a reasonable doubt to you with cocounsel

8     Samuel Stringfellow.

9           We've gone over the indictment in this

10    case, and now I'm going to go through the actual

11    elements to what the government bears the burden of

12    proving, and also how we intend to prove that beyond

13    a reasonable doubt.

14          Count One charges the defendant with

15    attempted Hobbs Act robbery.  In order to satisfy

16    that count the government must prove three things

17    beyond a reasonable doubt:

18          First.  That the defendant actually

19    intended to obtain property from the presence of the

20    Hickory Center Market without consent of the

21    property owner or the individual there;

22          Second.  We must show that the defendant

23    used or threatened violence in this attempt to take

24    the property from the premises of the store; and

25               Last, we must show that the Hickory Center

1  Market at the time of this incident, December 7th,
2  2012, was, in fact, a business engaged in interstate
3  commerce.
4          Those are the three elements that we have
5  to prove.
6          The court has already told you this is an
7  attempt case.  You noticed we showed that the
8  defendant attempted to obtain property.
9          Count Two, the government must prove that
10  the defendant used and carried the firearm during
11  and in relation to the crime of violence, the
12  attempted robbery of the Hickory Center Market.
13          In order to satisfy that the government
14  must merely show that the defendant actually
15  committed the violent felony, which is the attempted
16  robbery of the Hickory Center Market, that the
17  defendant possessed a firearm during this attempted
18  robbery, and that the firearm itself, the possession
19  of the firearm was used, carried, and brandished
20  during and in relation to that crime of violence.
21          And all that means is the firearm was used
22  to commit the crime of violence.  It was not
23  mistakenly possessed during the crime of violence.
24  It was actually used and employed, pointed in order
25  to -- in order to attempt to obtain the money from

1  the store.

2         Those are the three elements that the

3  government must prove as far as Count Two.

4         Count Three, the fact that the defendant

5  was, in fact, a felon in possession of a firearm on

6  the evening of December 7th, 2012, requires three

7  elements:

8         First.  That the defendant, in fact,

9  possessed the Rossi .38 caliber revolver as charged.

10        And the court has given you preliminary

11  instructions as to different types of possession,

12  actual possession, which is it's in someone's hand,

13  the firearm is in someone's hand, directly on their

14  person.

15        And then you also have constructive

16  possession.  The firearm is within that person's

17  reach and that person has an intent and authority to

18  exert control over that item.

19        We anticipate that the evidence in th8is

20  case will show that the defendant not only had

21  actual possession in that he possessed the gun when

22  he pointed the firearm at both victims during the

23  two separate robberies, but also that he had

24  constructive possession and that the firearm was

25  found in the leaves, under the leaves in the woods

1  where the defendant was apprehended.

2       The last element that the firearm

3  transported in interstate commerce, the government

4  merely must show that the gun at some point prior to

5  December 7th, 2012, was in a state other than

6  Tennessee.  That's all the government must show to

7  satisfy that last element.

8       How do we plan on intending on prove Count

9  One through Three.

10      Hickory Center Market robbery, you will

11  have an opportunity to hear from Jerry Harris.

12  Jerry Harris, the store clerk, who actually had the

13  firearm pointed in his face, will come to this

14  witness stand and account -- recount the events that

15  led to the gun being pointed in his face -- pointed

16  in his face.  He will tell you his emotions, and he

17  will give you the description that he provided to

18  law enforcement on that evening.

19      You will also hear from James Bolden, a

20  regular customer of the Hickory Center Market, who

21  frequently came into the store at night just to

22  watch TV, who was present at the time of the robbery

23  and provided information to law enforcement to help

24  them locate the robbery suspect.

25      You all will also hear from the Oakland

1  police officers involved in this case. You will

2  hear the initial call that came out, what

3  information they obtained to look for the robbery

4  suspect.

5      You will also hear how the defendant was

6  located in the woods hiding with the firearm buried

7  beneath him in the leaves, wearing the blue flannel

8  jacket and in possession of that blue ski mask with

9  the holes cut out for eyes.

10     Lastly, you will hear from Agent Brian

11 Weaks of the ATF, he will testify to the interstate

12 nexus of the Rossi .38 caliber revolver. He will be

13 able to tell you that the firearm was manufactured

14 outside of the State of Tennessee which will satisfy

15 the third element that I told you about to prove

16 felon in possession of a firearm.

17     How do we plan on proving the KFC

18 attempted robbery, the 8995 Highway 64 in Memphis.

19     You will have an opportunity to hear how

20 did the defendant attempt to obtain the money from

21 that store from the actual clerk.

22     You will also hear the use of force

23 threatened by the defendant with the firearm in that

24 clerk's face.

25     And last, you will hear that the Kentucky

1   Fried Chicken was a business engaged in interstate

2   commerce at the time of this rob -- attempted

3   robbery on December 7th, 2012.

4          Count Five, same elements as required as

5   Count Two except for a different store.

6          The defendant committed violent felony,

7   the attempted robbery of the KFC.  The defendant

8   possessed a firearm and that firearm was used,

9   carried and brandished during and in relation to

10   that crime of violence, the attempted robbery of the

11   KFC.

12          You will hear from Mr. Baker, the KFC

13   cashier.  He was face to face with the robber.  You

14   will hear the description that he gave.  And more

15   importantly you will also hear from the officer who

16   responded to the scene and obtained video of the

17   robbery and how this video was used to connect this

18   attempted robbery to the defendant Robert Drew.

19          The culmination of the government's proof

20   I'll come before you again, at that time, after you

21   all have seen all the evidence, heard all the

22   testimony in this case, I will ask you to return the

23   only verdict that the proof in this case supports,

24   guilty as to all five counts of the indictment.

25          Thank you.

1        **THE COURT:**  Thank you, Mr. Biggers.

2        And now, Ms. Robinson.

3        **MS. JERMANN-ROBINSON:**  Thank you, Your

4    Honor.

5        Can we turn the screen off.

6        Thank you.

7        Impossible.  It is going to be impossible

8    for the government to produce that Mr. Robert Drew

9    committed these two robberies.

10       And we talked -- talked about a blue

11   bandit and wearing -- wearing a jacket, I guess

12   maybe he should have been wearing a caped and an S

13   on the front of his shirt, because in order for him

14   to have committed those two robberies, he would have

15   had to travel 11-miles on foot in 40 minutes, that's

16   what the proof is going to show, 11-miles on foot in

17   40 minutes.

18       Or maybe -- maybe the proof will show that

19   he was transported, you know, maybe Mr. Spock or

20   Captain Kirk transported him that amount of time

21   that amount of distance.  Time and distance don't

22   lie, it's impossible.  It can't be done.

23       No worm hole between Lakeland, Tennessee

24   and Oakland, Tennessee.  And you are not going to

25   hear anything about a vehicle.  You are going to

1　hear from these witnesses, you are going to hear

2　from two victims, and there are two victims, you

3　will hear from them and you will hear that neither

4　one of them identified Mr. Drew as being the person

5　that did that to them.  And you will hear from both

6　of them about where their stores were.

7　　　　　And what you are not going to hear is any

8　solid scientific proof to link Mr. Drew to that mask

9　or gloves, there's going to be all kind of things

10　that they are going to say that he is connected to,

11　but not one scintilla of evidence, no fingerprints

12　on that gun, no crime scene at the Kentucky Fried

13　Chicken, no crime scene even attempted to be taken

14　from the Hickory Center Market.  All you are going

15　to have is words and impossibility.

16　　　　　And at the end of the day you will find

17　Mr. Drew is an innocent man, the government cannot

18　carry their burden because it's an impossible

19　burden.

20　　　　　Sit back and relax, take notes, listen to

21　time and distance, the things that can't lie, and

22　then you will come back not guilty on counts one,

23　two, three, four and five.

24　　　　　Thank you.

25　　　　　**THE COURT:**  Thank you, Ms. Robinson.

1          Mr. Biggers, Mr. Stringfellow, if you

2     would, please, call your first witness.

3          **MR. BIGGERS:**   The government calls Jerry

4     Harris to the witness stand, Your Honor.

5          **THE COURT:**   All right.

6          Come forward, sir, if you would, please.

7          Forward -- there your good -- you are good

8     right there.

9          Raise your right hand.

10         Do you solemnly swear or affirm, under the

11     penalties of perjury, the testimony that you are

12     about to provide the court and jury in the case now

13     on trial to be the truth, the whole truth and

14     nothing but the truth, so help you God?

15         **THE WITNESS:**   Yes.

16         **THE COURT:**   Just have a seat right here if

17     you would.

18         **MR. BIGGERS:**   May I proceed, Your Honor?

19         **THE COURT:**   Please.

20

21

22

23

24

25

1     **JERRY HARRIS,**

2    was thereupon called as a witness on behalf of the

3    Plaintiff, and having been first duly sworn,

4    was examined and testified as follows:

5              **DIRECT EXAMINATION**

6    **BY MR. BIGGERS:**

7    **Q.**     Good afternoon.

8    **A.**     Good afternoon.

9    **Q.**     Please state and spell your name for the

10   record.

11   **A.**     Jerry, J-e-r-r-y, Harris, H-a-r-r-i-s.

12   **Q.**     Mr. Harris, how old are you?

13   **A.**     Twenty-five.

14   **Q.**     Where do you currently live?

15   **A.**     In Nashville, Tennessee.

16   **Q.**     Were you -- previously did you live in the

17   Oakland area?

18   **A.**     Somerville.

19   **Q.**     Are you currently employed?

20   **A.**     No, sir.

21   **Q.**     How long have you been unemployed?

22   **A.**     For about a month now.

23              **THE COURT:**  You need to check.

24              Can all of the jurors hear what he is

25   saying?

1           Can you hear him all the way down the end?

2           Yes?

3           Okay.  All right, Mr. Harris.

4    **Q.**    I'm sorry?

5    **A.**    For about -- for about a month now.

6    **Q.**    Prior to that period were you current -- were

7    you employed somewhere?

8    **A.**    Yes, sir.

9    **Q.**    Where?

10   **A.**    At the Hickory Center Market in Eads,

11   Tennessee.

12   **Q.**    How long were you employed there?

13   **A.**    For about two and a half years.

14   **Q.**    Describe for the -- well, describe for the

15   ladies and gentlemen of the jury what you did at the

16   Hickory Center Market?

17   **A.**    I was a cashier.

18   **Q.**    What were your duties as a cashier?

19   **A.**    Running the register and making sure all the

20   things were stocked as far as cigarettes and the

21   lottery.

22   **Q.**    How many other employees worked at that

23   store?

24   **A.**    I'll say about eight, maybe eight or nine.

25   **Q.**    How many employees worked in a particular

1    shift?

2    **A.**    One as far as the cashier, one, just one.

3    **Q.**    And when you worked at the Hickory Center

4    Market, did you primarily work a particular shift or

5    did you work both day and night shift?

6    **A.**    Just night, the second shift.

7    **Q.**    Second shift?

8    **A.**    Yes, sir.

9    **Q.**    What timeframe did the second shift run?

10    **A.**    Two to ten, and on Fridays and Saturdays two

11    to 11.

12    **Q.**    During -- well, describe what type of

13    services the Hickory Center Market provides, what

14    type of store is it?

15    **A.**    It's a gas station but it also cooks food, it

16    cooks for, like, truck drivers who come through, you

17    can get a fresh meal.

18    **Q.**    Describe the interior of the store?

19    **A.**    It's relatively small, but when you come in,

20    it's the cash register and lottery, then in front of

21    you would be the deli and where you can get hot

22    foot, and to the side it's a restaurant.  And then

23    if you go back further you can get drinks and stuff

24    like that.

25    **Q.**    Describe for the ladies and gentlemen of the

1  jury, the exterior of the store?

2      What does the area outside of the store look

3  like?

4  **A.**    On one side it's gravel and on the other side

5  just gas pumps where when you first pull into the

6  parking lot.

7  **Q.**    Are there any buildings around the store?

8  **A.**    To the right side of the store there is a

9  shopping center.

10  **Q.**    What about to the left side of the store?

11  **A.**    On down there's a few houses, but other than

12  that, not too close.

13          **MR. BIGGERS:**  Permission to approach the

14  witness, Your Honor?

15          **THE COURT:**  Go ahead.

16  **BY MR. BIGGERS:**

17  **Q.**    I'm showing you six individual photographs?

18  **A.**    Uh-huh.

19  **Q.**    Take a look at those, please, Mr. Harris, and

20  tell me if you recognize them?

21  **A.**    Yes, sir.

22  **Q.**    What do you recognize those six photographs

23  to be?

24  **A.**    It's the outside of the store, the parking

25  lot and the -- just the outside exterior of the

1  store.

2  **Q.**    Outside of the Hickory Center Market?

3  **A.**    Yes, sir.

4  **Q.**    Do those -- all six of those pictures

5  substantially reflect how the store looked at the

6  time that you worked there?

7  **A.**    Yes, sir.

8  **Q.**    Specifically, were you working in December of

9  2012?

10  **A.**    Yes, sir.

11  **Q.**    Do all of those photographs accurately --

12  accurately depict how the store looked at that time?

13  **A.**    Yes, sir.

14          **MR. BIGGERS:**  At this time the government

15  moves to admit photographs as exhibits one through

16  six.

17          **THE COURT:**  Okay.  Any objection?

18          **MS. JERMANN-ROBINSON:**  No objection, Your

19  Honor.

20          **THE COURT:**  Okay.  I'm going to assume

21  that you have seen all of the physical exhibits.

22          If there is any problem, any objection,

23  please just let me know.

24          **MS. JERMANN-ROBINSON:**  I believe I have.

25  I guess I could look at them real quickly, but --

1          **THE COURT:**  Okay.  You want them separate

2     one through six?

3          **MR. BIGGERS:**  Yes, Your Honor.

4          **THE COURT:**  All right, that's fine.

5          We will go ahead and introduce the

6     photographs, they will be numbered one through six.

7          **MR. BIGGERS:**  Thank you, Your Honor.

8          Permission to publish.

9          **THE COURT:**  Mr. Herrin, mark them first

10    and then we will go ahead and proceed with

11    publishing.

12          (Exhibit Number 1 was marked; Description:

13    Photograph.)

14          (Exhibit Number 2 was marked; Description:

15    Photograph.)

16          (Exhibit Number 3 was marked; Description:

17    Photograph.)

18          (Exhibit Number 4 was marked; Description:

19    Photograph.)

20          (Exhibit Number 5 was marked; Description:

21    Photograph.)

22          (Exhibit Number 6 was marked; Description:

23    Photograph.)

24    **BY MR. BIGGERS:**

25    **Q.**    While we're getting those photographs marked.

1          Mr. Harris, were you working specifically on

2   December 7th, 2012.

3   **A.**      Yes, sir.

4   **Q.**      What shift did you work on that date?

5   **A.**      Second shift.

6   **Q.**      What timeframe would that have run again?

7   **A.**      Two to ten.

8   **Q.**      Was anyone working at the store that night

9   with you?

10  **A.**      No, sir.

11  **Q.**      So you were there alone?

12  **A.**      Yes, sir.

13  **Q.**      Showing you first Exhibit 1.

14          Describe for the ladies and gentlemen of the

15  jury what is shown in that photograph?

16  **A.**      This is the front of the store.

17  **Q.**      And is that the Hickory Center Market at

18  3305?

19  **A.**      Yes, sir.

20  **Q.**      Exhibit 2.

21          What's shown there, Mr. Harris?

22  **A.**      It's the front at a different angle, but you

23  are able to see the -- where the gas pumps are

24  outside.

25  **Q.**      Do you see Highway 64 on that photograph?

1    **A.**      Yes, sir.

2    **Q.**      All right.  Please circle where Highway 64 is

3    on that photograph.

4    **A.**      (Indicating)

5    **Q.**      Mr. Harris, is -- is the intersection of

6    Highway 64 and Highway 196 close to Hickory Center

7    Market?

8    **A.**      Yes, sir.

9    **Q.**      Is it shown in this photograph?

10   **A.**      No, sir.

11   **Q.**      And where would it be in relation to this

12   picture?

13   **A.**      If you come down, it would be on the other

14   side if you were to switch the camera around.

15   **Q.**      So the opposite camera view?

16   **A.**      Yes, sir.

17   **Q.**      I'm showing you Exhibit 4.

18          What's shown there, Mr. Harris?

19   **A.**      This is the front of the store again, but now

20   you can see where 64 and -- where you can see the

21   intersection right there.

22   **Q.**      I believe you circle where that intersection

23   is.

24   **A.**      (Indicating)

25   **Q.**      Showing you Exhibit 3.

1          What's shown there?

2     **A.**     You see where truck drivers are allowed to

3     park and also the Renaissance, like, shopping center

4     beside the store.

5     **Q.**     Please circle the shopping center beside the

6     store.

7     **A.**     (Indicating)

8     **Q.**     Last I will show you Exhibit 6.

9          What's shown there?

10    **A.**     You can see Highway 64.

11    **Q.**     Any other highway?

12    **A.**     196, the intersection right there.

13    **Q.**     Please circle that intersection.

14    **A.**     (Indicating)

15    **Q.**     Thank you.

16         Direct your attention to the night of

17    December 7th, 2012.

18    **A.**     Uh-huh.

19    **Q.**     What, if anything, out of the ordinary

20    occurred that night?

21    **A.**     Someone attempted to rob the store.

22    **Q.**     Someone attempted to rob the Hickory Center

23    Market?

24    **A.**     Yes, sir.

25    **Q.**     Describe for the ladies and gentlemen of the

1  jury how that attempted robbery took place?

2  **A.**    Like an hour before the store closed, we

3  shutdown the lottery.  And so right in front of me

4  would be the cash register and then to the right

5  would be where we shut lottery down.  So I was

6  shutting lottery down and I heard the door bell go

7  off.  So without even looking up instantly, I just

8  turned, you know, to go to the cash register.  When

9  I looked up someone was standing at the counter

10 wearing a mask with a gun asking for the money.

11 After being there for a few seconds, it felt longer,

12 but it -- I ended up going around the corner, going

13 through the kitchen and going into the office where

14 I called the policemen.

15 **Q.**    Mr. Harris, at the time the person came into

16 the store --

17 **A.**    Uh-huh.

18 **Q.**    -- could you get -- did you get a good look

19 at their clothing?

20 **A.**    Yes, sir.

21 **Q.**    Describe specifically what, if anything, you

22 saw on the person's face?

23 **A.**    A blue mask with the eyes exposed.

24 **Q.**    What -- so could you see the face at all, the

25 person's face at all?

1  **A.**     No, sir.

2  **Q.**     What else was the robbery suspect wearing?

3  **A.**     He had on like a plaid jacket that was -- it

4  wasn't open, it was closed.  And that's basically it

5  as far as clothing because where the counter is you

6  can't see below that, you only can see from the

7  waist up.

8  **Q.**     Could you tell what color that jacket was?

9  **A.**     Blue and black.

10 **Q.**     At the time did you see a -- that person's

11 arm?

12 **A.**     Yes, sir.

13 **Q.**     Describe the weapon you saw that person with?

14 **A.**     It was a small pistol.

15 **Q.**     And you say -- you say pistol, was it a

16 handgun?

17 **A.**     Yes, sir.

18 **Q.**     All right.  Could you tell if it was a

19 revolver or semiautomatic, do you know --

20 **A.**     Revolver.

21 **Q.**     It was a revolver?

22 **A.**     Yes, sir.

23 **Q.**     What color was it?

24 **A.**     Black.

25 **Q.**     Do you recall if the robbery suspect had his

1   hand exposed or was he wearing gloves?

2   **A.**    The hand that had the gun was exposed, it

3   didn't have a glove on it.

4   **Q.**    Now you mentioned that the person asked for

5   some money?

6   **A.**    Yes, sir.

7   **Q.**    Be more descriptive for the ladies and

8   gentlemen of the jury, specifically what did that

9   robber tell you?

10   **A.**    Basically, he told me he to give him the cash

11   or he would shoot me.

12   **Q.**    Where was the gun at that time?

13   **A.**    Pointed towards me.

14   **Q.**    How did you feel at that moment?

15   **A.**    Scared, panic, honestly, just didn't know how

16   to process anything at that point, just frightened.

17   **Q.**    Why were you frightened?

18   **A.**    I've never ever had anything like that happen

19   to me, a gun, like, that is something that I

20   associate with death.  So --

21   **Q.**    Ultimately what did you do when the gun was

22   pointed in your face?

23   **A.**    I was trying to tell him that I didn't have

24   the cash.  And as I was doing that, I made my way

25   around, like I said, to the kitchen and I went and

1    locked myself in the back.

2    **Q.**    You say you made your way around to the

3    kitchen --

4    **A.**    Uh-huh.

5    **Q.**    -- walking, did you walk to the kitchen?

6    **A.**    Ran.

7    **Q.**    Could you tell what the suspect was doing at

8    that time --

9    **A.**    No --

10   **Q.**    -- while you were fleeing to the kitchen?

11   **A.**    -- no, sir.

12   **Q.**    The police call, were the police called?

13   **A.**    Yes, sir.

14   **Q.**    Did you call the police?

15   **A.**    Yes, sir.

16   **Q.**    Do you know -- well, did you learn if the

17   defendant or if the robbery suspect was still in the

18   store?

19   **A.**    When I called --

20            **MS. JERMANN-ROBINSON:**  Objection, Your

21   Honor, calls for hearsay.

22            **THE COURT:**  Lay a better foundation.

23   **BY MR. BIGGERS:**

24   **Q.**    Did the robber leave the store?

25   **A.**    Yes, sir.

1    **Q.**    How do you know the robber left the store?

2    **A.**    In the office there -- there's a camera that

3    will show you what's going on at the exact moment

4    and you could hear, like, the door, you can hear a

5    loud banging to the door.

6    **Q.**    Go back, you said the office, is that the

7    same office that you fled into?

8    **A.**    Yes, sir.

9    **Q.**    There are cameras that show -- that have

10    monitors in the office?

11    **A.**    Yes, sir.

12    **Q.**    Did you personally see those monitors?

13    **A.**    Yes, sir.

14    **Q.**    Did you see the suspect leave the scene?

15    **A.**    Uh-huh.

16    **Q.**    I'm sorry, you have to --

17    **A.**    Yes, sir.

18    **Q.**    So is the store is equipped with monitors?

19    **A.**    Yes, sir.

20    **MR. BIGGERS:**  Permission to approach the

21    witness, Your Honor?

22    **THE COURT:**  Go ahead.

23    You have permission, you don't have to

24    keep asking.

25    **MR. BIGGERS:**  Thank you, Your Honor.

1      **THE COURT:** Uh-huh.

2  **BY MR. BIGGERS:**

3  **Q.** Showing you a disk, Mr. Harris, tell me if

4  you recognize that?

5  **A.** I do.

6  **Q.** What do you recognize that disk to be?

7  **A.** It has the video of what took place that

8  night on it.

9  **Q.** How do you know that has the video of what

10 took place the night of the robbery on that disk?

11 **A.** I viewed it and I've signed it and dated it.

12 **Q.** So you have had an opportunity to review the

13 video on that disk?

14 **A.** Yes, sir.

15 **Q.** And is it an accurate depiction of the events

16 that occurred during the robbery on December 7th,

17 attempted robbery on December 7th, 2012?

18 **A.** Yes, sir.

19     **MR. BIGGERS:** At this time the government

20 moves to admit Exhibit 7.

21     **THE COURT:** All right. We will go ahead

22 and admit it, that will be Exhibit Number 7.

23     **MS. JERMANN-ROBINSON:** No objection.

24     **MR. BIGGERS:** Permission to publish, Your

25 Honor?

1          **THE COURT:**  Go ahead.

2          Is this the one that we have to turn off

3  the lights?

4          **THE CLERK:**  Does this have sound?

5          **MR. BIGGERS:**  This is not, this does have

6  sound.

7          **THE CLERK:**  It does have sound.

8          **THE COURT:**  Go ahead.

9  **BY MR. BIGGERS:**

10  **Q.**    Play the video on full screen.

11          What's shown on the screen right now,

12  Mr. Harris?

13  **A.**    You can see the entrance and the cash

14  register where I would normally be.

15              (Videotape playing.)

16  **BY MR. BIGGERS:**

17  **Q.**    Now, Mr. Harris, when this video started,

18  could you be seen on the screen?

19  **A.**    No, sir.

20  **Q.**    Where would you have been on the screen?

21  **A.**    In front of the lottery station.

22  **Q.**    Go back to that original view that you just

23  showed, please.

24          So please make an indication on the screen

25  where you would be, which direction you would be?

1    **A.**    I would be over here to the right

2    (indicating).

3    **Q.**    Do you see a gentlemen walk up in the aisle

4    there?

5    **A.**    Yes, sir.

6    **Q.**    Do you know who that was?

7    **A.**    Yes, his name is -- we call him Mr. Sonny.

8    **Q.**    Who is he?

9    **A.**    He is just a regular customer who comes up

10   there every now and again and sit and watch TV and

11   drink coffee.

12   **Q.**    Show the second angle, please.

13         Mr. Harris, where would you be on this

14   screen?

15   **A.**    In this area right here (indicating).

16   **Q.**    Okay.  Which direction is the door to the

17   store?

18   **A.**    From me, it will be to the left.

19   **Q.**    Will you make an indication on the screen?

20   **A.**    Over here (indicating).

21   **Q.**    Please play this at full screen.

22              (Videotape playing.)

23   **BY MR. BIGGERS:**

24   **Q.**    Are you showing this -- you?

25   **A.**    Yes, sir.

1    **Q.**    Is that you with the hat?

2    **A.**    Yes, sir.

3    **Q.**    What are you doing at that point?

4    **A.**    Closing the lottery down.

5          Widen that angle.

6          **THE COURT REPORTER:**  Excuse me.

7    **BY MR. BIGGERS:**

8    **Q.**    Widen that angle.

9          Would you run that view, please.

10         Mr. Harris --

11   **A.**    Yes, sir.

12   **Q.**    -- pause it right -- pause it once the

13   suspect comes into the screen.

14         Right there.

15         Mr. Harris, you heard like a bell or a chime?

16   **A.**    Uh-huh, yes, sir.

17   **Q.**    Did you hear that?

18   **A.**    Yes, sir.

19   **Q.**    What was that?

20   **A.**    That was the door opening.

21   **Q.**    You say the door opening?

22   **A.**    Yes, sir.

23   **Q.**    What are you referring to?

24   **A.**    The front entrance -- well, there's two

25   doors, you come through one that you have to

1  physically open and then the next one is automatic.

2  When you enter the automatic door, it -- it alerts

3  the cashier.

4  **Q.**      And is that what you previously testified to

5  as to what drew your attention to the customer?

6  **A.**      Yes, sir.

7  **Q.**      All right.  Now showing on the screen is the

8  robbery suspect.

9          Do you see the blue mask?

10  **A.**      Yes, sir.

11  **Q.**      Please circle that.

12  **A.**      (Indicating)

13  **Q.**      Do you see the blue flannel-style jacket?

14  **A.**      Yes, sir.

15  **Q.**      Please circle that as well.

16  **A.**      (Indicating)

17  **Q.**      Now the firearm that was pulled on you --

18  **A.**      Yes, sir.

19  **Q.**      -- what, if anything, did the robbery suspect

20  do with that firearm?

21  **A.**      After asking for the money, and I didn't give

22  it, it was cocked as he was pointing it towards me.

23  **Q.**      When you say cocked, be as descriptive as you

24  can to explain what that means to you?

25  **A.**      Basically getting ready to take the shot,

1  that's what it looked like to me.

2  **Q.**     Play that video.

3         You see that happen --

4                (Video playing.)

5  **BY MR. BIGGERS:**

6  **Q.**     Does that happen?

7  **A.**     Yes, sir.

8  **Q.**     Please make an indication on the screen where

9  you see the gun being cocked.

10 **A.**     (Indicating.)

11 **Q.**     Play it out.

12       **MS. JERMANN-ROBINSON:**  Your Honor, may we

13 approach?

14       **THE COURT:**  All right.

15       (The following proceedings had at side-bar

16 bench.)

17       **THE COURT:**  Okay.

18       **MS. JERMANN-ROBINSON:**  Your Honor, I'm

19 going to make an objection, in discovery I only

20 received one video and now we're seeing a second

21 one.  I have a video and I've got a separate audio.

22 And I have -- have the disk that was provided to me,

23 but I don't have the video that's being shown right

24 now.

25       **THE COURT:**  It's a different view?

1              **MS. JERMANN-ROBINSON:**  It's a different

2    view.

3              **THE COURT:**  Uh-huh.

4              Yes, sir.

5         **MR. BIGGERS:**  Your Honor, all of this is

6    on the same disk.  You have to open it up and open

7    each one, they are all on the same disk.

8              **MS. JERMANN-ROBINSON:**  I mean, I can

9    re-look at again, but I only show two -- two videos,

10   especially a video and audio that actually popped

11   up.

12             **MR. BIGGERS:**  A separate audio.

13             **MS. JERMANN-ROBINSON:**  Separate, it wasn't

14   together.

15             **MR. BIGGERS:**  Your Honor, it's all on the

16   same disk.

17             **THE COURT:**  All right.  Well, maybe this

18   evening you can go through it again and see if there

19   are any other views.  We can take up the objection

20   later.

21             **MS. JERMANN-ROBINSON:**  Okay.

22             **MR. BIGGERS:**  And I'll just say, there are

23   multiple views that I intend to show.  The only

24   other views I intend to show there are two that show

25   the victim fleeing to the back of the store and

1   there's another one that shows a closer up view of

2   Mr. Bolden, Sonny who has been described, sitting in

3   the lobby area of the store.

4           **THE COURT:** Additional views of -- on the

5   same video?

6           **MR. BIGGERS:** All on the same disk.

7           **THE COURT:** Okay. And you haven't seen

8   any of those?

9           **MS. JERMANN-ROBINSON:** I have seen the

10  first one, Your Honor.

11          **THE COURT:** Okay. But the others you

12  weren't able to get multiple views I'm assuming.

13          **MS. JERMANN-ROBINSON:** That's right. And

14  I will look at it.

15          **THE COURT:** All right.

16          Okay. We will take this up later.

17          (The following proceedings were had in

18  open court.)

19          **MR. BIGGERS:** Continue to play this one

20  out, please?

21                  (Videotape playing.)

22  **BY MR. BIGGERS:**

23  **Q.**   Now while we're pulling up this other view,

24  Mr. Harris, tell me where did you go?

25  **A.**   First through the kitchen doors, which

1  were -- it's right here (indicating),  but I went

2  around this area into the kitchen doors that leads

3  you to the back of the store.  And then I came in

4  the office in the back door, through the back door.

5  **Q.**     Is that where you saw the video?

6  **A.**     Yes, sir.

7  **Q.**     All right.  Indicate on -- on this screen,

8  before we start playing the video, where you are.

9  **A.**     (Indicating.)

10  **Q.**     Play the video, please.

11                 (Videotape playing.)

12  **BY MR. BIGGERS:**

13  **Q.**     Mr. Harris, as you went towards that kitchen

14  door, you hear a -- you hear a bang or noise, what

15  is that noise?

16  **A.**     The guy leaving.

17  **Q.**     Go to the other angle.

18       What is shown in this photograph on this

19  screen?

20  **A.**     That's the automatic door that rings when it

21  opens.

22  **Q.**     Play it, please.

23                 (Videotape playing.)

24  **BY MR. BIGGERS:**

25  **Q.**     Who just came through the door?

1  **A.**     The person that tried to rob the store.

2  **Q.**     Now you said that the noise that you heard --

3  **A.**     Uh-huh.

4  **Q.**     -- was the suspect running to the door?

5  **A.**     Uh-huh.

6  **Q.**     Is there any evidence that the suspect

7  actually hit that door?

8  **A.**     It actually it knocked it off the hinges.

9  **Q.**     I'm going to play through where the suspect

10 is going out of the door and I want you to point out

11 any evidence of the door being knocked off the

12 hinges.

13 **A.**     Okay.

14                    (Videotape playing.)

15 **A.**     Would you look at the bottom right here

16 (indicating), it's no longer on track.

17 **Q.**     Lastly we will bring up another view, you

18 said there was a customer in the store --

19 **A.**     Yes, sir.

20 **Q.**     -- you called him Mr. Sonny?

21 **A.**     Yes, sir.

22 **Q.**     Where was he seated in the store?

23 **A.**     In the sitting, the restaurant area where you

24 can watch TV.

25 **Q.**     Please play this, play this other angle.

1          (Videotape playing.

2          You see what's on the screen right now,

3    Mr. Harris?

4    **A.**     Yes, sir.

5    **Q.**     Do you recognize who that individual is?

6    **A.**     Yes, sir.

7    **Q.**     Now where is the cash register in relation to

8    the --

9    **A.**     It's directly behind him.

10   **Q.**     That view Mr. Sonny is looking at, can he see

11   you?

12   **A.**     No.

13   **Q.**     All right.  Stop it, please.

14          Now you testified that once you went in the

15   back you called the police, is that correct?

16   **A.**     Yes, sir.

17   **Q.**     Did the police respond?

18   **A.**     Yes, sir.

19   **Q.**     About how long did it take for the police to

20   respond to scene?

21   **A.**     Maybe two minutes, it was pretty fast.

22   **Q.**     How many officers responded to the scene?

23   **A.**     Initially one officer came in and asked me

24   about, you know, what was going on.  And I told him

25   and he was asking what -- did I know which way he

1  went or what he was wearing, anything like that.

2  **Q.**    Were you able to provide a description of the

3  robbery suspect to that one office that came and

4  spoke to you?

5  **A.**    Yes, sir.

6  **Q.**    Specifically, what description was provided?

7  **A.**    The blue mask and the blue and black jacket.

8  **Q.**    Okay.  About how long did that officer stay

9  inside the store?

10 **A.**    Probably a minute, he wasn't long at all.

11 **Q.**    What did you do once that officer left?

12 **A.**    At that point I called the owner of the store

13 to let him know what had just happened.

14 **Q.**    The owner, a Mr. Ring?

15 **A.**    Yes, sir.

16 **Q.**    Did you, in fact, speak to Mr. Ring --

17 **A.**    Yes, sir.

18 **Q.**    -- advise advice him of what had occurred?

19 **A.**    Yes, sir.

20 **Q.**    Now during this robbery, when you see the

21 suspect tell you to take the money out of the

22 drawer?

23 **A.**    Yes, sir.

24 **Q.**    Did you ever give the robbery suspect money?

25 **A.**    No, sir.

1  **Q.**     Do you -- do you know if the police every

2  caught anyone that night?

3  **A.**     Did they catch anyone that night?

4  **Q.**     Yes, sir.

5  **A.**     Yes, sir.

6  **Q.**     And how do you know that?

7  **A.**     When they returned, one of the police

8  officers showed me an article to see if that's what

9  I saw, the jacket, a picture of the jacket.

10 **Q.**     You say an article --

11 **A.**     Uh-huh.

12 **Q.**     -- you mean a picture?

13 **A.**     Of the jacket, yeah.

14 **Q.**     Before we get into the picture of the jacket,

15 did law enforcement officers respond back to the

16 store?

17 **A.**     Yes, sir.

18 **Q.**     You recall how many offices came back to the

19 store?

20 **A.**     As far as they came in?

21 **Q.**     Yes.

22 **A.**     Two.

23 **Q.**     Now did you give a follow-up description of

24 the suspect to any officer?

25 **A.**     Yes.

1  **Q.**     What type of information did you provide in

2  this follow-up discussion?

3  **A.**     Just basically still talking about the -- the

4  mask and the coat and the color of the gun.

5  **Q.**     What color was the gun?

6  **A.**     Black.

7  **Q.**     About how long was it before officers came

8  back to the store after they initial -- after the

9  first officer initially left?

10 **A.**     Probably around like maybe four or five

11 minutes, it wasn't long at all.

12 **Q.**     So another short amount of time?

13 **A.**     Yes, sir.

14 **Q.**     And at this point did you give a written

15 statement to the officers?

16 **A.**     Yes, sir.

17 **Q.**     You mentioned that you know law enforcement

18 or the offices arrested -- obtained someone on that

19 night, is that correct?

20 **A.**     Yes, sir.

21 **Q.**     You mentioned that you saw a photograph?

22 **A.**     Yes, sir.

23 **Q.**     Describe the photograph for the ladies and

24 gentlemen of the jury?

25 **A.**     It was just a picture of the jacket that the

1  person was wearing, basically because that's all I

2  saw, so it was just a picture from neck down to see

3  if that was the same -- the clothing that I

4  described earlier.

5  **Q.**    Now, Mr. Harris, you described a jacket is

6  what the picture was of, but was it an actual person

7  wearing the clothing?

8  **A.**    Yes, sir.

9  **Q.**    Was this person's face exposed at all?

10 **A.**    No, sir.

11 **Q.**    At any point did you see the robbery

12 suspect's face?

13 **A.**    No, sir.

14        **MR. BIGGERS:**  Permission to approach the

15 witness, Your Honor?

16        **THE COURT:**  Go ahead.

17 **BY MR. BIGGERS:**

18 **Q.**    Showing you a photograph.

19        Tell me if you recognize that?

20 **A.**    Yes, sir.

21 **Q.**    What do you recognize that to be a photograph

22 of?

23 **A.**    The picture that they brought in to see was

24 this the jacket that I saw earlier during the

25 robbery.

1    **Q.**    And you say they, are you referring to --

2    **A.**    The police officers, yes, sir.

3    **Q.**    Was it Oakland police that responded to the

4    scene?

5    **A.**    Yes, sir.

6    **Q.**    Is that picture identical descript --

7    identical photo of what you saw on December 7th,

8    2012?

9    **A.**    Yes, sir, it is.

10          **MR. BIGGERS:**  At this time the government

11   moves to admit and publish.

12          **THE COURT:**  All right.  Go ahead and

13   introduce it, I believe it will be exhibit number --

14          **THE CLERK:**  Eight.

15          (Exhibit Number 8 was marked; Description:

16   Photograph.)

17   **BY MR. BIGGERS:**

18   **Q.**    And when you viewed this photograph, where

19   were you?

20          Inside or outside of the store?

21   **A.**    Inside.

22   **Q.**    At any point did you come out of the store?

23   **A.**    No.

24   **Q.**    So you did come out of the store to talk to

25   the police?

1   **A.**     No, sir.

2   **Q.**     Showing you Exhibit 8.

3          Describe this -- what's shown in this

4   photograph to the jury?

5   **A.**     This is the jacket that the person who tried

6   to rob the store wore in -- wore the night that they

7   came in.

8   **Q.**     Anything unique about this jacket that let's

9   you know that is the same jacket that the robber

10  wore?

11  **A.**     The symbol that's on the left side -- well,

12  it's my right, right here, side of the jacket.

13  **Q.**     Please circle that on the screen.

14  **A.**     (Indicating)

15  **Q.**     And when shown this photograph on the night

16  of the robbery, did you positively identify this as

17  the clothing?

18  **A.**     Yes, sir.

19          **THE COURT:**  Excuse me.

20          What did you say that was that you

21  circled, I didn't hear what you said.

22          **THE WITNESS:**  A symbol, it's like --

23          **THE COURT:**  A symbol?

24          **THE WITNESS:**  Yes.

25          **THE COURT:**  All right.

1  **BY MR. BIGGERS:**

2  **Q.**      Show you another photograph.

3          Do you recognize that?

4  **A.**      Yes, sir.

5  **Q.**      What do you recognize that to be?

6  **A.**      It's the cash register, the area where the

7  cashier works, and the person who tried to rob the

8  store.

9  **Q.**      Accurate depiction of how that looked during

10  the robbery on December 7th, 2012?

11  **A.**      Yes, sir.

12          **MR. BIGGERS:**  At this time the government

13  moves to admit.

14          **THE COURT:**  All right.  Let me take a look

15  at that one, please.

16          Hand it to me, Mr. Herrin.

17          Okay.  As I said, if there are any

18  objections, just let me know.

19          **MS. JERMANN-ROBINSON:**  No objection, Your

20  Honor.

21          **THE COURT:**  All right.  We will go ahead

22  and introduce the photograph.  That will be number

23  nine.

24          (Exhibit Number 9 was marked; Description:

25  Photograph.)

1      **MR. BIGGERS:**  Thank you.

2  **BY MR. BIGGERS:**

3  **Q.**      Showing you Exhibit 9, Mr. Harris.

4          Describe what's shown here.

5  **A.**      The cashier work area and a man holding a

6  gun.

7  **Q.**      And this is the robber who robbed you or

8  attempted to rob you on that night?

9  **A.**      Yes, sir.

10  **Q.**      And do you see that symbol --

11  **A.**      Yes, sir.

12  **Q.**      -- on the jacket worn during the robbery?

13  **A.**      Yes, sir.

14  **Q.**      Would you identify that again.

15          Where is it on this picture?

16  **A.**      It's on the left side of his coat but it

17  would be my right.

18  **Q.**      At the time you viewed the photograph in

19  Exhibit 8, the head in this photographed of a man

20  wearing that jacket, did you ever see that person's

21  face on that night?

22  **A.**      No, sir.

23  **Q.**      The time or during the robbery did you ever

24  see the person's face, the robber's face?

25  **A.**      No, sir.

1  **Q.**     Did -- do you know where that photograph in

2  Exhibit 8 was taken?

3  **A.**     Yes, sir.

4  **Q.**     Where was it taken?

5  **A.**     It was taken outside of the store.

6  **Q.**     Did you see the officers taking that

7  photograph?

8  **A.**     No, sir.

9  **Q.**     Did you go outside at any point?

10  **A.**     No, sir.

11  **Q.**     Why not?

12  **A.**     I honestly didn't want to see the person.

13  **Q.**     Is that to say you were afraid?

14  **A.**     Yes, sir.

15          **MR. BIGGERS:**  Brief moment, Your Honor.

16          **THE COURT:**  All right.

17          **MR. BIGGERS:**  Permission to approach the

18  witness, Your Honor?

19          **THE COURT:**  Go ahead.

20  **BY MR. BIGGERS:**

21  **Q.**     Take a look at this, Mr. Harris, it's marked

22  for I.D. only as Exhibit 10.

23          Do you recognize that?

24  **A.**     Yes, sir.

25  **Q.**     How does this look familiar?

1  **A.**      Because the symbol that's on the left side.

2  **Q.**      What does this appear to be?

3  **A.**      The jacket that the person had on when they

4  attempted to rob the store.

5  **Q.**      And what are you basing that on?

6  **A.**      That night and the picture.

7  **Q.**      You see the symbol on this jacket?

8  **A.**      Yes, sir.

9  **Q.**      Describe where that is shown?

10 **A.**      On the left pocket of the jacket.

11 **Q.**      Showing you this.

12         Do you recognize this, Mr. Harris?

13 **A.**      Yes, sir.

14 **Q.**      What do you recognize this as?

15 **A.**      The mask that the person had on when they

16 came in the store.

17         **MR. BIGGERS:**  This is marked for I.D. only

18 as Exhibit 11.

19         **THE COURT:**  Show it marked as Exhibit

20 Number 11 for identification purposes only.

21         (Exhibit Number 11 was marked;

22 Description:  Mask.)

23 **BY MR. BIGGERS:**

24 **Q.**      What makes you say this is the same mask that

25 the robbery suspect on December 7th, 2012?

1  **A.**    Because only the eyes, it's blue and only the

2  eyes were exposed that night.

3  **Q.**    Anything unique about the eyeholes in this

4  mask?

5  **A.**    Not that I could really see.  It just looks

6  like they have been punched out.

7  **Q.**    Is that how the eyeholes of the robber

8  appeared?

9  **A.**    Yes, sir.

10  **Q.**    Describe the gun again for me, please,

11  Mr. Harris?

12  **A.**    It's just a small hand -- black handgun,

13  revolver.

14  **Q.**    Showing you -- it will be marked for

15  identification purposes only Exhibit 12.

16          (Exhibit Number 12 was marked;

17  Description:  Gun.)

18  **BY MR. BIGGERS:**

19  **Q.**    Do you recognize that?

20  **A.**    Yes, sir.

21  **Q.**    What does this appear to be?

22  **A.**    The gun that was used the night that someone

23  attempted to rob the store.

24  **Q.**    On December 7th, 2012?

25  **A.**    Yes, sir.

1  **Q.**    Mr. Harris, at the time of the robbery, you

2  were not able to see the suspect's face, is that

3  correct?

4  **A.**    Correct.

5  **Q.**    You did -- you were able to positively

6  identify the clothing, is that correct?

7  **A.**    Yes, sir.

8  **Q.**    At any point did you see that person's face?

9  **A.**    No, sir.

10            **MR. BIGGERS:**  Brief moment, Your Honor?

11            **THE COURT:**  All right.

12            **MR. BIGGERS:**  No further questions from

13  the government at this time, Your Honor.

14            **THE COURT:**  All right, thank you.

15            And is there cross.

16            **MS. JERMANN-ROBINSON:**  Yes, Your Honor,

17  thank you.

18            **THE COURT:**  All right.

19                 <u>**CROSS EXAMINATION**</u>

20  **BY MS. JERMANN-ROBINSON:**

21  **Q.**    While we have this exhibit up, and is that

22  Exhibit 10?

23            **THE COURT:**  I believe it is, yes.

24  **BY MS. JERMANN-ROBINSON:**

25  **Q.**    I'm sorry, Mr. Harris, I'm Mary C. Robinson,

1    I represent the defendant Robert Drew.

2         Is that a -- what's that behind the person in

3    this picture, what's he standing in front of?

4    **A.**    Police cars.

5    **Q.**    Okay.  So that's the -- they showed you that

6    photo of a man that's been -- why can't we see his

7    hands or do you know?

8    **A.**    I don't know.

9    **Q.**    Do you think he has got his hands in cuffs

10   because he's in police custody?

11   **A.**    Probably so.

12   **Q.**    Okay.  And they showed you a picture of him

13   standing in front of a police car?

14   **A.**    Yes, ma'am.

15   **Q.**    Okay.  Mr. Harris, you testified that I think

16   your shift was between two and ten o'clock at night,

17   is that right?

18   **A.**    Yes, ma'am.

19   **Q.**    Okay.  And you also, I believe testified that

20   maybe an hour prior to closing y'all did something

21   with the lottery tickets --

22   **A.**    Yes, ma'am.

23   **Q.**    Would you state that again, please, I'm

24   sorry, I didn't get all of that?

25   **A.**    An hour before, even with the morning shift,

1  anytime we get ready to close, an hour before we

2  close the lottery down which gives us time to stock

3  and clean.

4  **Q.**    Okay.  And that's what you were doing before

5  all of this happened?

6  **A.**    Yes, ma'am.

7  **Q.**    Okay.  So was it -- what time was it when you

8  were doing that?

9  **A.**    It would be around like nine, 9:15 --

10  **Q.**    Okay.

11  **A.**    -- because it has to be around an hour before

12  the store closes.

13  **Q.**    Okay.  And is that about the time when you're

14  standing in front of the lottery, is that about the

15  time that the robbery took place?

16  **A.**    Yes, ma'am.

17  **Q.**    Okay.  You testified that you went, I guess,

18  through the -- I guess across the front of the

19  cashier's desk, I suppose, and then you went back

20  into the kitchen?

21  **A.**    Yes, ma'am.

22  **Q.**    Okay.  Did you hit a panic button or anything

23  on your way out?

24  **A.**    No, ma'am.

25  **Q.**    Okay.  So the only way that they -- the

1 officers would have known about what happened is

2 because you called them?

3 **A.**     Yes, ma'am.

4 **Q.**     And you -- you did call them, you called them

5 on 9-1-1, is that right?

6 **A.**     Yes, ma'am.

7 **Q.**     Okay.  And that was right after it happened

8 or a few minutes after it happened?

9 **A.**     Once I made it into the office.

10 **Q.**     Okay.  All right.  And when you saw the

11 robber come in, he came in on foot?

12 **A.**     Yes, ma'am.

13 **Q.**     Okay.  And he left on foot?

14 **A.**     Yes, ma'am.

15 **Q.**     And you didn't see him get in any vehicle or

16 anything like that?

17 **A.**     No.

18 **Q.**     Okay.  When he -- the robber came into the

19 store, he waked all the way up to that front

20 counter, right?

21 **A.**     Yes, ma'am.

22 **Q.**     Okay.  And we all saw it, but he leaned

23 forward and had that gun, right?

24 **A.**     Yes, ma'am.

25 **Q.**     And you were right there where the lottery

1    table was?

2    **A.**      Yes, ma'am.

3    **Q.**      Okay.  So you were pretty frightened because

4    he was pretty close; is that safe to say?

5    **A.**      Yes, ma'am.

6    **Q.**      Did you smell alcohol on his breath at that

7    time?

8    **A.**      No, ma'am.

9    **Q.**      Okay.  He was -- you testified that, I guess,

10   you had someone come fairly quickly, an officer I

11   suppose.

12          Do you know the name of that officer that

13   arrived first?

14   **A.**      No, ma'am, I don't.

15   **Q.**      Would that be Sergeant Maxwell maybe?

16   **A.**      Maybe so.

17   **Q.**      You just don't know?

18   **A.**      Yeah, I can't -- I can't remember his name.

19   **Q.**      Okay.  And sometime later other officers

20   came, was this after they had someone in custody or

21   did they come fairly soon after the first officer

22   was there?

23   **A.**      When I saw them again, it was once they had

24   got someone and they were coming to talk to me.

25   **Q.**      Okay.  So it was one officer and then several

1    minutes later then another officer?

2    **A.**    Yes, ma'am.

3    **Q.**    Okay.

4          **MS. JERMANN-ROBINSON:**  Can I have one

5    moment, Your Honor?

6          **THE COURT:**  Certainly.

7          **MS. JERMANN-ROBINSON:**  Thank you.

8    **BY MS. JERMANN-ROBINSON:**

9    **Q.**    And this was in December of 2012?

10   **A.**    Yes, ma'am.

11   **Q.**    So it was dark outside after nine o'clock,

12   nine, 9:15?

13   **A.**    Yes, ma'am.

14   **Q.**    Okay.  And you -- you testified that this

15   individual was wearing one glove, is that correct?

16   **A.**    The hand that I saw with the gun in it, it

17   didn't have a glove on it.

18   **Q.**    Is that glove on one hand and he is holding

19   the gun in the other with his hand right on that

20   gun?

21   **A.**    Yes, ma'am.

22   **Q.**    And the gun was black in color?

23   **A.**    Yes, ma'am.

24   **Q.**    And do you, only if you know, do you recall

25   the name of the officer who actually showed you the

1 photograph?

2 **A.** It was the same officer --

3 **Q.** He was the same one.

4 **A.** Yes, sir -- yes, ma'am.

5 **Q.** And did he show you a photograph or did he

6 actually show you a camera or cell phone camera,

7 what did you actually see?

8 **A.** A camera.

9 **Q.** Okay. So it wasn't the picture like we

10 looked at today?

11 **A.** No, ma'am.

12 **Q.** Okay.

13     **MS. JERMANN-ROBINSON:** Your Honor, if I

14 can have one minute?

15     **THE COURT:** Sure.

16     **MS. JERMANN-ROBINSON:** Thank you.

17     No further questions, Your Honor.

18     **THE COURT:** All right. Thank you,

19 Ms. Robinson.

20     Any redirect?

21     **MR. BIGGERS:** A quick follow-up, Your

22 Honor.

23               **REDIRECT EXAMINATION**

24 BY MR. BIGGERS:

25 **Q.** Mr. Harris, I want to make sure I understood

1   one question Ms. Robinson asked you.

2           You testified that the initial officer that

3   came and spoke to you about the crime --

4   **A.**      Yes, sir.

5   **Q.**      -- that was one officer that initially

6   responded to the scene, is that correct?

7   **A.**      Yes, sir.

8   **Q.**      Was that the same officer that showed you the

9   photograph in Exhibit 8 on the camera?

10  **A.**      Yes, sir.

11          **MR. BIGGERS:**  No further questions, Your

12  Honor.

13          **THE COURT:**  All right.  And any recross

14  based on that one?

15          **MS. JERMANN-ROBINSON:**  Have one moment,

16  Your Honor?

17          Nothing further, Your Honor.

18          Thank you.

19          **THE COURT:**  All right, thank you.

20          Thank you, Mr. Harris, for coming down.

21  You can step down, you are excused.

22                  (Witness excused.)

23          **THE COURT:**  How is everybody doing?

24  Anyone need a break or anything like that or can we

25  keep going?

1          Okay.  We're good to go?

2          Not you.

3          Okay.  We do need a break for just a few

4  minutes?

5          **A JUROR:**  Restroom break.

6          **THE COURT:**  Okay, sure.  We'll go ahead

7  and take a break at this time.  Be about ten minutes

8  or so.

9          Y'all will get tired of hearing me say

10  this, but I'm going to say it every time you leave

11  the courtroom, don't discuss the case among

12  yourself, you are hearing proof now, the time when

13  you discuss it will be at the end of the trial once

14  everything is done.

15          Why don't you all go ahead into the jury

16  room, be back with you in about ten minutes.

17          (Jury out at 3:08 p.m.)

18          **THE COURT:**  Okay.  We will be in recess.

19          **THE CLERK:**  The court stands in recess.

20          (Recess at 3:08 p.m.)

21          **THE COURT:**  Anything, now back to the

22  trial, anything we need to take up before we bring

23  in the jury?

24          **MR. BIGGERS:**  Nothing from the government,

25  Your Honor.

1          **THE COURT:**  Okay.

2          **MS. JERMANN-ROBINSON:**  No, Your Honor.

3          **THE COURT:**  All right.  Bring them in,

4    please.

5          (Jury present at 3:31 p.m.)

6          **THE COURT:**  Okay, folks, I guess we are

7    ready to go ahead and pick it up and go forward at

8    this time.

9          So I will ask Mr. Biggers, if you would,

10   please, call your next witness.

11         **MR. BIGGERS:**  The government calls James

12   Bolden to the witness stand.

13         **THE COURT:**  All right.

14         Okay, you are good right there, sir.

15         If you would, please, raise your right

16   hand.

17         Do you solemnly swear or affirm, under the

18   penalties of perjury, the testimony that you are

19   about to provide the court and jury in the case now

20   on trial to be the truth, the whole truth and

21   nothing but the truth, so help you God?

22         **THE WITNESS:**  I do.

23         **THE COURT:**  All right.  Have a seat right

24   here if you would, please.

25         **MR. BIGGERS:**  Proceed, Your Honor?

1          **THE COURT:**  Please.

1          **JAMES WILLIAM BOLDEN,**

2   was thereupon called as a witness on behalf of the

3   Plaintiff, and having been first duly sworn,

4   was examined and testified as follows:

5                    **DIRECT EXAMINATION**

6   **BY MR. BIGGERS:**

7   **Q.**      Good afternoon, Mr. Bolden.

8   **A.**      Good afternoon.

9   **Q.**      If you would, please, lean forward, speak

10  into the microphone.

11          State and spell your name for the record.

12  **A.**      My name is James William Bolden, J-a-m-e-s,

13  W-i-l-l-i-a-m, B-o-l-d-e-n.

14  **Q.**      Mr. Bolden, how old are you?

15  **A.**      Seventy-two.

16  **Q.**      Where do you -- where do you live, what city

17  do you currently live in?

18  **A.**      I live in Collierville.  10510 --

19          **THE COURT:**  Mr. Bolden, you don't have to

20  hold the microphone, it's good right there.

21  **BY MR. BIGGERS:**

22  **Q.**      And you don't have to give your full address,

23  all right.

24          Do you live in Collierville, Tennessee?

25  **A.**      That's right.

**Q.**    Are you familiar with the Hickory Center Market at 3305 Highway 64?

**A.**    I am.

**Q.**    How are you familiar with that location?

**A.**    Well, most time I go there, shortcut there to keep from going way out to a store.

**Q.**    What do you go there to do?

**A.**    Well, I go up there and look at the news on TV sometime and eat.

**Q.**    Were you going there in December of 2012?

**A.**    Yes.

**Q.**    Specifically, were you there on the night of December 7th, 2012?

**A.**    I was.

**Q.**    Showing you what's been admitted as Exhibit 1.  Would you look on that screen.

Take a look at this photograph.

Do you recognize what's shown there?

**A.**    I do.

**Q.**    What's shown in that photograph?

**A.**    A pickup there and a van, a white van.

**Q.**    Where are these two vehicles, what is that business they're in front of?

**A.**    Hickory Center Market there.

**Q.**    Now do you recall if you were in the Hickory

1  Center Market at the time of an attempted robbery on

2  December 7th, 2012?

3  **A.**     I was.

4  **Q.**     And what were you doing in that store on that

5  night?

6  **A.**     I was sitting in looking at the news and

7  eating, and had a book in my hand.

8  **Q.**     You say the news, was it the ten o'clock

9  news?

10  **A.**     Something like that.

11  **Q.**     And how did you learn that the store was

12  being robbed?

13  **A.**     Well, I tell you, I study the bible a lot.

14  And the good lord showed me this, that that store,

15  the store across the street, the Exxon would be

16  robbed.

17  **Q.**     Let me direct your attention specifically to

18  December 7th, 2012.  Were you in the store on that

19  night, on December 7th when the attempted robbery

20  occurred?

21  **A.**     Yes.

22  **Q.**     Were you present when someone tried to rob

23  that store?

24  **A.**     Yes.

25  **Q.**     Did you see the person that attempted to rob

1    the store?

2    **A.**      I did.

3    **Q.**      Okay.  What drew your attention to the

4    robber, how did you come to look at the robber?

5    **A.**      Well, the customer was coming in pretty

6    frequently, and I always would turn around and look.

7    And I had asked the good lord to show me when was

8    the robbery going to be.

9    **Q.**      Mr. Bolden, let me ask you to stick solely to

10   what you saw and heard on December 7th, 2012.

11            **MS. JERMANN-ROBINSON:**  Your Honor, I

12   object.

13            May we approach?

14            **THE COURT:**  All right.  Hold on just a

15   second.

16            **MR. BIGGERS:**  One moment.

17            **THE COURT:**  Hold on just a second.

18            (The following proceedings had at side-bar

19   bench.)

20            **MS. JERMANN-ROBINSON:**  Your Honor, he's

21   trying to answer the question.  It may not be the

22   right answer for Mr. Biggers.

23            **THE COURT:**  Do you really want him to go

24   on with what the lord told him?

25            Now I'm sure Mr. Biggers will allow him to

1  do that if you want him to just answer the question.

2       **MS. JERMANN-ROBINSON:**  I will withdraw it,

3  Your Honor.  I'm not sure where we are going with

4  this and I don't want him to lead him.

5       **THE COURT:**  Okay.  Well, let's see what

6  his answers are going to be.

7       (The following proceedings were had in

8  open court.)

9  **BY MR. BIGGERS:**

10  **Q.**  Mr. Bolden, on the night of December 7th,

11  2012, while you were present in the store, what, if

12  anything, did you hear in the store that made you

13  look to the cash register?

14  **A.**  Well, I heard some talking loud, I didn't

15  know whether it was friendly talking or whatever, I

16  heard some sounded like to me the money, I was

17  probably with fifty feet away.

18  **Q.**  When you heard that, did you look?

19  **A.**  I looked.

20  **Q.**  What did you see when you look back towards

21  the register?

22  **A.**  I seen the guy standing up with a mask, dark

23  clothes on, and --

24  **Q.**  Did you see that person leave the store?

25  **A.**  I did.

**Q.**     What did you do once the person left the

store?

**A.**     When the person left the store, I say I

stalled about two or three minutes, and then I went

out the door.

**Q.**     Which direction did you go when you went out

the door?

**A.**     I went south out the door.

**Q.**     All right.  And what did you do?

**A.**     I went outside and some fellow was sitting

out there in a car.  They said he went that way.

**Q.**     Was that towards 196?

**A.**     Exactly.

**Q.**     What did you do after hearing that?

**A.**     Well, I jumped in my car.

**Q.**     Where did you go in your car?

**A.**     And I -- I went afternoon behind the store

and come out, that's was trucks parked there, and I

said, something just told me, say, go up to 196 and

make a right off 64 Highway going north.

**Q.**     Did you go that way?

**A.**     I went that way.

**Q.**     What did you see?

**A.**     I seen a guy, the same guy, walking down the

ditch on the side the road, had a gun in his hand.

1    **Q.**    After seeing this, did you come back to the

2    store?

3    **A.**    I -- I -- I stopped, I seen a car sitting on

4    the left side.

5    **Q.**    You said you saw a car sitting on the left

6    side?

7    **A.**    In a dark low cut there on 196.

8    **Q.**    Was it parked off the side of the road?

9    **A.**    Yes.

10   **Q.**    After seeing that, did you go back to the

11   Hickory Center Market?

12   **A.**    I did.

13   **Q.**    When you got there, were the police there?

14   **A.**    Yes.

15   **Q.**    What were the police -- how many police

16   officers were there when you get back to the store?

17   **A.**    It was one car there.

18   **Q.**    Did you see an actual police officer?

19   **A.**    Yes.

20   **Q.**    What was he doing when you pulled up?

21   **A.**    He was coming out of the door.

22   **Q.**    Coming out of the door of the Hickory Center

23   Market?

24   **A.**    Yes.

25   **Q.**    What, if anything, did you tell the police

1    officer?

2    **A.**    I told him the same direction that the guy

3    went.  Go up.

4    **Q.**    Would be toward -- I'm sorry.

5    **A.**    I said go west on 64 and make a right at the

6    light.

7    **Q.**    Would that have been on 196?

8    **A.**    196.

9    **Q.**    Is that what you told -- did you tell the

10   officer what you saw in that area?

11   **A.**    Yes.

12   **Q.**    Did you see which way the officer went when

13   he left the store?

14   **A.**    Yes.

15   **Q.**    Which way did he go?

16   **A.**    He went west on 64 and made a right going

17   north on 196.

18   **Q.**    Approximately how much time passed from the

19   time you left the store and came back to see the

20   officer there?

21   **A.**    It wasn't no more about five, six, seven

22   minutes.

23   **Q.**    Did the police ultimately come back to the

24   store?

25   **A.**    Yes, he came back.

**Q.** Did you give a statement on that night?

**A.** No.

**Q.** Did they ask you what you -- what happened?

**A.** Yes.

**Q.** Did you tell them what happened?

**A.** I told them.

**Q.** Based on what you saw?

**A.** What I saw.

      **MR. BIGGERS:** Exhibit 7, please, Mr. Herrin, I believe that's the video.

**BY MR. BIGGERS:**

**Q.** Now while they're pulling this up, Mr. Bolden, I want you to take a look at the screen to your right and describe to the ladies and gentlemen of the jury what's shown on that screen?

**A.** Well, I was steadily looking at the TV there.

**Q.** Repeat that, please.

**A.** I was looking at the TV there.

**Q.** So we see an individual in that, do you see yourself in that shot?

**A.** Yes.

**Q.** Please circle yourself on the screen. Just make a mark on the screen and circle yourself.

**A.** (Indicating.)

**Q.** Was that you seated to the right?

1   **A.**      That's right.

2   **Q.**      Is that where you were when you heard the

3   robbery taking place?

4   **A.**      Exactly.

5   **Q.**      Please play that clip.

6                    (Videotape playing.)

7   **Q.**      Does that show you in the store during the

8   robbery?

9   **A.**      Yes.

10  **Q.**      Was it after that incident that you went to

11  your car and drove up 196?

12  **A.**      Yes.

13           **MR. BIGGERS:**  No further questions, Your

14  Honor.

15           **THE COURT:**  All right, thank you.

16           And is there cross?

17           **MS. JERMANN-ROBINSON:**  There is, Your

18  Honor, thank you.

19                    <u>**CROSS EXAMINATION**</u>

20  BY MS. JERMANN-ROBINSON:

21  **Q.**      Mr. Bolden, I'm Mary C. Robinson, I'm just

22  going to ask you a few questions.  Okay.

23  **A.**      Yes.

24  **Q.**      Okay.  You testified that you -- the officers

25  came and talked to you, that you did not give a

1  statement that night, is that right?

2  **A.**     That's right.

3  **Q.**     All right.  Are you sure you didn't give a

4  statement that night?

5  **A.**     I gave it off the one that come out the

6  door --

7  **Q.**     Uh-huh.

8  **A.**     -- you know, what I told you.  And so he

9  rushed on out and so he gave me a slip when he came

10  back and told me to fill it out or whatever.

11  **Q.**     Okay.  So you did give a statement?

12  **A.**     Oh -- oh, yes, I'm sorry.

13  **Q.**     Okay.  Okay.  And isn't it true, in that

14  statement you didn't say anything about getting in

15  your car and following this man that tried to rob

16  the store?

17  **A.**     I -- I -- I followed him, but I didn't give

18  anything that statement to them.

19  **Q.**     Okay, let me make sure I got the question

20  right.

21         You did fill out a form that the police

22  officer gave you, is that right?

23  **A.**     That's right.

24  **Q.**     Okay.  Isn't it true that nowhere in that

25  form that you filled out did you mention that you

1  got in your car and followed anyone?

2  **A.**     No, not really follow.

3  **Q.**     Say that one more time, I'm sorry.

4  **A.**     No one that I followed.

5  **Q.**     Okay.  So you did or did not put in the form

6  that you followed anybody?

7  **A.**     No, not that one.

8  **Q.**     Wouldn't that have been something important

9  to include on that form?

10  **A.**     Yes, it would.

11  **Q.**     Okay.  Did you tell anyone, any of those

12  officers that you indeed followed the individual out

13  of the store?

14  **A.**     No, I just talked to one only.

15  **Q.**     Okay.  Do you remember what he looked like?

16  **A.**     Yes, I remember -- I couldn't see his face on

17  the mask, but I could see the mask and the clothes

18  that he had on.

19  **Q.**     You talked to the man with the mask?

20  **A.**     No --

21  **Q.**     Okay.

22  **A.**     -- I seen him.

23  **Q.**     Okay.  And you told the police officers that

24  you saw the man with the mask?

25  **A.**     Yeah.

1  **Q.**    But you didn't tell the police officers that
2  you followed him out in your car?
3  **A.**    Probably not on this, not the same night.
4  **Q.**    Okay.  Would it refresh your recollection,
5  would it help you remember if you could look at the
6  statement that you gave to the officers that night?
7  **A.**    Yeah.
8          **MS. JERMANN-ROBINSON:**  May I approach,
9  Your Honor?
10         **THE COURT:**  Go ahead.
11 **BY MS. JERMANN-ROBINSON:**
12 **Q.**    Now take a look at that statement.
13         Is that the form that you filled out on that
14 evening?
15 **A.**    Yeah.
16 **Q.**    Okay.  And those your words that you wrote
17 down on that form?
18 **A.**    Yes.
19 **Q.**    And go ahead.
20 **A.**    This -- I -- I didn't say everything here.
21 **Q.**    Okay.  So is it safe to say that nowhere in
22 that statement does it say I followed the man with
23 the gun out the door?
24 **A.**    No.
25 **Q.**    And nowhere in that statement does it say I

1  got in my car and followed him up to 196?

2  **A.**     No.

3  **Q.**     Okay.  What does it say in that statement?

4  **A.**     It says I was looking at a TV and reading the

5  book, and I turned around and I saw a black man with

6  black pistol pointed at the cashier and he ran out

7  the door.

8  **Q.**     Okay.  And that's all it says?

9  **A.**     Yes.

10  **Q.**     Okay.  Thank you.

11          **MS. JERMANN-ROBINSON:**  May I retrieve

12  that, Your Honor?

13          **THE COURT:**  Sure.

14  **BY MS. JERMANN-ROBINSON:**

15  **Q.**     I'm sorry, are you finished?

16  **A.**     I'm -- well, it's a lot more that I didn't

17  state here, what I just told you all.

18  **Q.**     Take your time.

19  **A.**     That night I was shock up anyway, too.

20  **Q.**     Okay.

21          **MS. JERMANN-ROBINSON:**  May I retrieve that

22  from him?

23  **A.**     Now that night I was shock up pretty bad,

24  too, when the guy came in.

25  **Q.**     Because he had a gun and it scared you,

1    didn't it?

2    **A.**    I guess so.

3    **Q.**    Okay.  Because you were afraid you might get

4    shot?

5    **A.**    Well --

6    **Q.**    Is that fair?

7    **A.**    -- you know in a way when he seen me, he ran

8    out that door and knocked the door out of socket, so

9    I guess that was the good lord.

10   **Q.**    Thank you, sir.

11        May I retrieve that statement from you, that

12   piece of paper?

13        Yes, thank you.

14        **MS. JERMANN-ROBINSON:**  Your Honor, may I

15   have one moment?

16        **THE COURT:**  Certainly.

17        **MS. JERMANN-ROBINSON:**  Thank you,

18   Mr. Bolden.

19        No further questions.

20        **THE COURT:**  Thank you.

21        Any redirect?

22        **MR. BIGGERS:**  No, Your Honor.

23        Thank you, Mr. Bolden.

24        **THE COURT:**  Mr. Bolden, thank you very

25   much for coming down.  You may step down, you are

1    excused.

2         **THE WITNESS:**  Yes, sir, thank you.

3              (Witness excused.)

4         **THE COURT:**  Call your next witness.

5         **MR. BIGGERS:**  Your Honor, the government

6    calls Sergeant Jimmy Maxwell of the Oakland Police

7    Department.

8         **THE COURT:**  All right.  Sergeant, come on

9    up.

10         Okay, you are good right there.  You are

11    good right there.

12         Raise your right hand.

13         Do you solemnly swear or affirm, under the

14    penalties of perjury, the testimony that you are

15    about to provide the court and jury in the case now

16    on trial to be the truth, the whole truth and

17    nothing but the truth, so help you God?

18         **THE WITNESS:**  I do.

19         **THE COURT:**  Have a seat right here if you

20    would, please.

21

22

23

24

25

1      **JIMMY MAXWELL,**

2   was thereupon called as a witness on behalf of the

3   Plaintiff, and having been first duly sworn,

4   was examined and testified as follows:

5                    **DIRECT EXAMINATION**

6   **BY MR. BIGGERS:**

7   **Q.**     Good afternoon.

8   **A.**     How you doing?

9   **Q.**     All right.

10         Could you please state and spell your name

11  for the record.

12  **A.**     Sergeant Jimmy Maxwell, J-i-m-m-y,

13  M-a-x-w-e-l-l.

14  **Q.**     Sergeant Maxwell, where are you currently

15  employed?

16  **A.**     Oakland Police Department.

17  **Q.**     How long have you been with the Oakland

18  Police Department?

19  **A.**     Been with Oakland five years.

20  **Q.**     What position do you currently hold with the

21  Oakland Police Department?

22  **A.**     I hold the position of sergeant.

23  **Q.**     Briefly describe for the ladies and

24  gentlemen of the what your duties are as a sergeant

25  with the Oakland Police Department?

**A.**      My duties are to patrol.  I'm also shift supervisor over several offices during my shift.

**Q.**      How long have you been in that position as sergeant?

**A.**      Approximately three years.

**Q.**      Have you had any specialized training in the area of law enforcement?

**A.**      I have.

**Q.**      Briefly describe that training for the ladies and gentlemen of the jury?

**A.**      I've been through basic academies.  I've also been through basic specialized training of various natures.

**Q.**      Now were you in the position of sergeant in December of 2012?

**A.**      Yes, I was.

**Q.**      Specifically on December 7th, 2012, did you work on that day?

**A.**      I did.

**Q.**      What shift did you work?

**A.**      I was working the midnight shift which runs from nine p.m. to seven a.m.

**Q.**      During that shift, do you know if a call came in of an attempted robbery at the Hickory Center Market?

1   **A.**     I do.

2   **Q.**     Did you, in fact, get a call?

3   **A.**     I did get a call.

4   **Q.**     Describe for the ladies of gentlemen of the

5   jury the nature of the call that came out on that

6   evening?

7   **A.**     The nature of the call was dispatch called my

8   badge number, is what we go by, she described that

9   there was a armed robbery in progress at the Hickory

10  Center Market in Oakland.

11  **Q.**     Approximately what time did this call come

12  out?

13  **A.**     Approximately 2217, 10:17.

14  **Q.**     Ten --

15  **A.**     P.m.

16  **Q.**     -- p.m.

17          Showing you what has been marked and admitted

18  as Exhibit 1.

19          Do you recognize that?

20  **A.**     I do.

21  **Q.**     What is that a photograph of?

22  **A.**     That's a photograph of the Hickory Center

23  Market.

24  **Q.**     Now where were you when this call initially

25  came out?

**A.**     I was just west of Hickory Center Market on
Highway 64 and Highway 196 at a red light.

**Q.**     Were you in your vehicle at that time?

**A.**     I was.

**Q.**     Show you Exhibit 4.

     Describe what's shown in that photograph?

**A.**     This would be a view of Hickory Center Market
facing westbound of -- the highway to your left
would be westbound traffic.

**Q.**     Now do you see the intersection of Highway 64
and 196 on this photograph?

**A.**     I do.  In your midsection up to the left
would be a stop light, that would be Highway 196 and
Highway 194 -- I'm sorry -- Highway 64.

**Q.**     Please circle that intersection, you can use
your finger to actually touch the screen and make a
circle.

**A.**     (Indicating)

**Q.**     Showing you Exhibit -- Exhibit 6.

     Describe what's shown here?

**A.**     This is an up close view of Hickory Center
Market, also the camera lens would be facing
westbound traffic on Highway 64 indicating the same
traffic light, a little bit closer view at 64 and
Highway 196.

1    **Q.**    Is this where you were when you initially

2    received the call?

3    **A.**    Yes, it was.

4    **Q.**    What did you do once you got that call?

5    **A.**    I activated my emergency equipment, and I

6    actually done a U-turn right there at that light

7    coming back eastbound to the Hickory Center Market.

8    **Q.**    About how long did it take you to get to the

9    store, Hickory Center Market?

10   **A.**    Approximately seconds.

11   **Q.**    I'm showing you two photographs.

12        Tell me if you recognize what's shown in

13   those photographs?

14   **A.**    I do recognize both.

15   **Q.**    What do you recognize both of those

16   photographs to show?

17   **A.**    I can see aerial views of Hickory Center

18   Market.  I see the aerial views of Highway 64,

19   Highway 196.  And I see the area where we actually

20   apprehended the subject.

21   **Q.**    Do both of those photographs accurately

22   depict how that area surrounding the Hickory Center

23   Market looked on December 7th, 2012?

24   **A.**    Approximately, it looks fairly the same, yes,

25   sir.

1          **MR. BIGGERS:**  At this time the government

2    moves to admit both exhibits into evidence.

3              **THE COURT:**  All right.  Any objection?

4              **MS. JERMANN-ROBINSON:**  No objection.

5              **THE COURT:**  Okay.  Collective or each

6    individual?

7              **MR. BIGGERS:**  Be collective, Your Honor.

8              **THE COURT:**  It doesn't matter.

9              Collective?

10             **MR. BIGGERS:**  It doesn't matter.

11             **THE COURT:**  All right.  We will do them

12   separately then if you are going to be putting them

13   on the screen.

14             **MR. BIGGERS:**  Yes, Your Honor.

15             **THE COURT:**  Okay.  Then we will do them

16   separately.

17             We will just designate this one as 13 and

18   this one as 14.

19             (Exhibit Number 13 was marked;

20   Description:  Photograph.)

21             (Exhibit Number 14 was marked;

22   Description:  Photograph.)

23   **BY MR. BIGGERS:**

24   **Q.**    First I'm showing you Exhibit 14.

25             Describe what's shown here, Sergeant Maxwell?

1    **A.**    At the top of your screen I can identify the

2    roof top of Hickory Center Market along with its

3    parking area.  Closest to Highway 64 would be the

4    front of the market.

5    **Q.**    Would you please circle that, the Hickory

6    Center Market?

7    **A.**    This would be the -- the front -- the front,

8    this is Hickory Center's front here (Indicating).

9    **Q.**    Do you see 196 on this same photograph?

10   **A.**    I do.  196 will be to the west of Hickory

11   Center Market at the bottom of the exhibit.

12   **Q.**    Please indicate that area with an X.

13   **A.**    (Indicating.)

14   **Q.**    Now would that have been the intersection

15   where you made a U-turn?

16   **A.**    Yes.

17   **Q.**    Showing you Exhibit 13.

18          Is that also an aerial view of the same area?

19   **A.**    Yes, it is.

20   **Q.**    Please circle the Hickory Center Market on

21   that.

22          And please also indicate an X at the

23   intersection where you were when the call initially

24   came out.

25   **A.**    (Indicating.)

**Q.** Upon your arrival to the Hickory Center Market, what did you find?

**A.** I found Mr. Bolden, a witness, was in the parking lot at the front of the store. He was giving me some information, I really didn't absorb the information, at that point I wanted to get inside to the clerk. So I went inside the store to the clerk. I got the information -- do you want me to go into detail about that?

**Q.** Well, first of all, who did you speak to inside the store?

**A.** I spoke to -- the clerk was Jerry Harris.

**Q.** What type of information did you obtain from Mr. Harris?

**A.** I collected briefly what happened, what euthenic color the suspect may have been, what type of clothing description he had. Was he carrying a weapon. I -- I did get information back from Mr. Harris of the questions that I asked.

**Q.** Specifically what was that description that you obtained from Mr. Harris?

**A.** I asked Mr. Harris what color the subject was. He stated he was a black male, approximately six foot tall. He was wearing a blue and black jacket. He had either a blue or black mask over his

1  face.  And he had a black handgun.

2       I specifically asked him was he carrying a,

3  like a semiautomatic, I indicated what type weapon I

4  was carrying or a revolver.  And he apparently knew

5  what a revolver was, he told me he was carrying a

6  revolver.  And I immediately placed that information

7  over the radio.

8  **Q.**    You say over the radio, what was the purpose

9  of putting that information over the radio?

10  **A.**    So that other responding units could have

11  that information at their disposal and start the

12  investigation, start looking for the suspect.

13  **Q.**    About how long did this conversation with

14  Mr. Harris take?

15  **A.**    Seconds approximately.

16  **Q.**    What did you do after obtaining this

17  information?

18  **A.**    I exited the store.  I again encountered

19  Mr. Bolden, the witness.  Mr. Bolden stated to me

20  that --

21        **MS. JERMANN-ROBINSON:**  Objection, Your

22  Honor, hearsay.

23        **THE COURT:**  All right.  How do you respond

24  to hearsay?

25        **MR. BIGGERS:**  I will develop the question

1   some more, Your Honor.

2          **THE COURT:** All right. Why don't you lay

3   a better foundation.

4   **BY MR. BIGGERS:**

5   **Q.** Sergeant Maxwell, which direction did you go

6   after leaving the store.

7   **A.** Counsel, could you ask that in a more direct

8   question?

9   **Q.** All right. Did you, in fact, leave the store

10   after speaking to Mr. Harris?

11   **A.** I did.

12   **Q.** Before leaving the store did you speak to

13   Mr. Bolden?

14   **A.** I did.

15   **Q.** Okay. Where did you go after leaving the

16   store?

17   **A.** I got in my patrol car and I went westbound

18   Highway 64 to northbound Highway 196.

19   **Q.** Did you turn onto 196?

20   **A.** I did.

21   **Q.** Why did you go in that direction?

22   **A.** That was the direction given.

23   **Q.** By whom?

24   **A.** By the witness.

25   **Q.** You said the witness, specifically who are

1   you talking about?

2   **A.**     Mr. Bolden.

3   **Q.**     Once you turned on 196, at that time what

4   were you looking for?

5   **A.**     I was looking for a suspect matching the

6   description that the clerk had given me.

7   **Q.**     At that time was anyone else in the car with

8   you?

9   **A.**     No, no one was in the car with me.

10   **Q.**     Do you know if any other officer with the

11   Oakland Police Department had received the

12   description that you put out over the radio?

13          **MS. JERMANN-ROBINSON:**   Objection, Your

14   Honor, it calls for speculation.

15          **THE COURT:**   What's that question again?

16          **MR. BIGGERS:**   I asked him did he know if

17   anyone else heard the description that he put out

18   over the radio, does he personally know.

19          **THE COURT:**   Well, as I say, rephrase your

20   question, has to put a better foundation on it.

21   **BY MR. BIGGERS:**

22   **Q.**     Were you looking for the suspect, Sergeant

23   Maxwell?

24   **A.**     I was.

25   **Q.**     And which direction were you going looking

1  for the suspect?

2  **A.**    I was going northbound 196.

3  **Q.**    At any point did you speak to any other

4  officer regarding this incident?

5  **A.**    Not directly.

6  **Q.**    All right.  Did you see anything on 196 as

7  you went northbound?

8  **A.**    I did not.

9  **Q.**    Did you turn around and come back on 196?

10 **A.**    I did.

11 **Q.**    What did you observe on -- after you -- when

12 you came back on 196?

13 **A.**    I observed two of our officers on the scene

14 with a male subject in custody.

15 **Q.**    Who were those officers?

16 **A.**    Be Sergeant Atkins and Patrolman Clark.

17 **Q.**    Are both of them with the Oakland Police

18 Department?

19 **A.**    Yes, they are.

20 **Q.**    How much time passed from the time you went

21 up 196 to the time you turned around and came back

22 down 196 and saw these officers?

23 **A.**    Approximately seconds.

24 **Q.**    Please indicate on the photograph on the

25 screen where you observed those officers as best you

1   can?

2   **A.**      I believe it would be in this general

3   vicinity (indicating), somewhere in this area.

4   **Q.**      Now were they in uniform -- a squad car?

5   **A.**      They were.

6   **Q.**      On which side of the road were they on?

7   **A.**      They were on the northbound side.

8   **Q.**      All right.  Looking at this -- this screen,

9   were they on the right side or the left side?

10  **A.**      They were on the right.

11          This is northbound (indicating).

12  **Q.**      The named two officers, were they in two

13  separate cars?

14  **A.**      No, they were riding together as a two-man

15  unit.

16  **Q.**      Why did they stop in that particular area?

17  **A.**      They seen the subject.

18  **Q.**      Did you personally see the suspect at that

19  time?

20  **A.**      I did not -- oh, at that time, yes, sir, I

21  did.

22  **Q.**      What was that suspect wearing?

23  **A.**      The subject was wearing a blue and black

24  jacket.  He had on a, from where I stood from the

25  roadside, a dark colored toboggan type hat that was

1    rolled up on his head.

2    **Q.**    Did you have any conversations with Sergeant

3    Atkins or Officer Clark at that point?

4    **A.**    I did not.

5    **Q.**    Did you remain on the scene?

6    **A.**    I did not.

7    **Q.**    Where did you go?

8    **A.**    I went back to Hickory Center Market.

9    **Q.**    Why did you go back to Hickory Center Market?

10   **A.**    I went back to start further investigation

11   with the statements from the witness and the clerk

12   and to try to collect further evidence.

13   **Q.**    Upon your return to the Hickory Center

14   Market, did you, in fact, take a statement from the

15   clerk, Mr. Harris?

16   **A.**    I did, in fact, take that statement.

17   **Q.**    Did you, in fact, take a statement from

18   Mr. Bolden?

19   **A.**    I did take the statement.

20   **Q.**    Based on the information that you had at that

21   time was there any documentation of the robbery?

22   **A.**    Yes, there was.

23   **Q.**    What?

24   **A.**    There was video and still photos.

25   **Q.**    Did anyone else associated with the store,

1  other than Mr. Harris, respond to the scene?

2  **A.**    Yes, they did.

3  **Q.**    Who?

4  **A.**    Mr. Ring, the owner of the store.

5  **Q.**    Upon Mr. Ring's arrival were you there?

6  **A.**    Yes, I was.

7  **Q.**    Did you have an occasion to speak to

8  Mr. Ring?

9  **A.**    I did.

10  **Q.**    What, if any, evidence did you obtain or

11  review with Mr. Ring?

12  **A.**    I reviewed the video at the time.  And I

13  obtained two still photos from the video.

14  **Q.**    Did you have occasion to look at those photos

15  in the video?

16  **A.**    I did.

17  **Q.**    Were you able to determine if the description

18  of what you saw, the clothing of the robber, was

19  consistent with the individual that Sergeant Atkins

20  had on the side of the roadway?

21  **A.**    It was.

22  **Q.**    Now at that time was Sergeant Atkins and

23  Officer Clark present at the Hickory Center Market?

24  **A.**    No, they were not.

25  **Q.**    Where were they?

1  **A.**     They were still at the scene.

2  **Q.**     Do you know why they were still at the scene?

3  **A.**     I do.

4  **Q.**     And when you say "the scene," are you

5  referring to scene at 196?

6  **A.**     The apprehension scene, yes, sir.

7  **Q.**     Why were they there?

8  **A.**     They were looking for the weapon.

9  **Q.**     Did you provide any information regarding the

10 weapon to those officers?

11 **A.**     I did provide information via radio.

12 **Q.**     Specifically what type of information did you

13 provide?

14 **A.**     That I reviewed from the video, I confirmed

15 that we were looking for a .38 revolver blackened in

16 color.

17 **Q.**     Do you know if they found a revolver?

18 **A.**     They did.

19 **Q.**     How do you know they found the revolver?

20 **A.**     They reported over the radio the weapon had

21 been found.

22 **Q.**     Did you ever see the actual firearm that was

23 recovered?

24 **A.**     I did.

25 **Q.**     When?

1   **A.**     When they returned to the original scene --

2   **Q.**     Hickory Center Market?

3   **A.**     -- Hickory Center Market -- yes.

4   **Q.**     About how much time passed from the time they

5   initially apprehended the suspect until when they

6   actually came to the Hickory Center Market?

7   **A.**     I would say approximately 20 to 30 minutes.

8   **Q.**     All right.  How much time passed from the

9   time the call went out, the original call went out

10  on the armed robbery until they actually apprehended

11  someone on the side of the road?

12  **A.**     Three minutes.

13  **Q.**     What did you do once the other officers

14  arrived on the scene at the Hickory Center Market?

15  **A.**     I -- I went out, conferred with the other

16  officers about information that I had gathered from

17  the witness and information I'd gathered from the

18  clerk along with information I'd gathered from

19  Mr. Ring, the owner, I shared with them this

20  information.  I talked to them about what they had

21  going on on their scene.  They discussed some things

22  with me as well.

23  **Q.**     At any point did you attempt to determine if

24  Mr. Harris, the clerk, could identify the robbery

25  suspect?

**A.**    I -- I made an attempt to see if Mr. Harris

could identify the clothing that the robbery suspect

was wearing --

**Q.**    Explain --

**A.**    Yes.

**Q.**    -- explain to the jury how you did that?

**A.**    I, as a supervisor I carry a camera in my car

that I can take still photos with.  I took two still

shots of the suspect.  One was full body, face and

all.  And the second was from the neck down only

showing the clothing.

**Q.**    What, if anything, did you show to

Mr. Harris?

**A.**    I showed Mr. Harris, using my camera, the

photo that I took of the suspect from the neck down

of the clothing.

**Q.**    Why did you show Mr. Harris the photograph

just from the neck down?

**A.**    Mr. Harris had told me, when I initially made

the scene, that the suspect was wearing a full mask.

So I felt no need to show Mr. Harris a picture of

the suspect's face being he could not identify his

face anyway.

**Q.**    Did you, in fact, show the photograph -- the

headless photograph to Mr. Harris?

1    **A.**    I did show the photograph to Mr. Harris.

2    **Q.**    Was he able to positively identify that

3    suspect?

4    **A.**    He was able to positively identify him, yes.

5    **Q.**    I'm showing you what's been marked and

6    admitted as exhibit -- Exhibit 8.

7        Tell me if you recognize this?

8    **A.**    I do recognize that photo.

9    **Q.**    What is that a photograph of?

10   **A.**    That's the photo of the -- photograph of the

11   suspect, that was apprehend on 196, from the neck

12   down.

13   **Q.**    The clothing that's shown there, the jacket

14   specifically, is that consistent with what you saw

15   in the video?

16   **A.**    Yes.

17   **Q.**    Anything unique that allowed you to identify

18   that particular jacket?

19   **A.**    Other than the coloring of the jacket in the

20   video and the photo, the logo on the left chest

21   pocket was unique.

22   **Q.**    Would you please circle that.

23   **A.**    (Indicating)

24   **Q.**    At the time the clerk, Mr. Harris, was shown

25   this photograph, where were you all?

**A.**     I'm sorry, I --

**Q.**     Where were you and Mr. Harris when you showed Mr. Harris that photograph?

**A.**     We were inside the store.

**Q.**     At any point did you bring Mr. Harris outside of the store?

**A.**     No, I did not.

**Q.**     To your knowledge at any point did he come outside the store where the suspect was?

**A.**     To my knowledge, no.

**Q.**     Was that the only photograph you took of the suspect?

**A.**     I took another full-face shot photo.

**Q.**     Did you take any other photos of any of the items recovered from the suspect?

**A.**     I did.

**Q.**     Describe those photographs?

**A.**     I took a photograph of the weapon found, the mask found, the glove that was found, the ammunition that was inside the weapon when the weapon was found as I recall.

**Q.**     I'm showing you three photographs.

Take a look at these photographs, Sergeant Maxwell.

Do you recognize those?

**A.**     I do.

**Q.**     What do you recognize those to be photographs of?

**A.**     This one photograph would be the full-face shot of the suspect with the same clothing.

The next photo would be a toboggan-style hat with two eyeholes cut in it, and a glove.

The next photo would be the same mask, glove, and also included in this photo is the weapon found and three rounds of ammunition.

**Q.**     All three of those photographs accurately depict what you personally observed and photographed on the evening of December 7th, 2012?

**A.**     Yes.

         **MR. BIGGERS:**  At this time the government moves to admit in evidence all three as separate exhibits.

         **THE COURT:**  Okay.

         **MS. JERMANN-ROBINSON:**  Your Honor, may I look at them briefly.

         **THE COURT:**  Certainly.

         **MS. JERMANN-ROBINSON:**  Thank you, Your Honor.

         **THE COURT:**  Okay, let's go ahead and mark them, it would be Exhibit 15, 16 and 17.

1          (Exhibit Number 15 was marked;

2    Description:  Photograph.)

3          (Exhibit Number 16 was marked;

4    Description:  Photograph.)

5          (Exhibit Number 17 was marked;

6    Description:  Photograph.)

7    **BY MR. BIGGERS:**

8    **Q.**    At any point, Sergeant Maxwell, do you show

9    any of these photographs to Mr. Harris?

10   **A.**    To my knowledge, no, I don't believe I did.

11        **THE COURT:**  Let me see them.

12   **BY MR. BIGGERS:**

13   **Q.**    The actual items that were found, the

14   evidence that was recovered, the gun, the

15   ammunition, the jacket, and toboggan-style hat, what

16   was done with that?

17   **A.**    It was placed in evidence.

18   **Q.**    How do you know that?

19   **A.**    I placed it into evidence.

20   **Q.**    Who else was present when that took place?

21   **A.**    Sergeant Atkins, Patrolman Clark were present

22   as well.

23   **Q.**    Let me show you Exhibit 15.

24        Do you recognize that?

25   **A.**    Yes, I do.

1    **Q.**      What is that?

2    **A.**      That's a picture of the suspect.

3    **Q.**      Now at the time -- on the night of

4    December 7th, 2012, were you able to determine the

5    identity of that -- of the robber?

6    **A.**      The identity was identified, yes.

7    **Q.**      Who was it?

8    **A.**      Robert --

9    **Q.**      Is it Robert Drew?

10   **A.**      It would be Robert Drew.

11   **Q.**      Do you see that person in the courtroom

12   today?

13   **A.**      I do see the person.

14   **Q.**      Please stand and point to the person you've

15   identified as Robert Drew and describe the clothing

16   he's wearing?

17   **A.**      Robert Drew is wearing a brownish and black

18   shirt with a white T-shirt behind it.

19          **MR. BIGGERS:**  The record reflect the

20   witness has identified the defendant.

21          **THE COURT:**  The record will reflect it.

22   **BY MR. BIGGERS:**

23   **Q.**      Now do you recall on that evening if Mr. Drew

24   gave a statement?

25   **A.**      Mr. Drew did not give a statement.

**Q.**     Showing you Exhibit 16.

What's shown there?

**A.**     This would be a photo of the toboggan-style cap with the eyeholes cut in it and a glove.

**Q.**     And what color are those two items?

**A.**     The toboggan-style cap is -- looks to be a navy blue.  The glove is a brown glove.

**Q.**     Showing you Exhibit 17.

What's shown there?

**A.**     In this photo is going to the same blue toboggan-style cap, the brown glove, three rounds of ammunition in a evidence bag, and the black revolver.

**Q.**     Now you mentioned the ammunition, where did that ammunition come from?

**A.**     The ammunition was taken out of the weapon to make it safe for officers to handle, but those three rounds were inside the chamber.

**Q.**     In that firearm?

**A.**     In that firearm, yes, sir.

**Q.**     Is that firearm a Rossi .38 caliber revolver?

**A.**     It is.

**Q.**     The firearm was loaded at the time that it was recovered?

**A.**     Yes, it was.

**Q.**     Showing you what was marked for I.D. purposes only as Exhibit 10.

Take a look at it and tell me if you recognize this?

**A.**     I do recognize the jacket with the logo.

**Q.**     What do you recognize that jacket to be?

**A.**     This jacket was the jacket that Mr. Drew was wearing the night of his arrest.

**Q.**     Is it in substantially the same condition as it was when it was recovered on December 7th, 2012?

**A.**     Yes, it is.

**MR. BIGGERS:**  At this time the government moves to admit Exhibit 10 into evidence.

**THE COURT:**  Any objection?

**MS. JERMANN-ROBINSON:**  No, Your Honor.

**THE COURT:**  Okay, remove the letters I.D.

And Exhibit 10, the jacket, we will receive it into evidence.

(Exhibit Number 10 was marked; Description:  Jacket.)

**BY MR. BIGGERS:**

**Q.**     Now, if you would, you described the logo, but, please hold this jacket up, stand, hold the jacket up and point out the logo you're referring to for the ladies and gentlemen of the jury.

**A.**     This is the front of the jacket, this would be the logo.  It's looks like a little man maybe with a hat on.

**Q.**     Thank you.

        First, showing you what has been marked and identified as Exhibit 11 for I.D. only.

        Do you recognize that?

**A.**     I do.  This would be the blue toboggan-style cap with the eyeholes that are cut in it.

**Q.**     Is this the same mask that was recovered, hat, toboggan that was recovered from the defendant on that night?

**A.**     It is the same.

**Q.**     Is it substantially the same condition as it was on that evening?

**A.**     Yes.

**Q.**     Showing you these.

**A.**     This is the brown jersey work gloves that were found on the suspect at the time of apprehension and custody.

**Q.**     And those -- are those two gloves substantially the same condition as they were on December 7th, 2012?

**A.**     Yes, they are.

            **MR. BIGGERS:**  At this time the government

1    moves to admit the gloves and hat as collective

2    Exhibit 11.

3              THE COURT:  Okay.  Well, I think we have

4    already got the hat or the mask marked as Exhibit

5    Number 11.  We will remove the letters for I.D. and

6    go ahead and receive the mask into evidence as

7    Exhibit 11.

8              (Exhibit Number 11 was marked;

9    Description:  Mask.)

10             THE COURT:  I don't know that the gloves

11   were identified earlier.

12             MR. BIGGERS:  They have not been, Your

13   Honor.

14             THE COURT:  So we will go ahead and

15   introduce the gloves.  I think there are two of them

16   or just one?

17             MR. BIGGERS:  Two gloves.

18             THE COURT:  Two gloves.

19             They will be a collective exhibit, and I

20   think that will be number 18.

21             MR. BIGGERS:  Yes, Your Honor.

22             (Exhibit Number 18 was marked;

23   Description:  Gloves.)

24   BY MR. BIGGERS:

25   Q.    Show you what's been marked for I.D. only as

1    Exhibit 12.

2          Do you recognize this?

3    **A.**    I do.

4    **Q.**    What do you recognize that to be?

5    **A.**    It's a Rossi .38 revolver.

6    **Q.**    What's unique about that particular firearm?

7    **A.**    It's black in color and it's a revolver.

8    **Q.**    All right.  Do you know -- have you seen that

9    before?

10   **A.**    I have.

11   **Q.**    When was it recovered?

12   **A.**    It was recovered the night Mr. Drew was

13   arrested.

14   **Q.**    So is that the same Rossi .38 caliber

15   revolver that was recovered from the area Mr. Drew

16   was arrested?

17   **A.**    Yes, it is.

18   **Q.**    Is that the same one that you testified to

19   that was loaded on the night of December 7th, 2012

20   with three rounds of ammunition?

21   **A.**    Yes, it is.

22   **Q.**    Is it in substantially the same condition as

23   it was on that evening?

24   **A.**    Substantially, yes, sir.

25          **MR. BIGGERS:**  At this time the government

1  moves to admit into evidence Exhibit 12.

2         **THE COURT:** All right. Again the letters

3  for I.D. will be removed and we will go ahead and

4  receive the pistol into evidence and it will be

5  Exhibit Number 12.

6         (Exhibit Number 12 was marked;

7  Description: Gun.)

8  **BY MR. BIGGERS:**

9  **Q.** Tell me if you recognize that, Sergeant

10 Maxwell?

11 **A.** I do. This would be the three rounds of

12 ammunition that was in the weapon at the time.

13 **Q.** Are those in substantially the same condition

14 as they were on December 7th, 2012?

15 **A.** Yes, they are.

16        **MR. BIGGERS:** At this time the government

17 moves to admit the ammunition into evidence, Your

18 Honor.

19        **THE COURT:** We will receive them, it will

20 be collective Exhibit Number 19.

21        (Exhibit Number 19 was marked;

22 Description: Ammunition.)

23 **BY MR. BIGGERS:**

24 **Q.** After receiving confirmation from the Hickory

25 Center Market from Mr. Harris and after you

1    personally reviewed the video, did you do anything
2    else on that particular scene?
3    **A.**      Can you be more specific?
4    **Q.**      Did you conduct any tests or analysis on any
5    of the evidence collected?
6    **A.**      Not on that scene.
7    **Q.**      Okay.  What tests did you conduct on any
8    evidence?
9    **A.**      I checked the firearm for fingerprints.
10   **Q.**      Where were you when you conducted that test?
11   **A.**      At our police station.
12   **Q.**      Describe to the ladies and gentlemen of the
13   jury how you conducted that analysis?
14   **A.**      I laid down white butcher paper, laid the
15   weapon on top of the paper, I checked for latent
16   prints.  Latent prints are the oils from your
17   fingers that would be left behind on the weapon in a
18   print manner just as they are on your fingers.
19           I checked with the naked eye.  I did not see
20   any prints, but I went forward and dusted the black
21   weapon with white dusting powder.  I did not receive
22   any prints from the weapon.  I did see a couple of
23   smudge marks on the weapon.
24   **Q.**      Prior to that date, December 7th, 2012, had
25   you had any training in print collecting?

1  **A.**     I had basic training on print collection.

2  **Q.**     Showing you two photographs.

3        Tell me if you recognize those, Sergeant

4  Maxwell?

5  **A.**     I do recognize both.

6  **Q.**     What are those photographs of?

7  **A.**     This is photographs of the process of me

8  dusting the weapon for prints.

9  **Q.**     Both of those photographs accurately depict

10 how the firearm looked at the time of dusting?

11 **A.**     Yes.

12       **MR. BIGGERS:**  At this time the government

13 moves to admit both photographs into evidence, Your

14 Honor.

15       **THE COURT:**  All right.  We will go ahead

16 receive them.  I'm assuming they are similar

17 photographs, so we will introduce them as a

18 collective exhibit.  It will be Number 20.

19       (Exhibit Number 20 was marked;

20 Description:  Photographs.)

21 **BY MR. BIGGERS:**

22 **Q.**     The firearm, do you recall where that firearm

23 was recovered, Sergeant Maxwell?

24       Where -- where was it, was it on the

25 defendant's person at the time it was recovered or

1    do you recall?

2    **A.**    Counselor, I can't testify to that.

3    **Q.**    Okay.  This firearm, Exhibit 12, is the

4    firearm that you actually dusted for prints, is that

5    correct?

6    **A.**    It is.

7    **Q.**    What color is it?

8    **A.**    It's black in color.

9    **Q.**    Showing you collective Exhibit 20.

10        The first photograph, describe what's shown

11   there?

12   **A.**    I had the weapon laying on white butcher

13   paper.  I also have a scale rule to show the length

14   of the barrel.  And this maybe the second picture I

15   took prior to the dusting, I wanted to show the

16   weapon prior to me putting fingerprint dust on it.

17   **Q.**    Describe, if you haven't described that

18   weapon, describe how the weapon looked?

19   **A.**    The weapon looks black in color, black

20   handled, it would actually in a professional world

21   be called blued.  It looks in reasonably good

22   condition revolver.

23   **Q.**    Anything unique about its barrel?

24   **A.**    It's a snubnose barrel --

25   **Q.**    What --

**A.**     -- short, short in length.

**Q.**     Short in length?

**A.**     Yes.

**Q.**     Now the second -- the second picture of collective Exhibit 20, describe what's shown there?

**A.**     This would be the same weapon after dusting. I just wanted to show that I had the same weapon in hand.

**Q.**     Now for this photograph it appears to be silver?

**A.**     It does appear to be silver due to the powder and maybe the lighting of the camera is a different angle.

**Q.**     But that is a photograph of the same gun?

**A.**     It's the same weapon, yes.

        **MR. BIGGERS:**  Brief moment, Your Honor.

        **THE COURT:**  Okay.

        **MR. BIGGERS:**  Nothing further from this witness at this time.

        **THE COURT:**  Thank you.

        And is there cross?

        **MS. JERMANN-ROBINSON:**  There is, Your Honor.

        **THE COURT:**  Uh-huh.

                    <u>**CROSS EXAMINATION**</u>

**BY MS. JERMANN-ROBINSON:**

**Q.**     Sergeant Maxwell, Mary C. Robinson --

**A.**     Good to meet you, ma'am.

**Q.**     -- I'm here for the defendant.  Good to meet

you as well.

         You obviously were not in the store at the

time of the robbery --

**A.**     No, ma'am.

**Q.**     -- right?

         You were in your patrol car?

**A.**     Yes, ma'am.

**Q.**     Okay.  And so the person who had the best

idea of when this occurred would probably be the

person who was robbed; does that sound fair?

**A.**     Sounds fair to me.

**Q.**     Okay.  And you testified on direct a little

bit about something called dispatch, and that's how

you were informed that there was a robbery.

         Is that right?

**A.**     That is correct.

**Q.**     Okay.  And you have been -- you're on the

Oakland police force now or police department?

**A.**     Yes, ma'am.

**Q.**     Okay.  And how long have you been with them?

**A.**     I've been with Oakland five years.

**Q.**     For five years.

And were you in law enforcement before then?

**A.**     Prior to with Moscow for two years.

**Q.**     Two years.

And before that?

**A.**     No.

**Q.**     Okay.  So at least the last seven years or so?

**A.**     Yes, ma'am.

**Q.**     Okay.  And you're familiar with this process, I call it process for lack of a better word, called dispatch?

**A.**     I am.

**Q.**     Could you explain to the jury what all -- what dispatch is just in our own plain words?

**A.**     Dispatch is our communication center.  They collect information from complainants or people calling into them and they relay it to the squad cars.

**Q.**     Okay.  And so, and if I'm wrong you correct me, there is, I guess, someone who is the dispatcher who is back at the police station, is that right?

**A.**     That's correct.

**Q.**     Okay.  And this person sends out calls to you, the police officers, from dispatch, is that --

1   **A.**      That's correct.

2   **Q.**      -- right?

3          Okay.  And also the police cars or the

4   officers from the cars can also return or respond to

5   the calls from dispatch and their communication, I

6   guess, between dispatch and the cars?

7   **A.**      That's correct, it's a two-way radio.

8   **Q.**      Okay, two-way radio, that is what I was

9   looking for, thank you.

10          And this interchange between police officers

11  and the dispatch officer, that's recorded, correct?

12  **A.**      Yes.

13  **Q.**      Okay.  And it's recorded and preserved, is

14  that right?

15  **A.**      I assume.

16  **Q.**      Okay.  You assume.

17          Do you -- well, it's recorded and preserved

18  and since you assume that, why do you assume that's

19  so?

20  **A.**      I don't work in dispatch, I'm not really sure

21  what their process totally is.

22  **Q.**      Okay.  But you're aware that's going on?

23  **A.**      I'm aware that it could be going on.

24  **Q.**      Okay.  And, in fact, on that evening, you

25  testified on direct, that you received a broadcast

1    about this robbery?

2    **A.**    That's correct.

3    **Q.**    And the best way to know what time that

4    broadcast was would be, I guess, to get that

5    dispatch recording, correct?

6    **A.**    That's correct.

7    **Q.**    Okay.  And as well as there being a

8    recording, the ones that listened to, also isn't

9    this kept in written form in a detail report?

10   **A.**    It's possible.

11   **Q.**    Okay.  Probably need to ask someone in

12   dispatch about that, right?

13   **A.**    I would --

14   **Q.**    Okay.

15   **A.**    -- probably be your best bet.

16   **Q.**    But it's safe to say that's how you got

17   information about this robbery?

18   **A.**    My information was verbal on the two-way

19   radio.

20   **Q.**    Verbal on the two-way radio, from the

21   dispatcher?

22   **A.**    Yes.

23   **Q.**    Okay.  And it was also the result, that

24   dispatch was the result of a 9-1-1 call or do you

25   know that?

1    **A.**    I'm assuming that's the way it came in.

2    **Q.**    Okay. You don't know for certain?

3    **A.**    I don't know for certain.

4    **Q.**    Okay. But, in fact, through your

5    investigation of this case you did speak with

6    Mr. Harris about what time this robbery happened, is

7    that right?

8    **A.**    Not necessarily.

9    **Q.**    Okay. So you really don't know?

10    **A.**    I didn't ask Mr. Harris what time it

11    happened.

12    **Q.**    Okay. So you really don't know?

13    **A.**    I'm not understanding the question.

14    **Q.**    You really didn't know what time the robbery

15    took place?

16    **A.**    I know what time I was dispatched.

17    **Q.**    Sure.

18    But you really don't know exactly when the

19    robbery took place?

20    **A.**    No, ma'am.

21    **Q.**    Thank you.

22    Now, also, you've testified that, I guess,

23    that you were -- you were in your vehicle and you

24    went to the store, the Hickory Center Market, right?

25    **A.**    When the call out, yes, ma'am.

1   **Q.**    When the call came in, absolutely.

2        You were there briefly?

3   **A.**    Briefly.

4   **Q.**    Okay.  Got back in your car?

5   **A.**    Yes.

6   **Q.**    Okay.  Drove to Highway 96?

7   **A.**    196, yes, ma'am.

8   **Q.**    Thank you.

9        And I guess you drove down Highway 196?

10  **A.**    Northbound.

11  **Q.**    Okay.  And you didn't see anyone there with

12  your own eyes at that time?

13  **A.**    Not at that time.

14  **Q.**    Okay.  But that you turned around and came

15  back to the store?

16  **A.**    No, ma'am.

17  **Q.**    Tell me what you did?

18  **A.**    I was northbound 196.  I went passed the

19  exhibit that I pointed out where the suspect was

20  apprehended, and there's a church just over the

21  hill, block, turned around in that church and came

22  back.

23  **Q.**    Okay.  So I guess the other officers were in

24  a car behind your car?

25  **A.**    They were shortly behind me, yes.

1   **Q.**     Okay. Do you know the exact time of the

2   broadcast?

3   **A.**     It was 2217.

4   **Q.**     2217, okay.

5   **A.**     Which would be 10:17.

6   **Q.**     And do you know the time that actually

7   Mr. Drew was arrested?

8   **A.**     Our custody time was 2220 --

9   **Q.**     Twenty --

10   **A.**     -- 10:20 p.m.

11   **Q.**     And 20:59, does that sound about right?

12   **A.**     10:20, yeah.

13   **Q.**     The broadcast wouldn't lie, would it?

14   **A.**     We don't know the seconds, I mean, we -- we

15   ask for our times and they give us 2220.

16   **Q.**     But at their record at dispatch they would

17   have the exact time, correct?

18   **A.**     I'm assuming.

19   **Q.**     Okay. Now you also testified that a gun was

20   found.

21          It was not found by you?

22   **A.**     No.

23   **Q.**     Okay. And it was not -- well, let me ask you

24   this way.

25          You saw Mr. Drew under arrest before you knew

1    anything about the gun?

2         Let me rephrase that.

3         Before you saw the gun you saw Mr. Drew under

4    arrest?

5    **A.**    Yes.

6    **Q.**    Okay.  And how long between the time that you

7    saw Mr. Drew under arrest and then you saw the gun?

8    **A.**    Approximately 20 to 30 minutes.

9    **Q.**    Twenty to 30 minutes.

10        So they didn't find the gun on him?

11   **A.**    I wasn't there, I don't know.

12   **Q.**    You don't know?

13   **A.**    I can't testify to that.

14   **Q.**    Okay.  But you -- did Mr. Drew get brought to

15   the store first and then later a gun got brought to

16   the store?

17   **A.**    No.

18   **Q.**    Okay.  They were brought some 30 minutes

19   later, 20, 30 minutes later?

20   **A.**    Yes.

21   **Q.**    Okay.  So Mr. Drew was under arrest well

22   before you heard that they had a gun in their

23   possession?

24   **A.**    Yes.

25   **Q.**    And again the dispatch should show exactly

1   what time that they called that weapon in?

2   **A.**    Yes.

3   **Q.**    Okay.

4         Okay.  Let's talk about this gun.

5         You testified that you, I guess, dusted the

6   gun for fingerprints?

7   **A.**    Yes.

8   **Q.**    Okay.  And we saw -- saw pictures of that, of

9   your process for doing that, I guess the before and

10  after pictures of the gun?

11  **A.**    Yes.

12  **Q.**    Okay.  And when you dusted the gun for

13  fingerprints, did you -- you were back at the police

14  station when that happened?

15  **A.**    Yes.

16  **Q.**    Okay.  And is there a special room that you

17  use when you are dusting for fingerprints?

18  **A.**    No.

19  **Q.**    Okay.  Where does it take place?

20  **A.**    Took place in our squad room.

21  **Q.**    Okay.  Just a room in the police station

22  somewhere?

23  **A.**    Yes.

24  **Q.**    All right.  And when you dust for prints, you

25  said that you used white powder?

1    **A.**    It's a name white powder black powder --

2    **Q.**    White?

3    **A.**    White is not really white, so --

4    **Q.**    Things are not always what they seem.

5    And you applied that powder with a brush?

6    **A.**    I did.

7    **Q.**    Okay.  And where do you keep those brushes?

8    **A.**    The feather duster is kept in my -- I have a

9    satchel bag that I keep in my patrol car and it

10    stays in a sleeve that it's -- comes from the

11    manufacturer in.

12    **Q.**    And you used that same feather duster when

13    you check any gun?

14    **A.**    Yes.

15    **Q.**    You don't use different feather dusters?

16    **A.**    No.

17    **Q.**    Okay.  Isn't it true that if you use that

18    feather duster to apply powder to one gun, if there

19    was DNA on that gun and you went to use that same

20    brush to apply to another gun you could transfer

21    that DNA?

22    **A.**    I didn't check for DNA on the gun, ma'am.

23    **Q.**    Oh, I know you didn't.  Let me ask the

24    question again.

25    Isn't it true that when you took that feather

1    duster, a feather duster and go ahead and apply that

2    powder to a gun, if there is DNA on that gun, it

3    could be picked up by the feather duster and

4    transfer to another object that you're testing?

5    **A.**    It's possible.

6    **Q.**    Possible.

7          You corrupted the evidence?

8    **A.**    If I were checking for DNA, I would say yes.

9    **Q.**    Well, isn't it also true that you took a swab

10   or a sample from Mr. Drew of his DNA?

11   **A.**    I did.

12   **Q.**    Okay.  And so then did you take that sample

13   and request or do it yourself request DNA from the

14   hat that you saw in evidence?

15   **A.**    No.

16   **Q.**    Okay.  Or from the gloves?

17   **A.**    No.

18   **Q.**    Or how about from that did you take a Q-tip

19   and remove that smudge from the gun and then compare

20   the DNA?

21   **A.**    No.

22   **Q.**    Didn't even try?

23   **A.**    No.

24   **Q.**    Okay.  You also said on direct that you

25   didn't test for crime scene, I guess at the Hickory

1   Center Market, meaning you didn't, you or anyone

2   else underneath you didn't dust that table or the

3   counter for prints?

4   **A.**     No.

5   **Q.**     Didn't swab for DNA?

6   **A.**     No.

7   **Q.**     Okay.  And you did see the video, you saw

8   that the individual that did rob the store had his

9   hand on that gun and put his hand down on the

10  counter, right?

11  **A.**     I did.

12  **Q.**     But you didn't ask anybody to test it?

13  **A.**     No.

14  **Q.**     Okay.  Now isn't it true that you conferred

15  with the Memphis Police Department about another

16  robbery that supposedly happened on the same day?

17  **A.**     No.

18  **Q.**     You did not.  Okay.

19         Do you know if other offices did?

20  **A.**     I do.

21  **Q.**     Do you know who conferred?

22  **A.**     Sergeant Atkins.

23  **Q.**     Okay.  In terms of where the weapon was

24  found, you don't have any specific personal

25  knowledge of where that weapon was found, do you?

1   **A.**    No.

2   **Q.**    You didn't see it?

3   **A.**    No.

4   **Q.**    Only know what you're told?

5   **A.**    Yes, ma'am.

6   **Q.**    Okay. Were there any photographs taken of

7 where the weapon was found?

8   **A.**    To my knowledge I don't know.

9   **Q.**    You don't know?

10   **A.**    I haven't seen any photographs of where it

11 was taken.

12   **Q.**    Have you looked at file in this case?

13   **A.**    I have.

14   **Q.**    Okay. And you didn't see any photographs?

15   **A.**    I didn't -- I wouldn't be testifying to it,

16 so I only really looked at what I performed.

17   **Q.**    Okay. Do you know if there was any video

18 taken of where the gun was found?

19   **A.**    I don't believe so.

20   **Q.**    Do you know if there was any -- if there are

21 any photographs taken of where Mr. Drew was actually

22 arrested?

23   **A.**    Where he was actually arrested; yes.

24   **Q.**    Where he was -- well, let me change the

25 question.

1        Where was he when he was found?

2        I know where he was arrested, that was at the

3   store, but where was he actually found, were their

4   pictures taken of that?

5   **A.**    Yes.

6   **Q.**    Okay.

7   **A.**    Not the night of, but we do have pictures --

8   **Q.**    Okay.

9   **A.**    -- of where he was arrested.

10  **Q.**    Okay.  The night of there were no pictures

11  taken of him, wherever he might have been in the

12  woods?

13  **A.**    To my knowledge, no.

14  **Q.**    Okay.  No video?

15  **A.**    No.

16  **Q.**    Okay.  Is it true that you spoke with some of

17  the officers about where he was found?

18  **A.**    I did.

19  **Q.**    Okay.  And Officer Clark said that he was

20  found maybe a thousand feet off the road; does that

21  sound about right?

22  **A.**    Approximately.

23  **Q.**    Okay.  And Officer Atkins said he was found

24  about 25 feet off the road?

25  **A.**    I think there was a misunderstanding on the

1    question asked.

2    **Q.**    That's what they told you, right?

3    **A.**    Well, there was two different questions.

4    **Q.**    Those numbers were given to you by those two

5    different officers?

6    **A.**    With two different questions --

7    **Q.**    All right.

8    **A.**    -- yes.

9            **MS. JERMANN-ROBINSON:**  May I have one

10    moment, Your Honor?

11            **THE COURT:**  Okay.

12            **MS. JERMANN-ROBINSON:**  Thank you, Your

13    Honor.

14    **BY MS. JERMANN-ROBINSON:**

15    **Q.**    Besides, I think he's an officer, so if I'm

16    wrong, I apologize, besides Officer Atkins and

17    Reserve Officer Clark, there was also Officer

18    Gonzales on the scene, is that right?

19    **A.**    That's correct.

20    **Q.**    All right.  And she was there with a K-9?

21    **A.**    That's correct.

22    **Q.**    Okay.  And she let that K-9 go?

23    **A.**    No.

24    **Q.**    Okay.  She kept it in her car?

25    **A.**    I can't testify to whether she kept in the

1    car, but the dog was not deployed.

2    **Q.**    The dog was not deployed.  Okay.

3         Were was there any other officers out there?

4    **A.**    On that particular scene there?

5    **Q.**    That particular scene that particular night?

6    **A.**    No.

7         **MS. JERMANN-ROBINSON:**  Your Honor, I beg

8    your pardon, just one more moment.

9         Your Honor, just a couple of more

10   questions, I apologize.

11        **THE COURT:**  No need to apologize.

12   **BY MS. JERMANN-ROBINSON:**

13   **Q.**    You explained pretty carefully how you tested

14   the weapon for fingerprints with -- with powder.

15        And did you use any other methodology to try

16   to pull fingerprints or evidence from the gun?

17   **A.**    No.

18   **Q.**    Okay.  You're aware that there is a device

19   called a Superglue chamber that you can actually put

20   a weapon into?

21   **A.**    I am.

22   **Q.**    You are aware of that?

23   **A.**    Yes.

24   **Q.**    Okay.  And you didn't use that methodology?

25   **A.**    No.

1    **Q.**    Isn't that a far better methodology than

2    dusting for powder -- for prints with powder?

3    **A.**    I'm not a professional to state whether it's

4    a better method or not.

5    **Q.**    Well, you went through quite some detail in

6    telling us how you did do the process?

7    **A.**    I am aware of the process.

8    **Q.**    And you had training in this area?

9    **A.**    I have.

10   **Q.**    Okay.  And you've been an officer for seven

11   years?

12   **A.**    I have.

13   **Q.**    And you are aware that using a Superglue

14   chamber to find prints is a far better method in

15   finding fingerprints?

16   **A.**    I can testify that it's a good method.

17   **Q.**    Okay.  You are aware that the Memphis Police

18   Department has such a Superglue chamber?

19   **A.**    I am aware.

20   **Q.**    Okay.  Does Oakland have one?

21   **A.**    They do not.

22   **Q.**    Okay.  But you all were cooperating in this

23   investigation?

24   **A.**    Not at this point, no, ma'am.

25   **Q.**    So you all are at this point today, is that

1 correct?

2 **A.**      Well, we -- we are now.

3 **Q.**      Okay.  And on that date, actually -- actually

4 a day or two later weren't you, in fact, contact by,

5 I believe, a Memphis police officer by the name of

6 Cox?

7 **A.**      No, ma'am, I was not.

8 **Q.**      Okay.  But you were aware there was

9 communication very quickly after the Memphis robbery

10 and after your robbery?

11 **A.**      I can testify that I never spoken to anybody

12 with the Memphis Police Department about this

13 robbery.

14 **Q.**      But you know other Oakland officers have --

15 **A.**      I do --

16 **Q.**      -- correct?

17 **A.**      I do.

18         **MS. JERMANN-ROBINSON:**  Your Honor, that's

19 all the questions I have.

20         Thank you very much.

21         **THE COURT:**  All right, thank you.

22         And any redirect?

23         **MR. BIGGERS:**  Yes, Your Honor.

24              **REDIRECT EXAMINATION**

25 BY MR. BIGGERS:

1  **Q.**    Sergeant Maxwell, you're employed with the

2  Oakland Police Department, is that correct?

3  **A.**    I am employed with the Oakland Police

4  Department.

5  **Q.**    Approximately how many officers does the

6  Oakland Police Department have?

7  **A.**    Approximately 18, 19.

8  **Q.**    Now defense counsel asked you about some type

9  of Superglue chamber test, are you all equipped with

10  that type of equipment to check for prints at the

11  Oakland Police Department?

12  **A.**    We're not.

13  **Q.**    She asked you about DNA.

14        Are you trained in DNA sampling or taking

15  DNA?

16  **A.**    I'm only trained in the sampling for TBI

17  investigation.

18  **Q.**    And do you actively collect DNA in your role

19  with the Oakland Police Department?

20  **A.**    We do collect on aggravated cases.

21  **Q.**    You say aggravated, would that include

22  attempted robbery?

23  **A.**    It would include attempted robbery.

24  **Q.**    Now on this particular case, the jacket

25  recovered, Exhibit 10, did you attempt to get DNA

1   off of this jacket?

2  **A.**     I did not.

3  **Q.**     Why not?

4  **A.**     Because the subject was wearing the jacket.

5  **Q.**     So there was no need to check for DNA because

6  he was wearing it?

7  **A.**     Absolutely.

8  **Q.**     Who -- whose DNA would you expect to be on

9  the jacket?

10  **A.**     Mr. Drew's.

11  **Q.**     Exhibit 11, the mask, did you attempt to

12  collect any DNA from the mask or hat?

13  **A.**     I did not.

14  **Q.**     Why not?

15  **A.**     Mr. Drew was wearing it.

16  **Q.**     Whose DNA would you expect to be on the hat?

17  **A.**     Mr. Drew.

18  **Q.**     The defense counsel asked you about the time

19  that you -- the call went out.  And I believe you

20  testified that you heard the call it was

21  approximately 10:17 p.m., is that correct?

22  **A.**     That's correct.

23  **Q.**     And what time again was the -- was the

24  defendant Robert Drew actually arrested, taken into

25  custody?

**A.**     Three minutes later, 10:20.

**Q.**     So within three minutes of the call going out the defendant was found on the side of the roadway?

**A.**     That's correct.

**Q.**     All right.  I believe we have the video up to show Exhibit 7.

Defense counsel asked you, Sergeant Maxwell, about trying to collect prints from inside the store.

To your knowledge was the suspect wearing gloves on either of his hands?

**A.**     Yes, he was.

**Q.**     I'm going to play this video, and I want you to tell me when the defendant's gloved hand, the ungloved hand actually touched the register or the counter.

Please play the full screen.

(Videotape playing.)

**Q.**     I'm sorry, Sergeant Maxwell, you never interrupted me and told me when he touched the counter?

**A.**     That's correct.

**Q.**     Why not?

**A.**     He didn't touch the counter.

**MR. BIGGERS:**  No further questions, Your

1    Honor.

2              **THE COURT:**  Thank you.

3              And recross?

4              **MS. JERMANN-ROBINSON:**  Yes, just briefly,

5    Your Honor.

6                    **RECROSS EXAMINATION**

7    **BY MS. JERMANN-ROBINSON:**

8    **Q.**    Sergeant Maxwell, publishing Exhibit

9    Number 17 --

10             **MS. JERMANN-ROBINSON:**  If I need to --

11             Thank you.

12             Thank you, Mr. Herrin.

13   **BY MS. JERMANN-ROBINSON:**

14   **Q.**    Attempting to publish what is Exhibit 17, if

15   I remember correctly.  Yes.

16             In this photograph, clearly we're showing a

17   glove, three bullets, a gun, and a mask, correct?

18   **A.**    That's correct.

19   **Q.**    Okay.  And there are no time stamp on this

20   photograph, is that also correct?

21   **A.**    I don't see one, no, ma'am.

22   **Q.**    Okay.  And you've testified that this gun was

23   found maybe 20 or more minutes after Mr. Drew was

24   arrested, correct?

25   **A.**    That is correct.

**Q.** But you just put all the stuff together in the same picture, right?

**A.** That's correct.

**Q.** You're not saying it was all found at the same time, are you?

**A.** Twenty, 30 minutes apart.

**Q.** Twenty or 30 minutes apart, but yet they are all in the same picture.

Isn't it true that you're trying to lead this jury to believe that these were all found together, including the gun, on Mr. Drew?

**A.** I'm not leading anybody for anything, I'm just showing a picture.

**MS. JERMANN-ROBINSON:** Nothing further.

**THE COURT:** Okay, Sergeant, thank you very much for coming down. You can step down, you are excused.

(Witness excused.)

**THE COURT:** Okay, folks, we are going to break tonight at about 5:30.

Does anyone need a break right now or can we keep going?

Okay. I'm trying to get the next witness in today. If not, we will have to break and finish tomorrow, but I want to see if we can get at least

one more in today.  Okay.

　　　　Mr. Biggers, if you would, please, or Mr. Stringfellow, go ahead and call your next witness.

　　　　**MR. STRINGFELLOW:**  The government calls Officer Jason Clark.

　　　　**THE COURT:**  Come forward, Officer.

　　　　Come forward.

　　　　Okay.  You are good right there.

　　　　Raise your right hand.

　　　　Do you solemnly swear or affirm, under the penalties of perjury, the testimony that you are about to provide the court and jury in the case now on trial to be the truth, the whole truth and nothing but the truth, so help you God?

　　　　**THE WITNESS:**  Yes, sir, I do.

　　　　**THE COURT:**  Have a seat right here if you would, please.

1          **JASON CLARK,**

2    was thereupon called as a witness on behalf of the

3    Plaintiff, and having been first duly sworn,

4    was examined and testified as follows:

5                  **DIRECT EXAMINATION**

6    **BY MR. STRINGFELLOW:**

7    **Q.**      State and spell your name for the record.

8    **A.**      Jason Clark.  J-a-s-o-n, C-l-a-r-k.

9    **Q.**      Where do you live?

10   **A.**      Live in Oakland, Tennessee.

11   **Q.**      Do you work for the Oakland Police

12   Department?

13   **A.**      I'm a reserve, technically not employed, so

14   I'm a reserve police officer.

15   **Q.**      And how long have you been a reserve police

16   officer?

17   **A.**      Completed my training in August of 2012 and

18   was released on my own in the middle of the summer

19   of 2013, so just a couple of years.

20   **Q.**      Were you working as a reserve police officer

21   on December 7th, 2012?

22   **A.**      Yes, sir, I was.

23   **Q.**      And while working that night, did you receive

24   a call about a robbery in progress at the Hickory

25   Center Market?

1    **A.**    Yes, sir, I did.

2    **Q.**    What were you doing when you received that

3    call?

4    **A.**    At the time I received the call I was on a

5    traffic stop with my field supervisor, Sergeant --

6    Sergeant Atkins, interviewing a suspect on a traffic

7    stop.

8    **Q.**    What happened when you all got that call?

9    **A.**    I saw Sergeant Atkins say come on.  I didn't

10   hear that call come over the radio initially.  He

11   said, come on, come on, like that, so I ran and got

12   the car.  And I said, what have we got.  He said, we

13   have an armed robbery at Hickory Center.

14   **Q.**    And what happened after that, did you all

15   go --

16   **A.**    We -- we responded, yes, sir, we responded to

17   the scene at Hickory Center.

18   **Q.**    When you got to the Hickory Center Market,

19   did you all do anything else?

20   **A.**    When we were pulling to the Hickory Center

21   Market, right there in the very close proximity,

22   Sergeant Jimmy Maxwell gave over the radio a

23   description of the suspect and told us to go by the

24   Renaissance Center, which is a small shopping center

25   in the close vicinity of the Hickory Center Market.

1    And we patrolled through there, went through there,

2    did not see anything unusual and went northbound on

3    Highway 196 leading to where we found the suspect.

4    **Q.**    Did you use anything to assist you in your

5    search for a suspect?

6    **A.**    I did.  I used a spotlight that you can

7    manipulate.  It's mounted in front -- in front of

8    the wind -- the window of the passenger window.

9    Most of our police cars only have the spotlight on

10   the driver's side, but the police car we was in I

11   luckily had the spotlight on the passenger's side as

12   well, I could manipulate that.  So I did use that to

13   aid my vision.

14   **Q.**    Was this the first robbery call you had ever

15   received?

16   **A.**    It was, yes, sir.

17   **Q.**    And how many minutes had passed from when the

18   call came in to the time that you're going through

19   the Renaissance parking lot?

20            **MS. JERMANN-ROBINSON:**  I'm going to

21   object, Your Honor.

22            May we approach.

23            **THE COURT:**  All right.

24          (The following proceedings had at side-bar

25   bench.)

1          THE COURT:  Okay.

2          MS. JERMANN-ROBINSON:  I guess first, I

3   could say, Your Honor, if you want me to state the

4   objection when I stand up, I'll do that, I'm not

5   sure how the court prefers to do that.

6          THE COURT:  It's just a legal objection,

7   you can do it from -- from counsel table.

8          MS. JERMANN-ROBINSON:  Okay.

9          THE COURT:  If we have to involve and

10  start talking about facts, I appreciate it if we

11  could approach the bench.

12         MS. JERMANN-ROBINSON:  Okay.  Thank you,

13  Your Honor, I just wanted to make sure.

14         Your Honor, he testified that he didn't

15  hear the call, that he was told about the call.  So

16  I don't he would have the ability to respond to that

17  question.

18         THE COURT:  All right, so it's a lack of a

19  foundation then?

20         MS. JERMANN-ROBINSON:  Yes.

21         THE COURT:  All right.  You need to lay a

22  better foundation in order to proceed with the

23  questioning.

24         MR. STRINGFELLOW:  Your Honor, I don't

25  know if I understand the objection.  He testified

1   that when he got the call, his partner then told him

2   that we have a robbery in progress.

3          **THE COURT:**  I understand that, but he

4   didn't get the call.  And your question referred to

5   the dispatch call.

6          **MR. STRINGFELLOW:**  Okay.

7          **THE COURT:**  As I said lay a better

8   foundation.

9          **MR. STRINGFELLOW:**  Okay.

10         **THE COURT:**  All right.  Let's proceed.

11         **MR. STRINGFELLOW:**  Thank you.

12         (The following proceedings had at side-bar

13  bench.)

14  **BY MR. STRINGFELLOW:**

15  **Q.**    Officer Clark, how long did it take you to

16  respond to the robbery in progress?

17  **A.**    We were really about two miles down, so a

18  minute or so, not long at all.  We were in very

19  close proximity.

20  **Q.**    And when y'all went through the Renaissance's

21  parking lot, did you see a suspect?

22  **A.**    Not in the Renaissance's parking lot, no,

23  sir.

24  **Q.**    What happened after you searched the

25  Renaissance's parking lot?

1   **A.**     We continued to go northbound on Highway 196.

2   **Q.**     And while you all continued heading

3   northbound, did you eventually see a suspect?

4   **A.**     I -- I did.

5   **Q.**     Describe for the ladies and gentlemen of the

6   jury what -- what you saw?

7   **A.**     Okay.  As he turned out onto Highway 196

8   going northbound, as soon as you turn on the

9   highway, it's an extremely wooded area with the road

10  being elevated from the rest of the terrain, so as

11  you look down is -- the reason why I saw him because

12  I was on the passenger's side of the car, so sitting

13  from the driver's side it would be more difficult to

14  see.  So as I looked down with the spotlight as I'm

15  sweeping I see someone laying in the woods.  I would

16  say a rough guess would be probably 35 to 40 feet in

17  the woods.

18         Should I continue on.

19         **MR. STRINGFELLOW:**  Your Honor, may I

20  approach?

21         **THE COURT:**  Go ahead.

22  **BY MR. STRINGFELLOW:**

23  **Q.**     I'm handing you some photographs.

24  **A.**     Okay.

25  **Q.**     Do you recognize those?

1    **A.**    Yes, sir, I do.

2    **Q.**    What are those photographs of?

3    **A.**    Okay.  The first photos I look at is the

4    immediate area where we apprehended the subject on

5    Highway 196.

6    **Q.**    Okay.  And the other photographs?

7    **A.**    The photograph here would be the approximate

8    area where the suspect was.

9         This is immediately in the treeline where the

10   suspect was.

11   **Q.**    And do those photographs accurately depict

12   that area where you found the subject December 7th,

13   2012?

14   **A.**    Absolutely due to the -- you can tell these

15   photos were taken in the fall, there's no leaves on

16   the trees, and the same time, this was December 7th,

17   there were no leaves.  So as far as the vision,

18   distance, area it's exact.  So --

19        **MR. STRINGFELLOW:**  Your Honor, the

20   government would move to enter into exhibit evidence

21   the five pictures of that scene.

22        **MS. JERMANN-ROBINSON:**  Your Honor, if I

23   can see it first.

24        **THE COURT:**  All right, why don't you show

25   them to defense counsel.

1    **MS. JERMANN-ROBINSON:** Your Honor, may we

2   approach?

3    **THE COURT:** Okay.

4    (The following proceedings had at side-bar

5   bench.)

6    **MS. JERMANN-ROBINSON:** And I have been

7   shown these previously, Your Honor, but I want to

8   object at this time and even if I'm wrong, I stand

9   to be corrected, but I don't know if these

10  accurately depict the scene, I don't know if he is

11  going to testify to this or not. This appears to

12  be --

13   **THE COURT:** Well, he has testified to

14  that.

15   **MS. JERMANN-ROBINSON:** Okay. I guess the

16  question is when were these photographs taken if he

17  knows.

18   **THE COURT:** Well, I think you will be able

19  to cover that in cross.

20   **MS. JERMANN-ROBINSON:** Is it the intention

21  of the government to say this is exactly how it was

22  that evening because, of course, it was dark that

23  evening, this is nine or ten o'clock at night.

24   **THE COURT:** Why don't you go into the time

25  that the photographs were actually taken as opposed

1    to when he was apprehend.

2           But other than that, as I said, that's

3    fine for cross-examination.

4           **MS. JERMANN-ROBINSON:**  It appears that the

5    jury would be misled because it certainly wasn't

6    like that at nine or ten o'clock at night.

7           **THE COURT:**  I think they all know the

8    difference between what's shown there and nine or

9    ten o'clock at night, whatever time it happened.

10          **MS. JERMANN-ROBINSON:**  Thank you.

11          **THE COURT:**  But go ahead and ask those

12   questions and we will proceed.

13          **MR. STRINGFELLOW:**  Thank you, Your

14   Honoring.

15          (The following proceedings were had in

16   open court.)

17   **BY MR. STRINGFELLOW:**

18   **Q.**    Officer Clark, what time did you all actually

19   apprehend the suspect or a suspect on December 7th,

20   2012.

21   **A.**    It was 2220 or 10:17 p.m. -- or I'm sorry,

22   10:20 p.m., 2220.

23   **Q.**    And in the pictures that I just handed you,

24   the pictures were taken during the daytime?

25   **A.**    Yes, they were taken during the daytime.

1  **Q.**     But other than that, these pictures show the

2  area that you all actually apprehended the suspect.

3  **A.**     Yes, sir, that is correct.

4          **MR. STRINGFELLOW:**  Your Honor, the

5  government moves to enter these into evidence.

6          **THE COURT:**  All right.  Any further

7  objection.

8          **MS. JERMANN-ROBINSON:**  No, that's my only

9  objection, Your Honor.

10          **THE COURT:**  I understand, thank you.

11          And I will overrule the objection.  We

12  will go ahead and receive the photographs into

13  evidence.

14          Do you want to introduce them individually

15  or collectively?

16          **MR. STRINGFELLOW:**  Individually, Your

17  Honor.

18          **THE COURT:**  All right.  Then you need to

19  show Mr. Herrin which ones -- what order.

20          (Exhibit Number 21 was marked;

21  Description:  Photograph.)

22          (Exhibit Number 22 was marked;

23  Description:  Photograph.)

24          (Exhibit Number 23 was marked;

25  Description:  Photograph.)

1          (Exhibit Number 24 was marked;

2    Description:  Photograph.)

3          (Exhibit Number 25 was marked;

4    Description:  Photograph.)

5    **BY MR. STRINGFELLOW:**

6    **Q.**    Officer Clark, while waiting on those, I'm

7    going to show you what's been previously admitted

8    into evidence as Exhibit Number 13.

9    **A.**    Okay.

10   **Q.**    You recognize that?

11   **A.**    I do.

12   **Q.**    What -- what is that?

13   **A.**    That is an aerial view of the immediate area

14   with the Hickory Center Market, the Renaissance

15   Center, the bank, and the area where we apprehended

16   the suspect.

17   **Q.**    And -- and the screen in front of you is

18   actually a touch screen.

19   **A.**    Okay.

20   **Q.**    Would you indicate on the screen where the

21   Hickory Center Market is?

22   **A.**    There, I'm touching it (indicating).

23   **Q.**    You can circle it?

24   **A.**    Oh, okay, I apologize.

25   **Q.**    Would you also indicate where you were when

1    the call for the robbery in progress came in?

2    **A.**    Where -- it's not going to be on that screen,

3    but we were approximately about two miles east of

4    that facing westbound in the westbound lane on a

5    traffic stop.

6    **Q.**    And would you please indicate on the screen

7    where you all actually found the suspect laying off

8    the side of the highway?

9    **A.**    Yeah, absolutely.

10         Approximately right -- I guess I can make a

11   larger mark (indicating).

12   **Q.**    You can mark it with an X.

13   **A.**    Okay, there.

14   **Q.**    Now I'm now going to show you --

15         **MR. STRINGFELLOW:**  Your Honor, may I

16   publish these to the jury?

17         **THE COURT:**  Are you talking about the ones

18   that you just marked?

19         **MR. STRINGFELLOW:**  Yes, Your Honor.

20         **THE COURT:**  Sure, go ahead.

21         **MR. STRINGFELLOW:**  Thank you.

22   **BY MR. STRINGFELLOW:**

23   **Q.**    I'm showing you Exhibit 22.

24   **A.**    Okay.

25   **Q.**    What is that?

1  **A.**     That is where the area that we apprehended

2  the suspect, it is north of Highway 64, a rough

3  guesstimate, what I would say, we were about a

4  thousand feet up Highway 196 there.

5  **Q.**     And what intersection is that?

6  **A.**     The intersection in the distance down here is

7  Highway 64.

8          **MS. JERMANN-ROBINSON:**  I'm sorry, Your

9  Honor, what number exhibit is that?

10          **THE COURT:**  Exhibit 22.

11          **MS. JERMANN-ROBINSON:**  Thank you.

12          **THE COURT:**  Did you say about a thousand

13  yards or a thousand feet?

14          **THE WITNESS:**  A thousand feet, yeah,

15  roughly.

16  **BY MR. STRINGFELLOW:**

17  **Q.**     Now looking at Exhibit 21, what are we

18  looking at in this photograph?

19  **A.**     That is looking continued northbound on

20  Highway 196.  To the left here, that little small

21  dead-end road, Hickory Withe Road is what it would

22  be called.

23  **Q.**     Okay.  Now looking at Exhibit 23.

24          What are we looking at there?

25  **A.**     This would be the patrol car sitting on

1  Highway 196 still facing northbound.  The wooded

2  area no -- no more than five to ten feet in the

3  wooded area is where we found the suspect.

4  **Q.**    Would you please mark or circle where the

5  suspect, about where the suspect was laying?

6  **A.**    This -- probably about ten feet into

7  (indicating).

8  **Q.**    Showing you Exhibit 25, what's that?

9  **A.**    That photo appears to be taken right at the

10  edge of the treeline as opposed to from the street.

11  And that would have put the suspect in the five to

12  ten foot range, roughly there (indicating).

13         **THE COURT:**  Now hold it.

14         Can you make a little bigger circle.

15         **THE WITNESS:**  I can, oh, absolutely,

16  absolutely.

17  **A.**    This being the treeline, just a rough

18  guesstimate of, you know, five to ten feet on the

19  screen here would be in that area right in there

20  (indicating), so it was not real deep into the

21  treeline at all.

22  **Q.**    When you first spot the suspect laying on the

23  side of the highway by -- by the treeline, what --

24  what did you say?

25         What did you do?

1   **A.**     Being the passenger of the car, we were still

2   rolling, still moving, so I told my -- my field

3   supervisor, my sergeant, I said, got someone, stop.

4   And he stopped the car immediately.

5   **Q.**     Describe to the ladies and gentlemen of the

6   jury what that person was wearing?

7   **A.**     That person was wearing a black and blue

8   jacket and a dark colored, like, toboggan thing on

9   their head.

10  **Q.**     When you all stopped the car, what did you do

11  next?

12  **A.**     When we stopped the car, I immediately exited

13  the car and ordered the suspect to show me your

14  hands, show me your hands, show me your hands

15  immediately.

16  **Q.**     Did you then apprehend the suspect?

17  **A.**     I did, yes, sir.

18          **MR. STRINGFELLOW:**  Your Honor, may I

19  approach the witness?

20          **THE COURT:**  Go ahead.

21  **BY MR. STRINGFELLOW:**

22  **Q.**     I'm showing you what's been previously

23  entered into evidence as Exhibit 18.

24  **A.**     Yeah.

25  **Q.**     Are those the gloves that you saw on the

1    suspect?

2    **A.**     Yes, sir, they are.

3    **Q.**     And would you please show the ladies and

4    gentlemen of the jury how he was wearing the gloves

5    or holding the gloves?

6    **A.**     Okay.  Obviously I'm not putting it on, but

7    as -- when I came out of the car and ordered the

8    suspect show me your hands, show me your hands, show

9    me your hands, he did comply initially at first and

10   he immediately put his hands up.

11            When he put his hands up, I could see clearly

12   a glove on this hand, but something was in his right

13   hand and I was not sure what it was.  I ordered him

14   open your hands, open your hands.  When he opened

15   his hands, he had dropped out the right glove that

16   was wadded up in his hand, and it dropped to the

17   ground and he remained with his hands in the air.

18   **Q.**     Did you actually put the suspect in

19   handcuffs?

20   **A.**     I did, yes, sir.

21   **Q.**     When you put him in the handcuffs, did you

22   pat him down?

23   **A.**     I -- yes, I did.  He was laying on his

24   stomach, put his hands behind his back, got him

25   cuffed and did a pat down of the back, rolled him

1    over and did a frontal -- frontal pat down.

2    **Q.**    Did you find a gun?

3    **A.**    I did not find a gun, no, sir.

4              **MR. STRINGFELLOW:**  Your Honor, may I

5    approach the witness?

6              **THE COURT:**  You have permission to

7    approach the witness.  You didn't have to ask every

8    time.

9              **MR. STRINGFELLOW:**  Thank you, Your Honor.

10             **THE COURT:**  Go ahead.

11   **BY MR. STRINGFELLOW:**

12   **Q.**    I'm showing you what's been entered into

13   evidence as Exhibit 11.

14   **A.**    Okay.

15   **Q.**    What -- what is that?

16   **A.**    That is a blue little toboggan with make --

17   makeshift eyeholes that look -- have been cut with a

18   knife or something.

19   **Q.**    Was that the same type of toboggan that you

20   saw on the defendant or the suspect's head that

21   night?

22   **A.**    Yes, sir, it was.

23   **Q.**    After you put the suspect in the handcuffs,

24   what did you do next?

25   **A.**    Once we -- when I rolled him over and got him

1    hand -- patted him down, made sure he didn't have

2    anything on him, he got up and took him to the

3    patrol car that was waiting still on the roadway and

4    placed him in the back of the car.

5    **Q.**    When you were placing him in the back of the

6    car, what was Sergeant Atkins doing?

7    **A.**    Sergeant Atkins was still down at the

8    original scene where I apprehended him.

9    **Q.**    What was he doing?

10   **A.**    Looking around, because the call that came

11   out was that he had a gun.  I did not find a gun on

12   him, so we were trying to look in the immediate

13   area.

14   **Q.**    Eventually did Sergeant Atkins return to the

15   car where you were waiting for him?

16   **A.**    He did eventually return to the car, yes,

17   sir.

18   **Q.**    When he did, did he have a gun in his hand?

19   **A.**    He did.

20   **Q.**    What -- describe to the ladies and gentlemen

21   of the jury what that gun looked like?

22   **A.**    It was just a small black snub-nosed

23   revolver.

24   **Q.**    Do you see the individual that you found

25   hiding in the woods on December 7th, 2012 --

1    **A.**      Yes, sir.

2    **Q.**      -- in the courtroom today?

3    **A.**      Yes, sir.

4    **Q.**      If you would point to him and describe what

5    he's wearing.

6    **A.**      Yes, he's behind you there.  He's wearing --

7    I can't tell what exactly it is, a black shirt with

8    some kind of orange stuff on it.

9                **MR. STRINGFELLOW:**  Let the record reflect

10   that he has identified Robert Drew.

11               **THE COURT:**  The record will reflect that

12   he has pointed out the defendant.

13   **BY MR. STRINGFELLOW:**

14   **Q.**      After Sergeant Atkins returned to the car,

15   did you all go to the Hickory Center Market?

16   **A.**      We did return to the Hickory Center Market,

17   yes, sir.

18   **Q.**      When you all returned to the Hickory Center

19   Market, what -- what were you doing?

20   **A.**      At that point I was in my training period, so

21   my -- my role was to learn the paperwork and stuff.

22   So I asked, well, what can I start doing.  And they

23   said start filling out paperwork.  So I started

24   filling out a property tag, because I knew that we

25   had some property, which is common procedure in any

1    arrest.

2    **Q.**    Officer Clark, I'm handing you Exhibit 10.

3    **A.**    Okay.

4    **Q.**    Do you recognize this?

5    **A.**    I do recognize that.

6    **Q.**    What is that?

7    **A.**    It's a black and blue plaid jacket that we

8    obtained that night from the suspect.

9    **Q.**    What -- was Robert Drew wearing that when

10   y'all arrested him?

11   **A.**    He was wearing that.

12   **Q.**    Okay.  And how far away did you say he was

13   when you all actual -- from the Hickory Center

14   Market?

15   **A.**    From the actually Hickory Center Market, in

16   what would be a straight line, would be, I will say

17   probably a couple of thousand feet.

18   **Q.**    How long would it take someone to walk there?

19   **A.**    To walk there, a few minutes to walk.

20   **Q.**    It's pretty close?

21   **A.**    Yeah, it's definitely close.

22          **MR. STRINGFELLOW:**  Your Honor, may I have

23   a moment to confer with my cocounsel?

24          **THE COURT:**  Sure.

25          **MR. STRINGFELLOW:**  No further questions,

1  Your Honor.

2         **THE COURT:**  Thank you.

3         And cross?

4         **MS. JERMANN-ROBINSON:**  Thank you, Your

5  Honor.

6                    **CROSS EXAMINATION**

7  **BY MS. JERMANN-ROBINSON:**

8  **Q.**    Is it Patrolman Clark or Officer Clark?

9  **A.**    Either or Officer Clark.

10 **Q.**    What name would you like me to --

11 **A.**    Officer Clark will be fine.

12 **Q.**    I'll call you officer then.

13        Officer Clark, isn't it true when you

14 arrested Robert Drew he was drunk?

15 **A.**    I can not attest to that.

16 **Q.**    I'm sure you all charged him with public

17 intoxication?

18 **A.**    I do not recall.

19 **Q.**    Would it refresh your recollection for you to

20 look at your police report?

21 **A.**    It would.

22        **MS. JERMANN-ROBINSON:**  May I approach,

23 Your Honor?

24        **THE COURT:**  Go ahead.

25 **BY MS. JERMANN-ROBINSON:**

1  **Q.**     I'm handing you a two-page report.

2  **A.**     Okay.

3  **Q.**     Take your time and just let me know when you

4  are done.

5  **A.**     Yeah, I'm finished.

6  **Q.**     Okay.  And that's the Oakland Police

7  Department police report for this arrest, is that

8  correct?

9  **A.**     That is correct.

10  **Q.**     Okay.  And it should accurately depict what

11  happened on that evening because it was written

12  close in time, correct?

13  **A.**     Correct.

14  **Q.**     Okay.  And in that report it describes what

15  happened during the arrest that you just testified

16  that you were involved in?

17  **A.**     That is correct.

18  **Q.**     Okay.  And isn't it true that he was

19  arrested, not only for these other things, but also

20  for public intoxication?

21  **A.**     According to the charges, that is correct.

22  **Q.**     Okay.  And is it true that the report reports

23  that he had a strong odor of an intoxicant about his

24  person?

25  **A.**     May I have one more second to --

1  **Q.**     You sure can.

2  **A.**     -- review that narrative.

3          Yeah, I do see that at the end of the first

4  narrative that he did have a --

5  **Q.**     Okay.

6  **A.**     -- strong odor of an intoxicant.

7  **Q.**     Okay.  Thank you.

8          **MS. JERMANN-ROBINSON:**  May I retrieve

9  that, okay.  Your Honor.

10          **THE COURT:**  You have permission to

11  approach the witness, you don't have to ask every

12  time.

13          **MS. JERMANN-ROBINSON:**  Bad habit, I'm

14  sorry, Your Honor.

15  **A.**     Thank you.

16  **Q.**     Thank you.

17          Okay.  Now the first that you heard about

18  this robbery was, I guess, when you were out

19  performing a traffic stop?

20  **A.**     That is correct.

21  **Q.**     Okay.

22  **A.**     I think -- it came via -- over via radio.

23  Being a reserve I have not the good equipment, it

24  has good equipment, so I had to hear it and I was on

25  the side of a major highway when I actually got word

1    that it was a armed robbery in progress is when I

2    get back in the car with my -- with my partner who

3    heard it over the radio.  So --

4    **Q.**     Okay.  So you answered my next question, you

5    were out of the car at the time?

6    **A.**     I was out of the car, yes, ma'am.

7    **Q.**     Okay.  And you don't have personal knowledge

8    as to the exact time of the robbery itself, do you?

9    **A.**     Only as far as what the documentation

10   reflects that was our times for our call, that was

11   it.  So --

12   **Q.**     Okay.  But you weren't in the Hickory Center

13   Market when it happened?

14   **A.**     Absolutely not.

15   **Q.**     And the person robbed would have a better

16   idea of when the robbery actually took place?

17   **A.**     As they should, yeah, absolutely.

18   **Q.**     Okay.  You had testified that there is --

19   make sure I get this straight -- that there was a

20   spotlight or a special spotlight, I guess, in this

21   vehicle?

22   **A.**     Yes, absolutely.  As I said earlier, most

23   police cars have a spotlight that you can manipulate

24   on the driver's side.

25   **Q.**     Okay.

**A.**     -- because you typically have one officer per car, this one had one on the other side.  So --

**Q.**     Okay.  And you were operating that spotlight?

**A.**     I was, yes, ma'am.

**Q.**     Okay.  And in operating that spotlight, you were able to -- well, let me backup a little bit.

You were told, I guess, to go originally to the Renaissance Center?

**A.**     It is.  That is the shopping center that is immediately adjacent to the Hickory Center Market.

**Q.**     Okay.  So, let me see if I can get it straight.

If we are talking about east to west, going west, I guess, on Highway 64 would be going toward Memphis --

**A.**     That's correct.

**Q.**     And going east, I guess, would be going toward Oakland?

**A.**     Oakland, that is correct.

**Q.**     Okay.

**A.**     Uh-huh.

**Q.**     That the Renaissance Center would be, I guess, going west towards 196?

**A.**     It is west.

**Q.**     Okay.

1    **A.**      Yes, ma'am.

2    **Q.**      And when you went there with your spotlight,

3    you didn't -- you didn't see anybody?

4    **A.**      No, we didn't see anyone.  It's a relatively

5    very open building with minimal obstruction, it's

6    very easy to -- to search --

7    **Q.**      Okay.

8    **A.**      -- so it was not an in-depth search.

9    **Q.**      And you testified, also, that where you did

10   arrest Mr. Drew that that was about two thousand

11   feet, I guess, away from the store?

12   **A.**      In a direct line from the store.  And again,

13   that is purely my guesstimate.

14   **Q.**      Okay.  To the best -- best of your

15   knowledge --

16   **A.**      That's --

17   **Q.**      -- that's about what it was?

18   **A.**      -- yeah, about that --

19   **Q.**      Right.

20   **A.**      -- again an guesstimate.

21   **Q.**      And -- and you testified under oath on direct

22   that that would take a few minutes to get there?

23   **A.**      I testified if someone were walking --

24   **Q.**      If someone were walking --

25   **A.**      -- it would take that long, yeah --

**Q.**     -- it would take a few minutes to get

there --

**A.**     -- yeah, if they were walking.

**Q.**     -- is that -- that accurate?

**A.**     -- yeah, if they were walking.

**Q.**     Okay.  And, of course, you didn't see

Mr. Drew in a vehicle, you saw him in the woods, is

that right?

**A.**     I did see him in the woods, yeah, not a

vehicle.

**Q.**     And when he was arrested, isn't it true that

you all looked and -- not looked -- you all asked

him for identification?

**A.**     I -- I personally did not --

**Q.**     Did you observe Atkins?

**A.**     -- I do not recall.

**Q.**     You don't recall.

           Wouldn't that be normally what he would do?

**A.**     Oh, yeah, yeah, to positively get an

identification absolutely.

**Q.**     Okay.  When Mr. Drew was arrested, he was

fairly cooperative, is that accurate you'd say?

**A.**     Yes, ma'am, he was cooperative.

**Q.**     Okay.  So you could probably assume that he

was at least asked for his identification?

1    **A.**    Yes, he would -- he would have been asked,

2    yeah.

3    **Q.**    And did he tell --

4    **A.**    I personally did not.

5    **Q.**    -- did he tell you that he was on his way

6    home?

7    **A.**    I do not recall --

8    **Q.**    You don't remember what he said?

9    **A.**    -- he actually had very little conversation

10    with me.

11    **Q.**    Okay.  Now you've also testified that, and

12    stop me if I'm wrong, but that you saw this

13    gentleman, he was in the woods --

14    **A.**    Uh-huh.

15    **Q.**    -- okay, he was laying down, and you told him

16    to put his hands up?

17    **A.**    I did.

18    **Q.**    Okay.  And he complied?

19    **A.**    He did.

20    **Q.**    He put his hands up.

21    **A.**    He did -- he did comply.

22    **Q.**    And when you got closer, you saw a glove on

23    one hand?

24    **A.**    I -- it would be a glove on the left hand.

25    **Q.**    And then a glove maybe rolled up in the other

1  hand?

2  **A.**     Some object rolled up in the right hand that

3  eventually ended up being a glove as I ordered him

4  to open his hand.

5  **Q.**     Right.

6         You didn't see him with any hand try to take

7  a gun and shove it underneath anything?

8  **A.**     I did not.

9  **Q.**     And you all did not locate a gun at that

10 time?

11 **A.**     Not on the initial arrest at that time, no.

12 **Q.**     Okay.  Isn't it true that you found the mask

13 and the gloves near him not on him?

14 **A.**     The -- well, obviously a glove was on him.  I

15 found both gloves on him.

16 **Q.**     Uh-huh.

17 **A.**     -- I ordered him to open his hand so

18 therefore he dropped it and so it wasn't on him

19 anymore.  And then he had the mask on, not down, but

20 as a hood --

21 **Q.**     Okay.

22 **A.**     I could clearly see his face.

23 **Q.**     Did you find any remnants of alcohol around

24 him?

25 **A.**     I did not.

1   **Q.**     Okay.  Did he tell you he had been drinking,

2   that he was on his way home?

3   **A.**     He did not.

4   **Q.**     Okay.  Now bear with me just one moment.

5          This is Exhibit 14 that I'm publishing.

6          I believe that you -- and tell me if it's

7   here -- from this overhead shot can you tell me

8   where it was that you arrested Mr. Drew?

9   **A.**     That picture is not going to allow me --

10  **Q.**     It's not the right one, okay, strike that.

11  **A.**     -- to identify it accurately.

12  **Q.**     Let's try this one.

13         I'm publishing Exhibit 13.

14         Let me get this right.

15         How about this one?

16  **A.**     That one does allow for an accurate --

17  **Q.**     Make a great big mark where it is.

18  **A.**     A great big mark.  Okay.  (Indicating.)

19         And my intent is for the X to be right there.

20  **Q.**     Okay.  And that's going to be, I guess, on

21  the west side of the road?

22  **A.**     That would be on the east side of the road.

23  **Q.**     Okay.  Here is the Hickory Market.

24         So he is on the other side of Highway 196?

25  **A.**     No, he -- he's on the east side of Highway

196.   Highway 196 runs --

**Q.**   Oh, I see what you're saying, you're correct.

**A.**   -- north south, yeah.

**Q.**   You're correct.  Okay.

So we are over on, for lack of better things, this side of the road?

**A.**   That's correct, yeah.

**Q.**   All right.  And very close to the street?

**A.**   Very close, roughly, when you take into consideration how deep he was into the woods and then the non-wooded area, again, roughly 35 to 40 feet from my position.

**Q.**   Okay.  Now I believe that you had originally stated that -- let me ask you this.

Did you discuss what you saw and heard with Sergeant Maxwell?

**A.**   What's this -- I'm sorry, I don't understand the question.

**Q.**   Let me ask it better.

Did you discuss what you observed during the arrest of Mr. Drew with Sergeant Maxwell?

**A.**   At the present time, no.  I did not have any conversation with Sergeant Maxwell until we returned to the Hickory Center Market.

**Q.**   Okay.  Okay.  And upon that return did you

1    till him what you saw and heard?

2    **A.**    I did not.  Basically I asked him, again, it

3    was very, for me being a new officer, it was a very

4    high driven moment, and then I asked what can I do

5    to help, what -- what do I need to help.  And at

6    that point he said, here, fill this out.  And it was

7    the evidence forms.

8    **Q.**    Okay.

9            **MS. JERMANN-ROBINSON:**  Can I have one

10    moment, Your Honor?

11            **THE COURT:**  Okay.

12            **MS. JERMANN-ROBINSON:**  Thank you, Your

13    Honor.

14    **BY MS. JERMANN-ROBINSON:**

15    **Q.**    And you're not saying that y'all immediately

16    saw a gun on the ground with Mr. Drew or anything

17    like that?

18    **A.**    It was not an immediate process, no, ma'am.

19    **Q.**    Did y'all, isn't it true that y'all took him

20    to your police vehicle and transported him to the

21    Hickory Center Market and then came back and found

22    the gun?

23    **A.**    Oh, absolutely not --

24    **Q.**    Okay.

25    **A.**    -- now we did not leave the scene.

1    Q.    Okay.

2    A.    When I placed the suspect into custody,

3    Sergeant Atkins had came down with me and I took him

4    back to the car by himself, and Sergeant Atkins

5    remains in the area to look for the gun because we

6    knew there was a gun involved.  But we remained on

7    the scene, and what I mean by the scene, at the

8    actual site of the arrest on Highway 196 until the

9    gun was located.

10   Q.    And that was some 20 or more minutes later?

11   A.    Approximately 20 minutes, yeah.

12   Q.    Okay.  But isn't it true that in the original

13   arrest -- arrest report that you have already

14   viewed, states that it was found right next to

15   Mr. Drew?

16   A.    It was in the immediate area of where he was.

17   And the reason why we knew it was the immediate area

18   because the leaves were -- were moved wherever he

19   was laying.  So --

20   Q.    Well, there's lots of leaves out there,

21   aren't they?

22   A.    Well, at that time, leaves typically don't

23   get moved around, so you could tell they were

24   freshly moved.  And a lot of that was from us

25   wrestling around, you know, moving --

1   **Q.**    There is no wind in Oakland?

2   **A.**    At -- there was -- that particular spot had

3   more moved leaves than the rest of them then.

4   **Q.**    Okay.  But you couldn't pinpoint exactly

5   where you found that or where he found that gun

6   because you are not the one that found it?

7   **A.**    I'm -- I'm not, no.

8   **Q.**    So it took at least 20 additional minutes to

9   find it even though it's supposedly right in that

10  immediate area?

11  **A.**    Yes, it was about 20 minutes.

12  **Q.**    With that -- that special pile of leaves?

13  **A.**    Uh-huh.

14  **Q.**    Okay.

15          **MS. JERMANN-ROBINSON:**  Can I have one

16  moment, Your Honor?

17          Nothing further, Your Honor.

18          Thank you.

19          **THE COURT:**  Thank you.

20          And is there any redirect?

21          **MR. STRINGFELLOW:**  Yes, Your Honor.

22              <u>**REDIRECT EXAMINATION**</u>

23  BY MR. STRINGFELLOW:

24  **Q.**    Did you all actually stop and get out of the

25  car at the Hickory Center Market the first time?

**A.**    No.

**Q.**    Why not?

**A.**    Because we got the information per radio from Sergeant Maxwell of the direction of travel and a description, so there was no need to stop at the store.

**Q.**    What -- what -- what was the direction that he -- that he told you all?

**A.**    North towards 196.

**Q.**    And had Sergeant Maxwell already headed to that area?

**A.**    Yes.

**Q.**    So he was in front of you all?

**A.**    He did make the scene first and was pulling out to go to that area.  His direction of travel was different than others.  So he was --

**Q.**    Was his car equipped with the same spotlight that was on your car?

**A.**    He only has a spotlight on the driver's side of his car.

**Q.**    And -- and -- and how is that different from yours?

**A.**    We had one on the passenger's side.  So it's -- you can manipulate it.  And again, with me sitting on the passenger's side of the car and --

1    and the elevation change of where the suspect was

2    apprehended allowed me to see down much easier and,

3    again, I can move that spotlight to that area.  That

4    is something you cannot accomplish from the driver's

5    side of a car that easy.

6              **MR. STRINGFELLOW:**  That's all the

7    questions, Your Honor.

8              **THE COURT:**  All right, thank you.

9              And redirect -- recross based on that?

10             **MS. JERMANN-ROBINSON:**  Briefly, thank you

11   very much.

12                **RECROSS EXAMINATION**

13   **BY MS. JERMANN-ROBINSON:**

14   **Q.**    You testified, I guess, on redirect that

15   Sergeant Maxwell was coming from a different

16   direction of travel.

17             What do you mean by that?

18   **A.**    What I mean by that is he actually took, what

19   I understand by -- by talking with him, as he took

20   Highway 64 --

21   **Q.**    Okay.

22   **A.**    -- and turned right at the intersection that

23   we showed in the pictures which still led him to the

24   same area, he just did not cut through the

25   Renaissance Center as -- as we did.

**Q.**    Okay.  So y'all cut through the parking lot?

**A.**    We -- we cut through, yes, ma'am, that is correct.

**Q.**    Okay.  And did you see any other persons in that immediate vicinity?

**A.**    There was no one there.

**Q.**    Okay.  And no one -- when you actually drove up there and got the broadcast you didn't see anyone standing by their car out in front of the market?

**A.**    I -- I do not recall, I have not viewed the broadcast, I didn't see anyone out there.

**Q.**    I'm talking from your personal experience when you all got the call --

**A.**    Uh-huh.

**Q.**    -- you went to the market and didn't get out, that's right?

**A.**    We -- we did not get out, no, ma'am.

**Q.**    Okay.  You didn't see anybody standing around in the parking lot?

**A.**    I did not.

**Q.**    Okay.  You didn't talk to anybody standing around in the parking lot?

**A.**    I did not.

**Q.**    Just got the broadcast and cut through the Renaissance Center?

1   **A.**    Cut through the center, yeah, and that was

2  per order of Sergeant Maxwell, he said cut through

3  and check, so we looked, so that's what we did.

4   **Q.**    Okay, thank you.

5   **A.**    You're welcome.

6   **Q.**    I appreciate it.

7         **MS. JERMANN-ROBINSON:**  Nothing further.

8         **THE WITNESS:**  Thank you.

9         **THE COURT:**  Officer Clark, thank you very

10  much, you can step down, you are excused.

11         **THE WITNESS:**  Thank you.

12          (Witness excused.)

13         **THE COURT:**  Okay, folks, I think we are

14  going to call it quits today, I said we would stop

15  at about 5:30.  We have about six minutes, I don't

16  think we can get through a witness in that amount of

17  time.  So we will go ahead and call it for the day.

18         Now I'm going to ask you to leave your

19  notebooks in your chair, they will be there when you

20  get back tomorrow morning.

21         And remember my instructions about not

22  discussing the case, not dong any independent

23  investigation or anything like that.

24         You heard locations, locations of arrest,

25  locations where the facts took place, and don't be

1  attempted to get a Google map and take a look for

2  yourself.  Remember, you only find evidence here in

3  the court and not on your own.

4         When you go home tonight, your family is

5  going to hit you up whether or not you are on that

6  case, oh, my goodness, what kind of case, is it a

7  good juicy one and things like that.

8         Don't fall for that, you are under court

9  order not to discuss the case with anyone.  You can

10 tell them the charges in the case, what type of a

11 case it is, but beyond that, telling them the type

12 of the case, by that, I mean the charges, you are

13 under court order not to discuss it.

14        Also remember my instructions about news

15 reports, especially when it relates to crime.  Okay.

16 So keep those things in mind as move forward.

17        Now tomorrow when you come in, I have a

18 couple of matters right at nine o'clock that I am

19 going to handle, so our start time will be 9:30.

20        The reason I tell you that is, there may

21 be some other folks out in the hallway.  It may be

22 related to this case, maybe the lawyers, witnesses,

23 you know, things like that, it may be related to

24 another case, but that's not for you, so, please go

25 directly into the jury room and wait.  We will get

1   started right at 9:30 or maybe a couple of minutes

2   thereafter, please be prompted.  Okay.

3           All right.  Is there anything before we

4   break for the evening?

5           **MR. BIGGERS:**  Nothing from the government,

6   Your Honor.

7           **THE COURT:**  Okay.

8           **MS. JERMANN-ROBINSON:**  No, Your Honor,

9   thank you.

10          **THE COURT:**  All right.  Let's go ahead and

11  adjourn court.

12          **THE CLERK:**  All rise.

13          This honorable court now stands in

14  adjournment until morning nine o'clock a.m. for

15  status report, 9:30 for trial.

16          **THE COURT:**  9:30 for you all.  Okay.

17          We'll see you in the morning, have a good

18  evening.

19          (Adjournment at 5:23 p.m.)

20

21

22

23

24

25