**(UNREDACTED)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

---------------------------------------------------

UNITED STATES OF AMERICA,    )
                            )
          Plaintiff,    )
                            )
        VS.          )  NO. 13-20067
                            )
ROBERT DREW,           )
                            )
          Defendant.    )

---------------------------------------------------

TRIAL PROCEEDINGS

BEFORE THE HONORABLE JOHN T. FOWLKES, JR., JUDGE

WEDNESDAY MORNING

APRIL 23, 2014

LYNN DUDLEY
OFFICIAL REPORTER
923-A FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

        EDWARD L. STANTON, ESQ.
        UNITED STATES ATTORNEY
        SUITE 800
        167 NORTH MAIN STREET
        MEMPHIS, TENNESSEE 38103
        BY:  C. DAVID BIGGERS, JR.
             SAMUEL R. STRINGFELLOW
             ASSISTANT U. S. ATTORNEYS


Appearing on behalf of the Defendant:

        DORIS RANDLE-HOLT
        FEDERAL PUBLIC DEFENDER
        200 JEFFERSON AVENUE
        SUITE 200
        MEMPHIS, TENNESSEE 38103
        BY:  MARY C. JERMANN-ROBINSON
             NEDDUM L. GERMANY, III
             ASSISTANT FEDERAL DEFENDERS

# W I T N E S S   I N D E X

| WITNESS | PAGE | LINE |
|---|---|---|

CLIFF ATKINS

    DIRECT EXAMINATION

    BY MR. BIGGERS  ................241       6

    CROSS EXAMINATION

    BY MS. JERMANN-ROBINSON  .......275      22

    REDIRECT EXAMINATION

    BY MR. BIGGERS  ................290      17

JESSE BAKER

    DIRECT EXAMINATION

    BY MR. BIGGERS  ................296       6

    CROSS EXAMINATION

    BY MS. JERMANN-ROBINSON  .......311      25

    REDIRECT EXAMINATION

    BY MR. BIGGERS  ................319      14

    RECROSS EXAMINATION

    BY MS. JERMANN-ROBINSON  .......322       5

SAM STEWART

    DIRECT EXAMINATION

    BY MR. STRINGFELLOW  ..........326       6

# **E X H I B I T   I N D E X**

| EXHIBIT NUMBER | | PAGE | LINE |
|---|---|---|---|
| Exhibit Number 26 | Boots .........264 | | 17 |
| Exhibit Number 27 | Jeans .........265 | | 22 |
| Exhibit Number 28 | Shirt .........265 | | 24 |
| Exhibit Number 29 | Photographs ...272 | | 2 |
| Exhibit Number 30 | Photographs ...298 | | 12 |
| Exhibit Number 31 | Disk ..........302 | | 9 |

**WEDNESDAY MORNING**

**APRIL 23, 2014**

The trial of this case resumed on this date, Tuesday, April 23, 2014, at 9:30 o'clock a.m., when and where evidence was introduced and proceedings were had as follows:

------------------------

**THE COURT:** We will be in recess.

The parties can go ahead and get together as far as the trial is concerned and get started.

Okay. Why don't you bring him in, I will step off and I will be right back.

(Recess at 9:59 a.m.)

**THE COURT:** I don't -- I did see Mr. Biggers and Mr. Stringfellow.

**COURT SECURITY OFFICER:** They're in the witness room.

**THE COURT:** Okay, we're ready.

Ms. Robinson, you have the situation at 5:30?

**MS. JERMANN-ROBINSON:** No, I'm good. I should have had it covered yesterday. My husband, he was in a court and I was in court.

1          **MR. BIGGERS:**  Good morning, Your Honor.

2          **THE COURT:**  Good morning.

3          I just remember those days.

4          **MS. JERMANN-ROBINSON:**  He was at the track

5     so he could have run home.

6          **THE COURT:**  How old is he.

7          **MS. JERMANN-ROBINSON:**  Fourteen, it's a

8     little far.

9          **THE COURT:**  Okay.  Both sides ready?

10          **MS. JERMANN-ROBINSON:**  Yes, Your Honor.

11          **MR. BIGGERS:**  The government is ready.

12          Can I have one moment, Your Honor?

13          **THE COURT:**  All right.

14          **MR. BIGGERS:**  Apologize, Your Honor.

15          **THE COURT:**  Let's come back on the record.

16          Anything I need to take up with either

17     side before I bring in the jury?

18          **MR. BIGGERS:**  Nothing from the government.

19          **MS. JERMANN-ROBINSON:**  No, Your Honor,

20     thank you.

21          **THE COURT:**  All right.  Let's bring in the

22     jury.

23          (Jury present at 10:03 a.m.)

24          **THE COURT:**  All right.  Good morning,

25     folks.

1        **A JUROR:**  Good morning.

2        **THE COURT:**  Hope you had a good evening

3   last night.

4        I had a couple of things I had to take

5   care of this morning.  Those are all out of the way

6   so we are ready to proceed at this time.  Okay.

7        So we are going to turn to the government,

8   Mr. Biggers and Mr. Stringfellow, if you would,

9   please, call your next witness.

10        **MR. BIGGERS:**  The government calls

11   Sergeant Cliff Atkins to the witness stand.

12        **THE COURT:**  All right.

13        Come forward if you would, please,

14   Sergeant, on around.

15        Okay.  You are good right there.

16        Raise your right hand.

17        Do you solemnly swear or affirm, under the

18   penalties of perjury, the testimony that you are

19   about to provide the court and jury in the case now

20   on trial to be the truth, the whole truth and

21   nothing but the truth, so help you God?

22        **THE WITNESS:**  I do.

23        **THE COURT:**  Have a seat right here if you

24   would, please.

25        **MR. BIGGERS:**  May I proceed, Your Honor?

1          **THE COURT:**  Go ahead.

1          **CLIFF ATKINS,**

2     was thereupon called as a witness on behalf of the

3     Plaintiff, and having been first duly sworn,

4     was examined and testified as follows:

5                    **DIRECT EXAMINATION**

6     **BY MR. BIGGERS:**

7     **Q.**     Sergeant Atkins, please state and spell your

8     name for the record.

9     **A.**     It's Cliff Atkins, C-l-i-f-f, A-t-k-i-n-s.

10    **Q.**     Sergeant Atkins, where are you currently

11    employed?

12    **A.**     Oakland Police Department.

13    **Q.**     How long have you been employed with the

14    Oakland Police Department?

15    **A.**     Since 2009.

16              **THE COURT:**  Sergeant, I don't think you

17    need to lean forward --

18              **THE WITNESS:**  Okay.

19              **THE COURT:**  -- sit back and relax.  And if

20    we can't hear you, then lean the microphone a little

21    closer, but I don't think you need to lean, your

22    voice is strong enough.

23              **THE WITNESS:**  Okay.

24    **BY MR. BIGGERS:**

25    **Q.**     Have you had any prior law enforcement

1  experience other than the Oakland Police Department?

2  **A.**    Yes, sir.

3  **Q.**    All right.  How long have you worked in law

4  enforcement?

5  **A.**    Twenty-two years.

6  **Q.**    In your time working with law enforcement,

7  have you been given any award or accommodation?

8  **A.**    Yes, sir.

9  **Q.**    Describe those for the ladies and gentlemen

10 of the jury, please?

11 **A.**    In 2010 I was given a Purple Heart and a life

12 saving award for running into a burning house and

13 pulling out the home owner, okay, he was burned

14 90 percent of his body, third degree burns, I got

15 burned in the process.

16 **Q.**    Was that while you were with Oakland?

17 **A.**    Yes, sir.

18 **Q.**    What position do you currently hold with the

19 Oakland Police Department?

20 **A.**    I am a shift sergeant over Charlie shift.

21 **Q.**    What time does Charlie shift run?

22 **A.**    From two p.m. to midnight.

23 **Q.**    Were you in this same position in December of

24 2012?

25 **A.**    I was.

1  **Q.**      Specifically on December 7, 2012, did you

2  work on that day?

3  **A.**      I did.

4  **Q.**      What shift did you work on that day?

5  **A.**      Charlie shift that day.

6  **Q.**      Same timeframe?

7  **A.**      Yes, sir, tow -- two p.m. to midnight.

8  **Q.**      Were you working alone on that night?

9  **A.**      No, sir, I was not.

10 **Q.**      Who was with you on that night?

11 **A.**      In my vehicle I had Patrolman Clark and then

12 I had a K-9 officer that was on that shift, also,

13 she was Officer Gonzales, and then Sergeant Maxwell

14 was working.

15 **Q.**      You were the only officers working with the

16 Oakland Police Department on that night?

17 **A.**      No, sir.  Officer Farr, Stephen Farr was also

18 working that night.

19 **Q.**      Did you receive a call to respond to an

20 attempted robbery on that evening?

21 **A.**      I did.

22 **Q.**      Approximately what time did that call come

23 out?

24 **A.**      Approximately 10:17 p.m.

25 **Q.**      Where were you when you first heard the call

1   come out?

2   **A.**     I was approximately a mile and a half to two

3   miles from the scene of the robbery when it come

4   out.

5   **Q.**     You say "the scene of the robbery," are you

6   referring to the Hickory Center Market?

7   **A.**     I am.

8   **Q.**     What were you doing when the call came out?

9   **A.**     I was finishing up a traffic stop.

10  **Q.**     When you say "I," were you -- were you on

11  this stop with Officer Clark as well?

12  **A.**     Officer Clark and Officer Gonzales, she had

13  backed us up.

14  **Q.**     Once your heard the call come out, what did

15  you do?

16  **A.**     I give the driver back his -- their

17  information and got back in my vehicle and proceeded

18  directly toward the scene of the robbery.

19  **Q.**     When you say "scene of the robbery," Hickory

20  Center Market?

21  **A.**     Yes, sir.

22  **Q.**     Who got in the vehicle with you?

23  **A.**     Officer Clark.

24  **Q.**     Did you, in fact, go to the Hickory Center

25  Market?

**A.**      No, sir.  En route to the Hickory Center

Market Sergeant Maxwell made the scene, so I

proceeded passed it to the Renaissance Professional

Park and went up to that parking lot right there.

**Q.**      Why did you go to that area?

**A.**      Sergeant Maxwell put out on the radio that

the subject had left on foot.  So I went up that --

to the Renaissance's Park, where Officer Gonzales

she proceeded up to the red light at Highway 196.

**Q.**      Now show you Exhibit 4.

You look on the scene --

**A.**      Yes, sir.

**Q.**      -- to your right.

You recognize what's shown there?

**A.**      Yes, sir, that's the Hickory Center Market.

In the distance you can see the intersection where

Officer Gonzales went up to.

**Q.**      And it's a touch screen, you can actually

touch the screen and make a circle to indicate where

you are referring to?

**A.**      I'm referring to that area right there

(indicating).

**Q.**      All right.  So is that a traffic light that

you circled?

**A.**      Yes, sir.

1   **Q.**     And is that the intersection of Highway 64

2   and 196?

3   **A.**     It is.

4   **Q.**     Did you go to that light and turn right on to

5   196?

6   **A.**     No, sir, I actually turned right here

7   (indicating).

8   **Q.**     What is that?

9   **A.**     That's the Renaissance Professional Park

10   which is directly next door to the Hickory Center

11   Market.

12   **Q.**     All right.  Showing you Exhibit 3.

13          What's shown in that photograph?

14   **A.**     That is the -- the Renaissance Professional

15   Park and the Hickory Center Market, you can see it's

16   just adjacent -- adjacent to the Hickory Center

17   Market.

18   **Q.**     Okay.  Showing you Exhibit 13.

19          What's shown there?

20   **A.**     That's an aerial view of -- the Hickory

21   Center Market is right here (indicating).

22          The Renaissance Center is coming through here

23   (indicating), that's where I exited out.  I actually

24   come out on 196 right here (indicating), and that's

25   Highway 196 right there (indicating).

1    **Q.**    Okay.  What were you looking for?

2    **A.**    I was looking for a male black subject

3    that -- that had left the area on foot.  He was

4    wearing a blue or black -- blue and black checkered

5    flannel-type shirt.

6    **Q.**    How did you receive that information?

7    **A.**    Sergeant Maxwell, when he went -- made it to

8    the scene of the Hickory Center Market, he put that

9    information out on the radio.

10   **Q.**    All right.  Now on this map, do you see where

11   you were in relation to the Hickory Center Market

12   when the call came out?

13   **A.**    No, sir.

14   **Q.**    All right.  That's not shown on the screen,

15   is that correct?

16   **A.**    That's correct.

17   **Q.**    Indicate with an X the direction it would

18   have been from the Hickory Center Market.

19   **A.**    (Indicating).

20   **Q.**    So you came -- is that east?

21   **A.**    It's east.

22   **Q.**    From the east passed the Hickory Center

23   Market --

24   **A.**    Yes, sir.

25   **Q.**    -- once you got the call?

1    **A.**    Yes, sir.

2    **Q.**    When you passed the Hickory Center Market, do

3    you know if Sergeant Maxwell was still there?

4    **A.**    No, sir, he was not.

5    **Q.**    Once you took this route through the

6    Renaissance's parking lot and came to 196, what did

7    you do?

8    **A.**    I proceeded up this area right here

9    (indicating) and then I turned north on 196.

10           When I turned north on 196 I instructed

11   Officer Clark, because my vehicle was equipped with

12   a passenger spotlight, so I instructed him to put

13   the spotlight off in that wooded area right here

14   (indicating).

15   **Q.**    Now describe specifically what an office --

16   what a spotlight is?

17   **A.**    It's the -- right there by the windshield you

18   can direct the light to what direction, up, down,

19   left or right from that area right there from -- on

20   that side of the vehicle.

21   **Q.**    Are you familiar with Sergeant Maxwell's

22   vehicle?

23   **A.**    Yes, sir, I am.

24   **Q.**    Are you familiar -- familiar with Officer

25   Gonzales' vehicle?

**A.**     Yes, sir?

**Q.**     Do either of those vehicles have the same spotlight on the passenger's side as you described?

**A.**     No, sir, mine was the only one that was equipped like that.

**Q.**     All right.  Did Officer Clark, in fact, use that spotlight as you instructed him?

**A.**     He -- yes, sir, he did.

**Q.**     What, if anything, happened after he began using that spotlight on the wooded area?

**A.**     Just as we proceeded north Officer Clark spotted the subject in the woods just off the highway.  So he -- he -- he stated to me, he said, there he is.  I threw the car up in park.  He run out of the vehicle.  I exited the vehicle, come around and placed the -- we had the subject at gunpoint because he was -- Sergeant Maxwell stated that the subject was armed on the radio.

**Q.**     Now describe how you all approached him?

You said he was at gunpoint, who actually went to the suspect?

**A.**     Officer Clark went to the suspect.  And then I stayed off to the -- at a safe distance holding -- holding him at the gun or at gunpoint where I wouldn't -- I could actually not shoot Officer Clark

1    if I had -- if it come to that.

2    **Q.**    What did you instruct Officer Clark to do?

3    **A.**    Restrain him.

4    **Q.**    Did he, in fact, restrain him?

5    **A.**    He did.

6    **Q.**    Describe the suspect's positioning in that

7    wooded area when you all saw him?

8    **A.**    The subject was laying in the leaves.

9    **Q.**    You saying "laying," describe how he was

10   laying?

11   **A.**    He was laying on his stomach trying to hide.

12   **Q.**    Did you all give him any orders?

13   **A.**    Show us your hands and stay down.

14   **Q.**    And did he comply?

15   **A.**    He did.

16   **Q.**    Who physically took the suspect into custody?

17   **A.**    Officer Clark.

18   **Q.**    Now the person on the side of the roadway

19   that Officer Clark apprehended --

20   **A.**    Yes, sir.

21   **Q.**    -- and actually put handcuffs on --

22   **A.**    Yes, sir.

23   **Q.**    -- what drew your attention to this person?

24   **A.**    As you can see on the map, there's no houses

25   or anything in this area (indicating).  So there's

1   no reason for anybody to be in that wooded area.

2   **Q.**     What about the person's clothing drew your

3   attention?

4   **A.**     The clothing was actually the same type of

5   clothing description as Sergeant Maxwell had put out

6   on the radio.

7   **Q.**     I'm showing you what's been marked and

8   admitted as Exhibit 10.

9          Do you recognize this?

10   **A.**     Yes, sir.

11   **Q.**     What do you recognize this to be?

12   **A.**     That's the jacket that the subject was

13   wearing that night.

14   **Q.**     Was the subject wearing anything about his

15   head?

16   **A.**     Yes, sir.  He had a toboggan that was on his

17   head.  His face was showing, but he did have a

18   toboggan on his head.

19   **Q.**     Was that collected as evidence?

20   **A.**     Yes, sir, it was.

21   **Q.**     Was there anything unique about that

22   toboggan?

23   **A.**     Yes, sir.  When we took it off the subject's

24   head and rolled it out flat, it had two eyeholes cut

25   into it.

1  **Q.**      Showing you what's been marked and admitted

2  as Exhibit 11.

3  **A.**      Yes, sir.

4  **Q.**      Take it, please.

5         Do you recognize that?

6  **A.**      Yes, sir.

7  **Q.**      What do you recognize that to be?

8  **A.**      That's the subject, that -- that's the

9  toboggan that the subject had on his head that had

10 the eyeholes cut out in it.

11 **Q.**      Please -- please hold it up and show the

12 ladies and gentlemen of the jury the eyeholes that

13 you're referring to.

14 **A.**      (Indicating).

15 **Q.**      Do those eyeholes seemed to be

16 manufactured -- is that manufactured eyeholes?

17 **A.**      No, sir, that's homemade.

18 **Q.**      Did you learn the identity of that person?

19 **A.**      Yes, sir.

20 **Q.**      Who was that person?

21 **A.**      Robert Drew.

22 **Q.**      I'm showing you Exhibit 15.

23        Do you recognize that?

24 **A.**      Yes, sir.

25 **Q.**      What is that?

**A.**      That's a picture of the subject.

**Q.**      Is that how the person appeared without the
hat on his head when y'all saw him on the side of
the road?

**A.**      Yes, sir.

**Q.**      The person that you've identified as Robert
Drew --

**A.**      Yes, sir.

**Q.**      -- in this photograph, do you seem them in
the courtroom today?

**A.**      Yes, sir.

**Q.**      Please point to that person and describe the
clothes he's wearing?

**A.**      He's wearing a blue and white striped shirt
there.

          **MR. BIGGERS:**  May the record reflect that
the witness has identified the defendant, Your
Honor.

          **THE COURT:**  The record will reflect that
he's pointed out defendant.

**BY MR. BIGGERS:**

**Q.**      Any other items found in that area where the
defendant was found on the side of the road?

**A.**      Yes, sir.

**Q.**      What?

1    **A.**     There was a handgun revolver -- a revolver

2    that was discovered and a brown cotton-type glove.

3    **Q.**     Now once the defendant was taken into

4    custody, did you all leave the scene?

5    **A.**     Not for -- not for a little bit --

6    **Q.**     Why?

7    **A.**     -- twenty or 30 minutes.

8    Because that when we first took him into

9    custody he -- there was no weapon on his person.

10    **Q.**     What -- what made you believe there would --

11    should -- would be a weapon found in that area?

12    **A.**     Sergeant Maxwell and the victim -- or

13    Sergeant Maxwell stated over the radio the subject

14    was armed.  So there had to be a weapon around there

15    with the clothing matching perfect.

16    **Q.**     At the time did you know what type of weapon

17    you were looking for?

18    **A.**     Saturday Maxwell put on the radio that it was

19    going to be a blue or black revolver, and that's

20    what I was looking for.

21    **Q.**     What area did you look for the firearm?

22    **A.**     I looked in the area where the subject was

23    taken into custody.  And Officer Gonzales, she

24    looked in the area just south of the area.

25    **Q.**     When you say just south --

1    **A.**      Southeast --

2    **Q.**      -- that?

3    **A.**      -- southeast of where I was.

4    **Q.**      Now did Officer Gonzales look on -- by

5    herself or did she have some assistance?

6    **A.**      She had assistance from her K-9 partner.

7    **Q.**      And why did Officer Gonzales go in that area

8    with the K-9?

9    **A.**      Because that would have been in the direction

10   the subject could have come on foot.

11   **Q.**      At any point did Officer Gonzales and the K-9

12   search the area where the defendant was actually

13   located?

14   **A.**      No.

15   **Q.**      Who searched that area?

16   **A.**      I did.

17   **Q.**      What, if anything, did you find -- did you

18   find in that area?

19   **A.**      I -- I did locate a brown cotton glove that

20   was laying on the ground in the leaves and a .38

21   revolver.

22   **Q.**      The brown cotton glove, was that consistent

23   with the glove found on the defendant's person at

24   the time that he was taken into custody?

25   **A.**      Yes, sir, he had one on his person.

1    **Q.**    He had one on his person and one was found in

2    the woods?

3    **A.**    Yes, sir.

4    **Q.**    All right.  And was that glove found in the

5    same area as the firearm?

6    **A.**    Approximately two foot apart.

7    **Q.**    Showing you what's been admitted as

8    Exhibit 18.

9    Tell me if you recognize that?

10    **A.**    I do.

11    **Q.**    What do you recognize that to be?

12    **A.**    These were the brown gloves that Mr. Drew had

13    on his person.

14    **Q.**    And there are two gloves there?

15    **A.**    Right.  Well, one of them he had on his

16    person, one of them was laying in the ground.

17    **Q.**    Could you tell which one was laying in the

18    ground?

19    **A.**    The one with the mud.

20    **Q.**    Describe that area on that night?

21    **A.**    It's December, it was wet, heavily -- lot of

22    foliage, leaves that had fell on the ground -- I

23    mean, there wasn't -- the trees were sparse, but, I

24    mean, the ground was dense with leaves.

25    **Q.**    Show you Exhibit 23.

1     Recognize what's shown in that photograph?

2 **A.**     Yes, sir.

3 **Q.**     What is that?

4 **A.**     That's the area where the subject was taken

5 into custody.

6 **Q.**     All right.  Please indicate on the screen

7 roughly where the defendant was found?

8 **A.**     Right on here (indicating), right in that

9 area right there (indicating).

10 **Q.**     Show you Exhibit 24.

11     You see on that photograph where the

12 defendant was recovered?

13 **A.**     Yes.

14 **Q.**     Was it back in that treeline wooded area?

15 **A.**     Yes, sir.

16 **Q.**     I'm showing you a close-up photo of the same

17 area in 25.

18     Is that how the ground appeared on the night

19 of December 7th, 2012?

20 **A.**     Yes, sir, pretty much.

21 **Q.**     About how long did it take you to actually

22 find the firearm?

23 **A.**     It took me approximately 20 to 30 minutes.

24 **Q.**     Okay.  Why did it take so long?

25 **A.**     Because it was up under all of those leaves.

1  **Q.**    At the time was the gun loaded?

2  **A.**    Yes, sir.

3  **Q.**    Do you recall how many rounds of ammunition

4  was in the firearm?

5  **A.**    There was three rounds.

6  **Q.**    Show you Exhibit 12.

7         Do you recognize that?

8  **A.**    Yes, sir.

9  **Q.**    What do you recognize this to be?

10 **A.**    It appears to be the weapon that I recovered

11 in the woods that night.

12 **Q.**    Now take a look at this firearm.

13         Now the dirt on the glove, one of the gloves

14 that you recovered from the ground?

15 **A.**    Right.

16 **Q.**    Do you see any traces of dirt on that

17 firearm?

18 **A.**    No.

19 **Q.**    Showing you Exhibit 19.

20         Do you recognize that?

21 **A.**    Yes, sir.

22 **Q.**    What are those?

23 **A.**    Those were the rounds that was inside the

24 weapon.

25 **Q.**    Was this firearm consistent with the

1    description that you received from Sergeant Maxwell?

2    **A.**      Yes, sir.

3    **Q.**      Now after you collected this evidence, what

4    did you do?

5    **A.**      I placed it in evidence container.

6    **Q.**      All right.  Now did you stay on the scene on

7    the side of Highway 196?

8    **A.**      After I located the weapon, I -- I went to

9    the scene of the -- where the actually robbery took

10   place at the Hickory Center Market or the attempted

11   robbery.

12   **Q.**      Who was there when you arrived there?

13   **A.**      Sergeant Maxwell.

14   **Q.**      What did you do once you arrived at the

15   Hickory Center Market?

16   **A.**      He wanted to take -- Sergeant Maxwell wanted

17   to take pictures of Mr. Drew and of the evidence

18   that was collected from the scene of the arrest.

19   **Q.**      Did you all, in fact, take photographs?

20   **A.**      We did.  The weapon and the glove and the

21   mask were placed on the trunk of my car, those were

22   taken.  And then the -- then Sergeant Maxwell took

23   two photos of Mr. Drew.

24   **Q.**      Showing you Exhibit 17.

25            Do you recognize that?

1  **A.**     Yes, sir.

2  **Q.**     Is that one of the photographs that you took

3  on that night?

4  **A.**     Yes, sir, that's the one that was taken on

5  the trunk of my car.

6  **Q.**     I've already showed you -- shown you 15.

7          Is that one the photographs that you took of

8  the defendant on that night?

9  **A.**     Yes, sir.

10  **Q.**     Do you know if Sergeant Maxwell also took

11  this photograph in Exhibit 8?

12  **A.**     Yes, sir.

13  **Q.**     At any point did you go inside the Hickory

14  Center Market?

15  **A.**     No, sir.

16  **Q.**     Did Sergeant Maxwell?

17  **A.**     Sergeants Maxwell did, yes, sir.

18  **Q.**     Do you know why he went inside the Hickory

19  Center Market?

20  **A.**     He went into show the victim this photo right

21  here (indicating).

22  **Q.**     And you remained outside the entire time, is

23  that correct?

24  **A.**     Yes, sir.

25  **Q.**     Did Sergeant Maxwell come out?

1   **A.**    He did.

2   **Q.**    Do you know if the victim was able to

3   positively identify that photograph?

4   **A.**    I can --

5          **MS. JERMANN-ROBINSON:**  Objection, Your

6   Honor.  He wasn't there.

7          **THE COURT:**  So the objection is

8   speculation?

9          **MS. JERMANN-ROBINSON:**  Speculation, Your

10  Honor.

11         **THE COURT:**  I will have to sustain the

12  objection.

13         **MR. BIGGERS:**  That's fine, Your Honor.

14  **BY MR. BIGGERS:**

15  **Q.**    Sergeant Atkins, Sergeant Maxwell came out of

16  the Hickory Center Market after showing the victim

17  that photograph, is that correct?

18  **A.**    He did.

19         **MS. JERMANN-ROBINSON:**  Objection, Your

20  Honor.

21  **Q.**    At that point --

22         **MS. JERMANN-ROBINSON:**  Again speculation,

23  he wasn't in there.

24         **THE COURT:**  You have to lay a better

25  foundation.

1    **MR. BIGGERS:** That's fine, Your Honor,

2    I'll move on.

3    **BY MR. BIGGERS:**

4    **Q.** After Sergeant Maxwell came out of the

5    Hickory Center Market with that photograph --

6    **A.** Yes, sir.

7    **Q.** -- what did you do?

8    **A.** I transported Mr. Drew to the Oakland Police

9    Department.

10   **Q.** At that point he was under arrest?

11   **A.** Yes, sir.

12   **Q.** Was he under arrest for the attempted robbery

13   of the Hickory Center Market?

14   **A.** He was.

15   **Q.** Was he charged with any other offense on that

16   evening?

17   **A.** Public intoxication.

18   **Q.** Why was that?

19   **A.** The subject had a strong odor of alcohol.

20   **Q.** Did you personally notice that?

21   **A.** I did.

22   **Q.** Did you have any conversations with the

23   defendant on that night?

24   **A.** I did.

25   **Q.** What, if anything, did the defendant say?

1   **A.**    When I placed him in the car and read him his

2   Miranda rights, he stated that the only reason that

3   he was laying in those leaves was that some guys

4   come by in a white car threatened to kill him, so

5   that's why he was hiding in the weeds -- in -- in

6   the leaves.

7   **Q.**    Did he say anything about drinking that

8   night?

9   **A.**    I asked him if he had anything to drink and

10   he stated he didn't want to talk to me anymore.

11   **Q.**    Was the defendant actually taken to the jail

12   and processed?

13   **A.**    He was.

14   **Q.**    What was done with his clothing?

15   **A.**    I took his clothing for evidence, so they

16   were confiscated at that time.

17   **Q.**    Describe the clothing that you collected ed

18   from the defendant on the night of December 7th,

19   2012?

20   **A.**    I took the jacket, his white thermal shirt,

21   the bluejeans and his boots and they placed in

22   individual evidence bags.

23   **Q.**    Take a look at the items in this bag,

24   Sergeant Atkins, and tell me if you recognize them?

25   **A.**    I do.

1    **Q.**    Go ahead and take them out.

2    **A.**    These are the muddy boots that the subject

3    was wearing.

4    **Q.**    Are those in substantially the same condition

5    as they were on December 7th, 2012, when you

6    collected them?

7    **A.**    Yes, sir.

8            **MR. BIGGERS:**  At this time the government

9    moves to admit the boots in evidence.

10            **THE COURT:**  All right.  Any objection?

11            **MS. JERMANN-ROBINSON:**  No objection, Your

12    Honor.

13            **THE COURT:**  Okay.  Then we will go ahead

14    and introduce them.  I believe it will be 26.

15            **THE CLERK:**  Yes, sir.

16            **THE COURT:**  Twenty-six.

17            (Exhibit Number 26 was marked;

18    Description:  Boots.)

19            **MR. BIGGERS:**  This is the shirt and the

20    jeans.

21            Permission to publish those, Your Honor?

22            **THE COURT:**  Go ahead.

23    **BY MR. BIGGERS:**

24    **Q.**    I will hand you another bag which I believe

25    will be 27 and 28.

1          Take a look at the items inside that bag and

2    tell me if you recognize those?

3    **A.**      Yes, sir.  These are the bluejeans that the

4    subject was wearing.

5    **Q.**      Those jeans in substantially the same

6    condition as they were when you recovered them from

7    the defendant's person on December 7th, 2012?

8    **A.**      Yes, sir, they were -- yes, sir, they are.

9    **Q.**      What else is in that bag?

10   **A.**      Also, it's the white thermal shirt.

11   **Q.**      The defendant wearing that shirt on that

12   evening?

13   **A.**      Yes, sir, he was.

14   **Q.**      Is that shirt in substantially the same

15   condition as it was on that evening?

16   **A.**      Yes, sir.

17          **MR. BIGGERS:**  The government moves to

18   admit the jeans and the shirt as exhibits 27 and 28,

19   Your Honor.

20          **THE COURT:**  All right.  We will make the

21   jeans 27 and the shirt will be 28.

22          (Exhibit Number 27 was marked;

23   Description:  Jeans.)

24          (Exhibit Number 28 was marked;

25   Description:  Shirt.)

1    **BY MR. BIGGERS:**

2    **Q.**     I'm holding these jeans up, Exhibit 27.

3           Any indication of the defendant lying in the

4    ground on these jeans?

5    **A.**     Yes, sir, you can see where all the mud is on

6    the front of them.

7    **Q.**     On the pants leg?

8    **A.**     Yes, sir.

9    **Q.**     Now I direct your attention to the back

10   collar of Exhibit 28.

11          Anything unique about that?

12   **A.**     Yes, sir, it's got the subject's last name in

13   it.

14   **Q.**     D-r-e-w.

15   **A.**     Yes, sir.

16   **Q.**     Again, this shirt was taken from the

17   defendant's person, is that correct?

18   **A.**     Yes, sir.

19   **Q.**     Were any of these items photographed?

20   **A.**     Yes, sir.

21   **Q.**     Did you personally take those photographs?

22   **A.**     I did.

23   **Q.**     Now did this end your investigation on that

24   night?

25   **A.**     It did.

1  **Q.**     Do you know if the firearm recovered was

2  fingerprinted at all?

3  **A.**     Sergeant Maxwell fingerprinted it with

4  powder.

5  **Q.**     How did you know he did that?

6  **A.**     I observed it.

7  **Q.**     You were present when that occurred?

8  **A.**     Yes, sir.

9  **Q.**     Where -- when did that happen?

10 **A.**     Immediately after we got back to the police

11 department.

12 **Q.**     On the night of December 7th, 2012?

13 **A.**     Yes, sir.

14 **Q.**     Did you share the information that your

15 investigation revealed regarding this attempted

16 robbery with any other law enforcement agency?

17 **A.**     I did.

18 **Q.**     Who?

19 **A.**     Memphis Police Department.

20 **Q.**     What made you share the information with the

21 Memphis Police Department?

22 **A.**     My chief at the time, Chief Jewel, he had got

23 information that -- that KFC had been robbed on

24 Highway 64 in Memphis.

25 **Q.**     Is that on Highway?

1      64 the Hickory Center Market is also on

2 Highway 64, is that correct?

3 **A.**      Yes, sir.

4 **Q.**      Did you learn when that robbery, the

5 attempted robbery of the KFC occurred?

6 **A.**      Yes, sir, it was on the same night.

7 **Q.**      After hearing that information, what did you

8 do?

9 **A.**      I contacted Memphis Robbery Division.

10 **Q.**      And did you hear back from anyone with the

11 Memphis Police Department?

12 **A.**      I did.  I did -- first, I heard back from a

13 lieutenant, I cannot think of his name at this time,

14 he asked me if I had any pictures of the clothing.

15 I told him at the time I had still shots from the

16 surveillance, and I sent those to him.

17      He contacted me back after he'd received

18 them, he said, yes, that somebody else would be

19 getting in touch with me.

20      Then I was contacted later by Detective Tony

21 Cox with the Memphis Police Department Robbery

22 Division.

23 **Q.**      Now you just recounted multiple

24 conversations.

25      When did you first learn of the attempted

1   robbery in Memphis?

2   **A.**     That would have been a Monday morning.

3   **Q.**     Was it the night of the robbery?

4   **A.**     No, sir, it was not.

5   **Q.**     It would have been days later?

6   **A.**     Approximately three.

7   **Q.**     Approximately three days later?

8   **A.**     Yes, sir.

9   **Q.**     When did you have the initial conversation

10  with the lieutenant?

11  **A.**     Like three days later, it would have been

12  that afternoon.

13  **Q.**     On that Monday?

14  **A.**     On that Monday.

15  **Q.**     Did you hear back from Sergeant Tony Cox on

16  that same day?

17  **A.**     No, sir, it was the next day.

18  **Q.**     When you spoke to Sergeant Cox, what, if any,

19  information did you provide to him?

20  **A.**     He asked me if I had any pictures of the

21  evidence that we took in.  And if I -- if I did,

22  could I share those.  And I did.

23  **Q.**     Specifically, what did you share with him?

24  **A.**     I shared him photos of the clothing and also

25  photos of the weapon, and the mask.

1  **Q.**     Now at any point did you learn any additional

2  information about the attempted robbery in Memphis?

3  **A.**     Detective Cox, he contacted me, stated that

4  he wanted to interview Mr. Drew, that he was their

5  prime suspect.

6          **MS. JERMANN-ROBINSON:**  May we have a

7  moment, Your Honor?

8          **THE COURT:**  All right.

9  **BY MR. BIGGERS:**

10  **Q.**     And that was after you sent him the pictures,

11  is that correct?

12  **A.**     Yes, sir.

13  **Q.**     All right.  Now were you involved in the

14  investigation of the Memphis attempted robbery at

15  all?

16  **A.**     No, sir.

17  **Q.**     Showing you nine photographs.

18          Please take a look at those photographs,

19  Sergeant Atkins.

20  **A.**     Yes, sir.

21  **Q.**     Do you recognize those photographs?

22  **A.**     Yes, sir.

23  **Q.**     What do you recognize those to be pictures

24  of?

25  **A.**     Those are the pictures of the still photos

1    and the photos of the clothing that I shared with

2    Memphis.

3    **Q.**    That you sent to the Memphis Police

4    Department?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  Are all those accurate -- the pictures

7    of the actual photos that you sent to the Memphis

8    Police Department?

9    **A.**    Yes, sir.

10          **MR. BIGGERS:**  At this time the government

11    moves to admit into evidence, Your Honor.

12          **THE COURT:**  All right.  Collective?

13          **MR. BIGGERS:**  It can be a collective

14    exhibit, Your Honor.

15          **THE COURT:**  All right.  I believe you said

16    there were nine photographs there, Sergeant?

17          **THE WITNESS:**  Yes, sir.

18          **THE COURT:**  Nine -- All right.

19          Then the nine photographs that have been

20    identified, they will be introduced collectively

21    Exhibit Number 29.

22          **MR. BIGGERS:**  And just ask for

23    clarification purposes, Your Honor, there are nine

24    pages of photographs, seven pages have multiple

25    pictures on them.

1          **THE COURT:**  All right.

2          (Exhibit Number 29 was marked;

3     Description:  Photographs.)

4     **BY MR. BIGGERS:**

5     **Q.**     The first paper of collective Exhibit 29,

6     describe what's shown there for the ladies and

7     gentlemen of the jury?

8     **A.**     That's the subject when he was in the Hickory

9     Center Market holding a weapon at the clerk.

10    **Q.**     The second picture of collective Exhibit 29?

11    **A.**     Same photo zoomed in on the weapon.  You can

12    see the hammer, thumb is on the hammer and on the

13    trigger.

14    **Q.**     Third picture of collective Exhibit 29, third

15    page, rather?

16    **A.**     Multiple photos of Mr. Drew's jeans and

17    shirt.

18    **Q.**     The fourth page?

19    **A.**     It's the underside and overside, top side of

20    the gloves, photos.

21    **Q.**     Fifth page?

22    **A.**     It's boots.

23    **Q.**     Sixth page?

24    **A.**     It's photos of the weapon that was recovered

25    from the arrest scene.

1   **Q.**    And describe that firearm as best you can for

2   the ladies and gentlemen of the jury?

3   **A.**    It's a .38 snub-nosed revolver, black, shiny,

4   it's in good shape.

5   **Q.**    You say snub-nosed, what do you mean by that?

6   **A.**    It's got a short barrel.

7         That's a picture of the mask with homemade

8   eyeholes.

9   **Q.**    This -- this photograph, the mask appears to

10  possibly be dark, maybe black, but is this the

11  same --

12  **A.**    Yes --

13  **Q.**    -- is this the same mask that you identified?

14  **A.**    Yes, sir, it is.

15  **Q.**    And what color is it actually?

16  **A.**    It's actually blue, a dark blue.

17  **Q.**    That was seven, page seven.

18        What's shown on page eight?

19  **A.**    This is the jacket that the subject was

20  wearing that night, blue and black checked, and

21  you've got that logo right there on that left front

22  pocket.

23  **Q.**    Please circle what you're referring to?

24  **A.**    This logo right here (indicating).

25  **Q.**    The last of the nine pages, what's shown

1    there?

2    **A.**      That's his thermal shirt, and you can see his

3    name right here (indicating).

4    **Q.**      Okay.  This is all the information that you

5    provided to the Memphis Police Department, is that

6    correct?

7    **A.**      Yes, sir.

8    **Q.**      Did you do anything else in your

9    investigation with regard to the Hickory Center

10   Market attempted robbery?

11   **A.**      No, sir, my involvement with that was pretty

12   much done.

13   **Q.**      Outside of relaying this information to the

14   Memphis Police Department, specifically Sergeant

15   Tony Cox, did you do anything else with regard to

16   the Memphis investigation?

17   **A.**      No, sir, that was the only involvement that I

18   had to that.

19           **MR. BIGGERS:**  Brief moment, Your Honor?

20           **THE COURT:**  All right.

21   **BY MR. BIGGERS:**

22   **Q.**      Going back to the Hickory Center Market

23   robbery, attempted robbery.

24   **A.**      Yes, sir.

25   **Q.**      You testified that at the time the call came

1   out it was approximately 10:17, is that correct?

2   **A.**     Yes, sir.

3   **Q.**     How much time passed before you actually

4   apprehended the defendant on the side of the

5   roadway?

6   **A.**     Mr. Drew was placed in custody on the arrest

7   scene approximately three minutes later at 2220.

8   **Q.**     Okay.  2220, is that 10:20 p.m.?

9   **A.**     10:20 p.m.

10  **Q.**     The scene where he was found, how far is that

11  approximately from the actual Hickory Center Market,

12  the place of the attempted robbery?

13  **A.**     As the crow flies, it's a thousand to

14  1500 feet.

15          **MR. BIGGERS:**  No further questions at this

16  time, Your Honor.

17          **THE COURT:**  Thank you.

18          And cross?

19          **MS. JERMANN-ROBINSON:**  Thank you, Your

20  Honor.

21                **CROSS EXAMINATION**

22  **BY MS. JERMANN-ROBINSON:**

23  **Q.**     Is it Officer Atkins.

24  **A.**     Yes, sir.

25  **Q.**     Mary C. Robinson for the defendant, Robert

1  Drew.

2  Do you have the address of this Hickory

3  Center Market?

4  **A.**  It's 3305 Highway 64.

5  **Q.**  Okay.  And that's in Eads, Tennessee?

6  **A.**  Yes, sir -- yes, ma'am.

7  **Q.**  That's fine.

8  And that is how far from Memphis?

9  **A.**  From the city limits?

10  **Q.**  Well, going along Highway 64, about how far

11  till you say you get to Lakeland where the KFC is?

12  **A.**  16 miles maybe.

13  **Q.**  Okay.

14  **A.**  I would say from the city limits, it's three

15  miles from Memphis.

16  **Q.**  Absolutely.  But from that Kentucky Fried

17  Chicken?

18  **A.**  Approximately 16 miles.

19  **Q.**  Okay.  About 16 miles.

20  **THE COURT:**  Excuse me.

21  The Kentucky Fried Chicken to the market

22  or to --

23  **THE WITNESS:**  From -- from the KFC on

24  Highway 64 in Lakeland to the Hickory Center Market

25  would be about 16 miles.

1    **THE COURT:** That's -- okay.  All right.

2  **BY MS. JERMANN-ROBINSON:**

3  **Q.**    Okay.  Thank you.

4    Now you testified today that you had a

5  conversation with Mr. Drew, is that right?

6  **A.**    Yes, ma'am.

7  **Q.**    Okay.  And you testified today that he said

8  that there was a vehicle and someone threatened to

9  kill him?

10  **A.**    Yes, ma'am.

11  **Q.**    Okay.  And so immediately upon hearing that

12  did you radio the other officers to try to run that

13  car down?

14  **A.**    No, ma'am.

15  **Q.**    Okay.  Did you yourself try to chase that car

16  down?

17  **A.**    No, ma'am, I had him in my car, I couldn't

18  leave.

19  **Q.**    You didn't, but there's other officers, we

20  know there's Gonzales and we also know that there's

21  Clark and there's other people on duty, who did you

22  call to investigate this?

23  **A.**    Nobody.

24  **Q.**    Nobody at all?

25  **A.**    No, ma'am.

1  **Q.**    Even though a man said he had just been
2  threatened?
3  **A.**    Yes, ma'am.
4  **Q.**    All right.  Now as part of your
5  responsibilities as an officer, you have to
6  document, I suppose, when you make an arrest, is
7  that correct?
8  **A.**    Yes, ma'am.
9  **Q.**    Okay.  And when you do this documentation,
10 that's for what purpose?
11 **A.**    The evidence.
12 **Q.**    Okay.  Good.  Preserve the evidence.
13       So that god forbid something happened to you,
14 it would be in writing --
15 **A.**    Right.
16 **Q.**    -- so that other officers could go on and
17 continue the prosecution.
18       And this -- in this -- is this called the
19 police report?
20 **A.**    Yes, ma'am.
21 **Q.**    Okay.  And did you do a police report on this
22 incident on that evening?
23 **A.**    Yes, ma'am.
24 **Q.**    Okay.  And as part of that police report, did
25 you write a narrative about what had happened?

1   **A.**     I did.

2   **Q.**     Okay.  And that narrative should accurately

3   reflect the things that happened on that evening,

4   correct?

5   **A.**     Yes, ma'am.

6   **Q.**     Okay.  Isn't it true in that narrative that

7   is supposedly accurately reflect on that evening

8   there is no mention of any statement made by

9   Mr. Drew?

10  **A.**     That is true.

11  **Q.**     Okay.  So you didn't even write it down in

12  your report?

13  **A.**     No, ma'am.

14  **Q.**     Okay.  And you didn't try to follow-up or

15  fine out if there was, in fact, another vehicle?

16  **A.**     No, ma'am.

17  **Q.**     Okay.  And that was after he said this person

18  tried -- threatened to kill him?

19  **A.**     That's what he stated, yes, ma'am.

20  **Q.**     Okay.  You -- let me make sure I got this

21  straight, kind of start from the beginning.

22         You were working the two to ten, that's the

23  Charlie shift, right?

24  **A.**     Two to midnight.

25  **Q.**     Two to midnight, okay.

1        And there were other -- you were actually at

2   a traffic stop when this whole thing -- when you

3   heard about this whole thing over the dispatch,

4   right?

5   **A.**     Yes, ma'am.

6   **Q.**     Okay.  And you were not present at the

7   Hickory Center Market for the robbery, you were down

8   the road, I guess, stopping a car, something like

9   that?

10  **A.**     Yes, ma'am.

11  **Q.**     Okay.  Was that just an incidental traffic

12  stop down the road?

13  **A.**     Yes, ma'am.

14  **Q.**     Okay.  And when you did -- were there you

15  testified, I suppose, that you had to give the

16  person in the car, the one that you had stopped, I

17  suppose, their information back?

18  **A.**     Yes, ma'am.

19  **Q.**     Okay.  In fact, when you arrested Mr. Drew,

20  didn't you take -- get an I.D. from him as well?

21  **A.**     I don't recall an I.D.

22  **Q.**     You didn't recall?

23        But you did -- were able to obtain his home

24  address, weren't you?

25  **A.**     Yes, ma'am.

**Q.**     Okay.  And that home address was 5455 Highway 64, do you remember that?

**A.**     Yes, ma'am.

**Q.**     Okay.  And that's just a little bit of ways if you are going east on Highway 64, correct?

**A.**     Yes, ma'am.  It's going to be approximately where my traffic stop was.

**Q.**     Okay.  Right down the road.

And the information that you received is that the person that robbed the store was on foot when they left?

**A.**     Yes, ma'am.

**Q.**     All right.  There is no information received by you that he was in any kind of vehicle or anything else?

**A.**     No, ma'am.

**Q.**     Okay.  And you testified that at some point you, and I think it's patrolman, I'm not sure if it's officer or patrolman Clark, you all had turned out of the Renaissance Center and were going down one -- Highway 196?

**A.**     Going north on 196.

**Q.**     Okay, you're on 196, and he spotted someone in the woods?

**A.**     Yes, ma'am.

1    **Q.**    Okay.  Isn't it true that he spotted someone

2    walking in the woods or walking down the street?

3    **A.**    No, ma'am.

4    **Q.**    Well, you don't really know what he saw, he

5    saw it first, right?

6    **A.**    Right.

7    **Q.**    Okay.  And you testified that Officer Clark

8    gets out of the car and he goes directly to the

9    person in the woods?

10    **A.**    Yes, ma'am.

11    **Q.**    Okay.  And so he, I guess, is the first

12    person could see what -- who this person is or what

13    they're doing?

14    **A.**    Yes, ma'am.

15    **Q.**    Okay.  But you stayed back, you didn't go

16    with him?

17    **A.**    I went around my vehicle and approached to

18    the -- the area that they were at, but I stayed a

19    safe distance.

20    **Q.**    Okay.  But at some point you got close enough

21    to --

22    **A.**    I was within eight feet.

23    **Q.**    Eight feet.

24    Okay.  Well, you got close enough to Mr. --

25    within eight feet, and from that distance you could

1    smell that there was alcohol on his person or on his

2    clothes or on his breath --

3    **A.**    Yes, ma'am.

4    **Q.**    -- those sorts of things?

5    **A.**    Yes, ma'am.

6    **Q.**    Okay.  Now you said there is no houses right

7    there, but there are residential areas within that

8    general area, isn't that true?

9    **A.**    Yes, ma'am.

10   **Q.**    Okay.  In fact, Mr. Drew lives a little bit

11   down the street?

12   **A.**    Mr. Drew lives -- not on that street.

13   **Q.**    Not on Highway 96, but over off of Highway --

14   on Highway 64?

15   **A.**    Approximately two miles from it.

16   **Q.**    A couple of miles from there.  Okay.

17           All right.  Now you testified that you found,

18   20 or 30 minutes later you found a weapon?

19   **A.**    Yes, ma'am.

20   **Q.**    Okay.  And within two feet of that weapon on

21   the ground also you found a glove?

22   **A.**    Yes, ma'am.

23   **Q.**    Okay.  But -- and those were very -- those

24   two were close together?

25   **A.**    Yes, ma'am.

1    **Q.**    Okay.  And those were right here or right

2    underneath where Mr. Drew had been laying?

3    **A.**    Yes, ma'am.

4    **Q.**    Okay.  But you didn't find it for 20 or 30

5    minutes?

6    **A.**    Not the weapon --

7    **Q.**    Okay.

8    **A.**    -- the glove I saw immediately.

9    **Q.**    You saw the glove immediately, but it took

10    you another 20 or 30 minutes to find the weapon?

11    **A.**    Right.

12    **Q.**    Okay.  I'm a little confused about K-9

13    partner, I guess that means you've got an officer

14    that's Gonzales and her partner is a --

15    **A.**    A dog.

16    **Q.**    -- a police dog?

17    Okay.  And you had testified that they

18    searched somewhere else rather than where you were?

19    **A.**    Right.

20    **Q.**    How far away was that?

21    **A.**    Five hundred to eight hundred feet.

22    **Q.**    Okay.  A little bit off the scene.

23    So she wouldn't -- doesn't know anything

24    about how Mr. Drew was dressed or anything like that

25    at the point that she's searching with her dog?

1  **A.**      Right.

2  **Q.**      Okay.

3           **MS. JERMANN-ROBINSON:**  Your Honor, if I

4  may have a moment?

5           **THE COURT:**  Go ahead.

6           **MS. JERMANN-ROBINSON:**  Your Honor, can I

7  speak with your case manager?

8           Two of the exhibits, I need 21 through 25.

9           May I have a moment to speak with the

10 prosecutor, Your Honor?

11          I think he may have misspoke.

12          (Conference between defense counsel and

13 government counsel.)

14          **MS. JERMANN-ROBINSON:**  Thank you, Your

15 Honor, for your patience.

16 **BY MS. JERMANN-ROBINSON:**

17 **Q.**      I am, Officer, I'm publishing Exhibit

18 Number 21.

19          And that, of course -- is that your police

20 vehicle?

21 **A.**      Yes, ma'am.  That's the one I have at this

22 time.

23 **Q.**      Okay.  Okay.  At this time.

24          So you are not telling this jury that this is

25 a picture of your police vehicle on that evening,

1    are you?

2    **A.**    No, that's not the one I had at that evening.

3    **Q.**    Okay.  But you're saying that's -- well, let

4    me ask you.

5            When was this picture taken?

6    **A.**    This picture -- I don't remember the date

7    this picture was taken.

8    **Q.**    Was it taken yesterday?

9    **A.**    No, ma'am.

10   **Q.**    Was it taken last week?

11   **A.**    It was taken some months ago.

12   **Q.**    Some months ago.

13           Five months ago?

14           It wasn't taken on December the 7th, 2012?

15   **A.**    No, ma'am.

16   **Q.**    Okay.  How long after December the 7th was

17   this picture taken?

18   **A.**    Last year.

19   **Q.**    Sometime last year?

20   **A.**    Yes, ma'am.

21   **Q.**    Okay.  So less than a year from the time of

22   the occurrence?

23   **A.**    Yes, ma'am.

24   **Q.**    Okay.  Within a year.

25           How about -- I'm publishing Exhibit

1    Number 23.

2         Was this taken -- taken at the same time as

3    the first?

4    **A.**     Yes, ma'am.

5    **Q.**     Okay.  And that was sometime last year but

6    not December 7th, correct, or two thousand -- not

7    December 7th, 2012, sometime last year?

8    **A.**     Yes, ma'am.

9    **Q.**     Okay.  And this is where you indicated

10   somewhere in this treeline that Mr. Drew was

11   arrested?

12   **A.**     Yes, ma'am.

13   **Q.**     Okay.  So you waited some months afterwards

14   to go back and take a picture and you expect this

15   jury to believe you're going to be able to point out

16   where he was found?

17   **A.**     Yes, ma'am.

18   **Q.**     Okay.  I'm sorry, publishing number 25.

19        Was this picture taken at the same time as

20   the vehicle picture and the treeline picture?

21   **A.**     Yes, ma'am.

22   **Q.**     Okay.  So this was not taken December 7th,

23   2012, but some months later after the events?

24   **A.**     Yes, ma'am.

25   **Q.**     Okay.  And so you went back sometime later

1    and just kind of guessed where it was that he was

2    found?

3    **A.**     Yes, ma'am.

4    **Q.**     Okay.  Thank you.

5         Now you never, actually on the night of the

6    occurrence, I will be real specific, on December the

7    7th, 2012, you didn't actually go into the market

8    and speak with the victim, did you?

9    **A.**     No, ma'am.

10   **Q.**     Okay.  You remained outside, you saw Maxwell

11   go in?

12   **A.**     Yes, ma'am.

13   **Q.**     Okay.  But you were aware there was a victim?

14   **A.**     I am aware.

15   **Q.**     Okay.  And he was the clerk in the store?

16   **A.**     Yes, ma'am.

17   **Q.**     And his name is Jerry Harris?

18   **A.**     Yes, ma'am.

19   **Q.**     Okay.  And he would be the one that would

20   know best when this robbery occurred?

21   **A.**     Yes, ma'am.

22   **Q.**     Okay.  You also testified about getting

23   together with or sharing information with Memphis

24   Police Department --

25   **A.**     Yes, ma'am.

1    **Q.**      -- is that right?

2          And you all talked about how you all were

3    going to each prosecute, I suppose, these two

4    separate crimes, correct?

5    **A.**      Prosecution was not actually part of the

6    conversation, it was just --

7    **Q.**      Investigation maybe?

8    **A.**      Just shared the information that I had

9    because I heard of their crime.

10   **Q.**      Sure.  How did you hear about the crime?

11   **A.**      Like I -- like I stated, my former chief,

12   Chief Jewel he -- he heard about it and asked me to

13   contact Memphis because of the area of location --

14   **Q.**      Okay.

15   **A.**      -- was so close.

16   **Q.**      So close -- 16 miles apart?

17   **A.**      Yes, ma'am.

18   **Q.**      Okay.

19   **A.**      That's approximately.

20   **Q.**      Absolutely.

21          And in -- in return you sent photographs, I

22   guess, of the evidence that you had taken, to them?

23   **A.**      Yes, ma'am.

24   **Q.**      Okay.  And did they send photographs of their

25   evidence to you?

**A.**     No, ma'am, I've never seen any of Memphis'
information.

**Q.**     Okay.  Fair enough.

          **MS. JERMANN-ROBINSON:**  May I have one
moment, Your Honor?

          I can have one additional moment, Your
Honor, I may be through.

          **THE COURT:**  Uh-huh.

          **MS. JERMANN-ROBINSON:**  No further
questions, Your Honor.

          Thank you.

          **THE COURT:**  Okay.  Thank you,
Ms. Robinson.

          And is there any redirect?

          **MR. BIGGERS:**  Yes, Your Honor.

                    <u>**REDIRECT EXAMINATION**</u>

**BY MR. BIGGERS:**

**Q.**     Sergeant Atkins, make sure I clarify some
things brought up by Ms. Robinson.

**A.**     Okay.

**Q.**     Now I believe she said you -- she asked you
whether or not you guessed about the location of
where the firearm was recovered and where the
defendant was seen laying on the side of the road;
do you recall that?

1  **A.**     I do recall that.

2          **MS. JERMANN-ROBINSON:**  Objection, Your

3  Honor, leading.

4          **THE COURT:**  He can direct his attention to

5  certain things.  But don't lead the witness.

6          **MR. BIGGERS:**  I won't, Your Honor.

7  **BY MR. BIGGERS:**

8  **Q.**     Did you, in fact, guess on the location of

9  where --

10 **A.**     No, sir, I knew where he was laying.

11 **Q.**     I'm showing you Exhibit 14.

12 **A.**     Yes, sir.

13 **Q.**     Do you see on this photograph where the

14 defendant was found, the area where he was found?

15 **A.**     Can you move it down just a little bit?

16         Yes.

17 **Q.**     Please make an indication on the screen as to

18 where that area is.

19 **A.**     (Indicating).

20 **Q.**     I'm going to show you a different photograph,

21 Exhibit 13, that shows the full picture of 196.

22 **A.**     Right.

23 **Q.**     Now, please indicate on this photograph the

24 area?

25 **A.**     It's going to be right in that area right

1  there (indicating).

2  **Q.**    Now what are you basing that on?

3  **A.**    The Hickory Withe Road, that area, this

4  little trail right here cut through.

5  **Q.**    Circle it, please.

6  **A.**    This area (indicating) I knew I was north of

7  that area and just across or just south of that one.

8  **Q.**    Now I'm showing you Exhibit 21.

9        Do you recognize that?

10 **A.**    Yes, sir.

11 **Q.**    Is that the area where you -- where the

12 photograph was taken of where the defendant was

13 apprehended some -- some time after December 7th,

14 2012?

15 **A.**    Yes, sir.

16 **Q.**    And do you see either one of those roads that

17 you just mentioned on this photograph?

18 **A.**    The Hickory Withe Road is right there

19 (indicating).

20 **Q.**    That's the turnoff for Hickory Withe Road?

21 **A.**    Yes, sir.

22 **Q.**    Is that how you are able to identify that as

23 the area --

24 **A.**    Yes, sir.

25 **Q.**    -- where the defendant was located?

1    **A.**    Yes, sir.

2    **Q.**    Now is there any question that the person was

3    found hiding in the woods on December 7th, 2012 was

4    anyone other than the defendant Robert Drew?

5    **A.**    No, sir.

6    **Q.**    Is there any question as to the clothing that

7    the defendant was wearing at the time he was

8    apprehended?

9    **A.**    No, sir.

10    **Q.**    Now, when you first saw the defendant on the

11    side of the road, describe his posture?

12    **A.**    He was laying in the -- on the ground trying

13    to hide.

14    **Q.**    He was laying on the ground when you saw him?

15    **A.**    Yes, sir.

16    **Q.**    You never saw him walking?

17    **A.**    No, ma'am -- no, sir.

18    **Q.**    Is that the person --

19    **A.**    Yes, sir.

20    **Q.**    -- that you apprehended on that night?

21    **A.**    It is.

22    **Q.**    Was that clothing description that he had

23    consistent with that reported to you by Sergeant

24    Maxwell?

25    **A.**    Yes, sir, it is.

1  **Q.**    The firearm recovered on that night in the

2  same area where the defendant was found, was that

3  also consistent with the firearm description given

4  to you by Sergeant Maxwell?

5  **A.**    It is.

6         **MR. BIGGERS:**  No further questions, Your

7  Honor.

8         **THE COURT:**  Thank you.

9         And recross?

10         **MS. JERMANN-ROBINSON:**  No questions.

11         **THE COURT:**  All right, Sergeant, thank you

12  very much for coming down.  You may step down, you

13  are excused.

14                (Witness excused.)

15         **THE COURT:**  Okay.  How is everyone doing?

16         Anyone need a break?

17         If not, keep rolling.  Good.

18         All right.  If you would, please,

19  Mr. Biggers, call your next witness.

20         **MR. BIGGERS:**  The government calls Jesse

21  Baker to the witness stand, Your Honor.

22         **THE COURT:**  All right.

23         Okay, sir, you are good right there.

24         If you would, please, raise your right

25  hand.

1         Do you solemnly swear or affirm, under the

2  penalties of perjury, the testimony that you are

3  about to provide the court and jury in the case now

4  on trial to be the truth, the whole truth and

5  nothing but the truth, so help you God?

6         **THE WITNESS:**  Yes, sir.

7         **THE COURT:**  Have a seat right here if you

8  would, please.

1      **JESSE BAKER,**

2   was thereupon called as a witness on behalf of the

3   Plaintiff, and having been first duly sworn,

4   was examined and testified as follows:

5                    **DIRECT EXAMINATION**

6   **BY MR. BIGGERS:**

7   **Q.**     Good morning.

8   **A.**     Good morning.

9   **Q.**     Good morning.

10          Please state and spell your name for the

11  record.

12  **A.**     Jesse, J-e-s-s-e, Baker, B-a-k-e-r.

13  **Q.**     How old are you, Mr. Baker?

14  **A.**     Twenty-six.

15  **Q.**     Are you currently employed?

16  **A.**     Yes, sir.

17  **Q.**     Where do you -- where do you currently work?

18  **A.**     AFLAC.

19  **Q.**     How long have you been with AFLAC?

20  **A.**     Eight months.

21  **Q.**     Prior to that did you work at the KFC --

22  **A.**     Yes, sir.

23  **Q.**     -- on Highway 64?

24  **A.**     Yes, sir.

25  **Q.**     Is that at 8995 Highway 64?

1   **A.**      Yes, sir.

2   **Q.**      Were you working there December 2012?

3   **A.**      Yes, sir.

4   **Q.**      Specifically, what were your duties at the

5   KFC?

6   **A.**      I was a cashier.  I took money from the

7   customers and cleaned the lobby and cleaned up after

8   the mess in the back.

9   **Q.**      Were you working on December 7th, 2012?

10  **A.**      Yes, sir.

11  **Q.**      What shift did you work on that date?

12  **A.**      The night shift, four p.m. to ten p.m.

13          **MR. BIGGERS:**  Permission to approach the

14  witness, Your Honor?

15          **THE COURT:**  Go ahead.

16  **BY MR. BIGGERS:**

17  **Q.**      Showing you two photographs.

18          Do you recognize those?

19  **A.**      Yes, sir.

20  **Q.**      What do you recognize those two photographs

21  to be?

22  **A.**      That was my old job, KFC on Highway 64.

23  **Q.**      Both of those pictures substantially depict

24  how the KFC looked on December 7th, 2012?

25  **A.**      Yes, sir.

1    **MR. BIGGERS:**  At this time the government

2  moves to admit the two photographs in evidence?

3          **THE COURT:**  All right.

4          **MS. JERMANN-ROBINSON:**  No objection.

5          **THE COURT:**  Okay.  Let's see, we going to

6  do them collective?

7          **MR. BIGGERS:**  Yes, Your Honor, collective

8  30.

9          **THE COURT:**  All right.  It would be number

10  30.  We will go ahead and receive them as two

11  photographs of the KFC, be Exhibit 30 collective.

12          (Exhibit Number 30 was marked;

13  Description:  Photographs.)

14  **BY MR. BIGGERS:**

15  **Q.**    Now, Mr. Baker, at the time or how long total

16  did you work at KFC.

17  **A.**    One year and eight months.

18  **Q.**    I'm showing you the first picture of

19  collective Exhibit 30.

20          What -- tell the ladies and gentlemen of the

21  jury what's shown there?

22  **A.**    That is the front entrance to the KFC that I

23  worked at.

24  **Q.**    The second picture of collective Exhibit 30?

25  **A.**    That is the side entrance and the drive-thru

1    of the KFC that I worked at.

2    **Q.**      Please circle the side entrance.

3           You can touch the screen and make a circle on

4    the screen.

5    **A.**      (Indicating).

6    **Q.**      What, if anything, happened during your shift

7    on December 7th, 2012?

8    **A.**      Would you repeat that for me?

9    **Q.**      What, if anything, out of the ordinary

10   happened during your shift on the night of December

11   7th, 2012?

12   **A.**      At about 9:30 p.m. I was -- I had someone

13   come in, put a gun to my head and asked me to empty

14   the register for them.

15   **Q.**      Is that the first time you had ever had this

16   happen to you?

17   **A.**      Yes, sir.

18   **Q.**      How did that make you feel?

19   **A.**      A little frightened for my life.

20   **Q.**      Would you describe specifically what that

21   person said to you?

22   **A.**      He came in, pointed a gun at me, asked me to

23   open the register and give him all the money -- told

24   me.  I told him I couldn't.  And then he told

25   that he would kill me if I didn't open the register

1   and give him the money.  And I still told him that I

2   couldn't.  And then he ran out the door.

3   **Q.**     Describe as best you can for the ladies and

4   gentlemen of the jury what that person was wearing?

5   **A.**     A blue checkered flannel shirt, a black ski

6   mask, and one glove.

7   **Q.**     Did you get a look at the firearm?

8   **A.**     Yes, sir.

9   **Q.**     Describe that firearm for the ladies and

10  gentlemen of the jury?

11  **A.**     From what I saw, it was silver snub-nosed

12  revolver.

13  **Q.**     When you say "snub-nosed," what do you mean

14  by that?

15  **A.**     A short barreled revolver.

16  **Q.**     Approximately how far was the robber from you

17  at the time he held that gun to your face?

18  **A.**     Roughly about three, four feet.

19  **Q.**     What did you do when ordered to give the

20  robber the money out of the drawer?

21  **A.**     I actually believed that I couldn't do it

22  because I believed that I had to have a key to open

23  the register, so I thought that I could not get it

24  for him so -- which is why I told him that I can't

25  get it for you.

1   **Q.**     Did the robber get any money?

2   **A.**     No, sir.

3   **Q.**     About how long did this entire attempted

4   robbery take?

5   **A.**     Seemed like about 20 minutes, but probably

6   about a total of five or six minutes.

7   **Q.**     Showing you a disk, Mr. Baker.

8         Tell me if you recognize that disk?

9   **A.**     Yes, sir.

10  **Q.**     What is that disk?

11  **A.**     That is the video footage from the

12  surveillance cameras of the night of the robbery.

13  **Q.**     And how do you know that's what's contained

14  on that disk?

15  **A.**     Because that's what's been shown to me.

16  **Q.**     Have you had an opportunity to review that

17  video surveillance --

18  **A.**     Yes, sir.

19  **Q.**     -- to determine if it's an accurate depiction

20  of what occurred during and around the time of the

21  robbery on December 7th, 2012?

22  **A.**     Yes, sir.

23  **Q.**     And have you initialed that and dated it

24  indicating that it is an accurate copy of that?

25  **A.**     Yes, sir.

1          **MR. BIGGERS:**  At this time the government

2     moves to admit into evidence as Exhibit 31.

3               **THE COURT:**  Any objection?

4               **MS. JERMANN-ROBINSON:**  No objection at

5     all, Your Honor.

6               **THE COURT:**  All right.  Then we will go

7     ahead and receive the disk as identified.

8               It will be Exhibit 31.

9               (Exhibit Number 31 was marked;

10    Description:  Disk.)

11              **MR. BIGGERS:**  Permission to publish, Your

12    Honor.

13              **THE COURT:**  Go ahead.

14              **MS. JERMANN-ROBINSON:**  I'm sorry, Your

15    Honor.

16              What numbered exhibit is that?

17              **THE COURT:**  Thirty-one.

18              **MS. JERMANN-ROBINSON:**  Thirty-one, thank

19    you.

20    **BY MR. BIGGERS:**

21    **Q.**     On the screen, going to play one of the views

22    of the attempted robbery that occurred on December

23    7th, 2012.

24              Now do you have it up on your screen?

25    **A.**     Yes, sir.

1   **Q.**    Describe for the ladies and gentlemen of the

2   jury what is shown on the screen right now?

3   **A.**    Right now it's showing me with a rag in my

4   hand walking back to start making this lady's order

5   that I just took which this is the lady that ordered

6   right before I got robbed that night.

7   **Q.**    Please play it.

8                   (Videotaping playing.)

9   **BY MR. BIGGERS:**

10  **Q.**    Now which direction is she going?

11  **A.**    She went out the door.

12  **Q.**    Is that the front door or the side door?

13  **A.**    The side door.

14  **Q.**    What's going on right now?

15  **A.**    I am having the gun pointed at me and being

16  asked to empty the register.

17  **Q.**    What is that -- pause, please.

18          What is that in the robber suspect's right

19  hand?

20  **A.**    The gun that he used to rob us.

21  **Q.**    At that time could you tell if he had a glove

22  on the hand that is holding the gun?

23  **A.**    I believe that it did.  It doesn't look like

24  there is one here.

25  **Q.**    Play it, please.

1          He is doing something with his left hand?

2    **A.**     Pointing at the register.

3    **Q.**     At any point did you see him actually touch

4    the register?

5    **A.**     No, sir.

6    **Q.**     What is he doing now?

7    **A.**     He is walking out the door.

8    **Q.**     What are you doing?

9    **A.**     I just called my manager.  And told her to

10   call the cops and I'm walking to the bathroom to

11   make sure he's gone.

12   **Q.**     I did not see anyone other than yourself as

13   far as KFC employees shown in that clip.

14          Was there anyone else inside -- is there

15   anyone else that was an employee of the KFC that

16   came into contact with the robbery suspect?

17   **A.**     No, sir.

18   **Q.**     Were you the only person that the robbery

19   suspect addressed or encountered?

20   **A.**     Yes, sir.

21   **Q.**     Play the second clip, please.

22          What view is this, Mr. Baker?

23   **A.**     This is the view of the lobby where the

24   register is.

25   **Q.**     And I see -- what is that at the top of the

1    screen?

2    **A.**    What -- which top of the screen?

3    **Q.**    Right next to the number six where the lady

4    is walking out.

5    **A.**    That is the side entrance.

6    **Q.**    Play it a little bit further, please.

7          Hold it right there.

8          Who just came in?

9    **A.**    The guy that robbed me.

10   **Q.**    Now at the time could you see the robber's

11   face?

12   **A.**    No, sir.

13   **Q.**    Why not?

14   **A.**    Because he had a mask on.

15   **Q.**    Did the mask have any -- well, how was the

16   robber able to see?

17   **A.**    It had two holes in the eyes for him to be

18   able to see.

19   **Q.**    Describe that jacket as best you can?

20   **A.**    Blue, checkered on it.  Has little embroidery

21   right there (indicating), and it has a hood on the

22   back of it.

23   **Q.**    When you say embroidery right there, please

24   indicate on the screen what you are referring to?

25          You can touch the screen and circle it.

1    **A.**      (Indicating).

2    **Q.**      Play, continue to play, please.

3            Pause it again.

4            Do you see a closer up view of that jacket?

5    **A.**      Yes.

6    **Q.**      Closer up view of that emblem on the jacket?

7    **A.**      Yes.

8    **Q.**      Please circle that again.

9    **A.**      (Indicating).

10   **Q.**      And this time can you see if the robber has

11   anything covering his left hand?

12   **A.**      Yes, he has a glove on his left hand.

13   **Q.**      Continue playing.

14           Now at the time could you tell if the robber

15   suspect -- could you tell the race of the robbery

16   suspect?

17   **A.**      Yes.

18   **Q.**      How could you tell that?

19   **A.**      By the sound of his voice and by the eyes

20   because it wasn't completely covering his skin where

21   the eyes were cut out.

22   **Q.**      What was -- what was his race?

23   **A.**      African-American.

24   **Q.**      You know if the police were called?

25   **A.**      Yes, sir.

1  **Q.**    Did the police respond to the scene?

2  **A.**    Yes, sir.

3  **Q.**    Did it take a long time or a short time for

4  the police to respond?

5  **A.**    A short time.

6  **Q.**    Did you speak to them once they arrived?

7  **A.**    Yes.

8  **Q.**    Were you able to provide them with a suspect

9  description?

10  **A.**    Yes.

11  **Q.**    What did you tell them?

12  **A.**    He was about five 11, a hundred and 85 pounds

13  in between his thirty -- mid-thirties, mid-forties,

14  and male African-American.  And that he had the blue

15  checkered jacket on and a black hood on and a black

16  mask and the description of the gun.

17  **Q.**    Now, when was the first time that you had an

18  opportunity to view this video?

19         Was it the night of December 7th, 2012?

20  **A.**    No, sir.

21  **Q.**    How many times did you actually speak to the

22  police regarding this incident as far as giving an

23  account or a description of the suspect?

24  **A.**    Twice.

25  **Q.**    Twice.

1    What -- the first time was it on the night of

2  December the 7th, 2012?

3  **A.**    Yes, sir.

4  **Q.**    When was the second time?

5  **A.**    The second time was about four days later.

6  **Q.**    Who did you speak to on that occasion?

7  **A.**    An officer came and got me and they took my

8  statement.

9  **Q.**    Did you tell them substantially the same

10 thing that you told the officers that responded to

11 the scene on December the 7th, 2012?

12 **A.**    Yes, I did.

13 **Q.**    Do you recall the description of the firearm

14 that you gave?

15 **A.**    Yes.  I said it's silver snub-nosed, short

16 barreled gun, revolver.

17 **Q.**    Sometime after giving those two statements

18 did you have an opportunity to review this video?

19 **A.**    Yes, sir.

20 **Q.**    Please play that first clip.

21     While you are putting that up --

22     **MR. BIGGERS:**  Your Honor, if the court

23 will indulgence the government, I would like to ask

24 Mr. Baker to stand and demonstrate for the ladies

25 and gentlemen of the jury his view of the gun on the

1    night of December the 7th, 2012?

2                **THE COURT:**  Go ahead.

3                (Witness demonstrating.)

4    **BY MR. BIGGERS:**

5    **Q.**      Is that the angle of the firearm that you had

6    on that night?

7    **A.**      Yes, sir.

8    **Q.**      And on the night of the robbery, what color

9    did the snub-nosed revolver appear to be to you?

10   **A.**      Silver.

11   **Q.**      After reviewing the video, what color did the

12   firearm appear to be based on the video?

13   **A.**      Black.

14   **Q.**      Please play that portion of the clip.

15               (Videotape playing.)

16               **MR. BIGGERS:**  Hold it right there -- play

17   it a little bit.  Right there.

18   **BY MR. BIGGERS:**

19   **Q.**      All right.  Is this the video angle that you

20   saw?

21   **A.**      Yes, sir.

22   **Q.**      And on this video what color does that

23   snub-nosed revolver appear to be?

24   **A.**      Black.

25   **Q.**      On the night of December 7th, 2012, to your

1    knowledge did the police apprehend anyone in

2    relation to this attempted robbery?

3    **A.**      No.

4    **Q.**      Did you ever see the face of the person that

5    attempted to rob you on that night?

6    **A.**      No.

7    **Q.**      Have you ever seen the face of the person who

8    attempted to rob you on that night to your

9    knowledge?

10   **A.**      No.

11   **Q.**      If you saw him today, would you be able to

12   identify him?

13   **A.**      No.

14   **Q.**      Why not?

15   **A.**      Because I didn't see his face, he had a mask

16   on.

17   **Q.**      Did you get a good look at the actual

18   clothing that he was wearing?

19   **A.**      Yes.

20   **Q.**      Is that the same clothing that is depicted in

21   that video?

22   **A.**      Yes.

23   **Q.**      If you saw that jacket again would you be

24   able to recognize it?

25   **A.**      Yes.

1  **Q.**    I'm showing you what's been marked and

2  admitted as Exhibit 10.

3       Do you recognize that?

4  **A.**    Yes.

5  **Q.**    Does it appear to be the same jacket as the

6  robber wore on the night of December 7th, 2012, when

7  he pointed the gun to your face at the KFC on

8  Highway 64?

9  **A.**    Yes, that's the jacket he was wearing.

10  **Q.**    Anything unique about his jacket that would

11  lead you to that conclusion?

12  **A.**    Black hood and blue checkers and embroidery

13  logo on the pocket.

14       **MR. BIGGERS:**  Brief moment, Your Honor.

15       **THE COURT:**  Okay.

16       **MR. BIGGERS:**  No further questions of the

17  witness at this time, Your Honor.

18       **THE COURT:**  All right, thank you.

19       And is there cross?

20       **MS. JERMANN-ROBINSON:**  Yes, Your Honor.

21       If I may, for ease, I may ask to use the

22  agent over here to bring that video back up, the

23  second clip, right around 432.

24                    **CROSS EXAMINATION**

25

**BY MS. JERMANN-ROBINSON:**

**Q.**      While he is doing that, I'm Mary C. Robinson,
I represent Robert Drew.

            **MS. JERMANN-ROBINSON:**  If you will stop it
for just -- once you get it to 432.

            Thank you.

**BY MS. JERMANN-ROBINSON:**

**Q.**      Now you testified that this is the jacket
that you saw and it's the jacket in the video, but
isn't it true that at some point later, after you
talked to officers, it was determined that what's in
this picture is not this jacket but it is actually a
bubble jacket?

**A.**      No.

**Q.**      Take a look at it.

            **MS. JERMANN-ROBINSON:**  Can you go to 432.

            (Videotape playing.)

**BY MS. JERMANN-ROBINSON:**

**Q.**      We see the woman walking out --

            **A VOICE:**  Continue.

            **MS. JERMANN-ROBINSON:**  Ought to be, we're
good for now, but keep going through.

            Thank you.

**BY MS. JERMANN-ROBINSON:**

**Q.**      You see an individual walking in --

1      **MS. JERMANN-ROBINSON:** Stop it right

2  there.

3          Let me backup just a little bit.

4          Okay. Stop it.

5          Now move forward.

6          Stop right there.

7  **BY MS. JERMANN-ROBINSON:**

8  **Q.**    You're telling me that's not a bubble jacket?

9  **A.**    Yes, ma'am, that's exactly what I'm telling

10  you.

11 **Q.**    Okay. Let's keep moving forward.

12         **MS. JERMANN-ROBINSON:** Stop right here.

13         Actually you can go a little further.

14         Right there.

15 **BY MS. JERMANN-ROBINSON:**

16 **Q.**    Now it appears to be plaid, but, in fact,

17 isn't it puffy, can't you see the puffs in that

18 jacket?

19 **A.**    No, ma'am.

20 **Q.**    Okay.

21         **MS. JERMANN-ROBINSON:** Let's roll it

22 forward.

23         Right there.

24 **BY MS. JERMANN-ROBINSON:**

25 **Q.**    You still so sure?

1    **A.**    No.  I can see where you get that, that's

2    also a camera lens angle.

3    **Q.**    Okay.

4         **MS. JERMANN-ROBINSON:**  Let's roll it,

5    let's keep going.

6         Stop it right there.

7    **BY MS. JERMANN-ROBINSON:**

8    **Q.**    You still so certain that's a flannel jacket?

9    **A.**    Yes.

10   **Q.**    Okay.

11        **MS. JERMANN-ROBINSON:**  Go ahead and roll

12   probably the next ten seconds.

13        And stop.

14        Thank you so much, Agent Reed.

15   **BY MS. JERMANN-ROBINSON:**

16   **Q.**    Now when you saw this individual leave, you

17   didn't run out the door, he was on foot when he came

18   in and on foot when he left?

19   **A.**    Yes, ma'am.

20   **Q.**    Okay.  And he -- you testified and you were

21   given a statement or they took a statement -- strike

22   all of that.

23        You gave a statement at some point, I guess

24   four days later, to law enforcement?

25   **A.**    Yes, ma'am.

1  **Q.**    Okay.  And you would recognize that statement

2  if you saw it?

3  **A.**    Yes, ma'am.

4  **Q.**    Okay.  And isn't it true in that statement

5  you clearly described a silver weapon, is that

6  right?

7  **A.**    Yes, ma'am.

8  **Q.**    Okay.  And you've worked at the Kentucky

9  Fried Chicken for about a year and eight months,

10  right?

11  **A.**    Yes, ma'am.

12  **Q.**    And it's kind of a bright shiny place, it's

13  well lit, correct?

14  **A.**    No, ma'am.

15  **Q.**    You're telling us it's a dark place?

16  **A.**    At night it is.

17  **Q.**    But it's dark outside, but within the actual

18  store, you're telling me it's dark in there?

19  **A.**    No, it's very well lit in the store, yes,

20  ma'am.

21  **Q.**    Okay.  Thank you, thank you, I wasn't trying

22  to trick you, I promise.

23        It's well lit and it's clean, you know,

24  because people eat food there?

25  **A.**    Yes.

1    **Q.**    Okay.  And you've looked at this video

2    several times, it's a little murkier when you look

3    at the video, isn't it?

4    **A.**    Yes, ma'am.

5    **Q.**    Obviously your eyes probably see better,

6    right because it's brighter than it looks in this

7    video?

8    **A.**    Yes, ma'am.

9    **Q.**    Okay.  Were you -- I know you testified that

10   you couldn't see the face.

11         Were you ever called upon to look at

12   photographs of any suspects or anything like that?

13   **A.**    No.

14   **Q.**    Okay.  Were you shown any photographs at all

15   of clothing?

16   **A.**    No, ma'am.

17   **Q.**    Okay.  Were you actually shown this jacket at

18   any point?

19   **A.**    Not until the very last time that I met with

20   the prosecutors.

21   **Q.**    Okay.  So you have seen this jacket before?

22   **A.**    Yes.

23   **Q.**    Okay.  And you met with -- is that

24   Mr. Biggers or someone else?

25   **A.**    Mr. Biggers, yes.

1   **Q.**     Okay.  So you had seen that jacket prior to

2   coming into court?

3   **A.**     Yes.

4   **Q.**     Okay.  And was it -- did you see it in a

5   paper bag or was it already laying out?

6   **A.**     It was in a paper bag.

7   **Q.**     Okay.  So that -- was that an evidence bag to

8   the best of your knowledge?

9   **A.**     Yes, ma'am.

10  **Q.**     Okay.  So they pulled, someone, an agent or

11  Mr. Biggers, pulled that jacket out and showed --

12  told you that that was the jacket that was worn by

13  the robber?

14  **A.**     Yes, ma'am.

15  **Q.**     Okay.

16  **A.**     Well, they asked me --

17  **Q.**     Okay.

18  **A.**     -- if that was the jacket?

19  **Q.**     Fair enough.  Okay.

20          But they pulled that out of an evidence bag

21  and you were at the police station when that

22  happened?

23  **A.**     I was in this building.

24  **Q.**     You were in this building --

25  **A.**     Yes.

1  **Q.**    Okay.  You were in Mr. Biggers' office in the

2  U. S. Attorney's office?

3  **A.**    Yes, ma'am.

4  **Q.**    Okay.  So you were -- and that was in

5  preparation for this testimony?

6  **A.**    Yes, ma'am.

7  **Q.**    Okay.  You know the address of that Kentucky

8  Fried Chicken?

9  **A.**    8995 U. S. Highway 64.

10 **Q.**    Thank you.

11        **MS. JERMANN-ROBINSON:**  If I could have one

12 moment, Your Honor?

13        **THE COURT:**  Okay.

14        **MS. JERMANN-ROBINSON:**  Thank you, Your

15 Honor.

16 **BY MS. JERMANN-ROBINSON:**

17 **Q.**    I'm not sure, but is there an indication of

18 what time it is -- there it is.

19        In looking at this video can you see what

20 time it is, just from the still shot even, right

21 after this individual left the store?

22 **A.**    9:35 and 44 seconds.

23 **Q.**    Is that the twenty-one thirty-five forty-one?

24 **A.**    Yes, ma'am.

25 **Q.**    Okay.  So that would be 9:35 or so in the

1    evening?

2    **A.**      Yes, ma'am.

3    **Q.**      And this all happened fairly quickly?

4    **A.**      Yes, ma'am.

5            **MS. JERMANN-ROBINSON:**  One moment, Your

6    Honor, I may be through.

7            Nothing further, Your Honor.

8            Thank you.

9            **THE COURT:**  All right.

10           Any redirect?

11           **MR. BIGGERS:**  Yes, Your Honor.

12           **THE COURT:**  All right.

13                   **REDIRECT EXAMINATION**

14   BY MR. BIGGERS:

15   **Q.**      Mr. Baker, defense counsel asked you multiple

16   questions about the actual jacket and whether or not

17   it was, in fact, a bubble jacket, is that correct?

18   **A.**      Yes, sir.

19   **Q.**      Do you recall giving a statement to law

20   enforcement, an actual detective, days after the

21   robbery?

22   **A.**      Yes, sir.

23   **Q.**      In that statement did you give a description

24   of the actual jacket worn by the attempted robber?

25   **A.**      Yes, sir.

1    **Q.**    Do you recall what that was?

2    **A.**    It was a blue checkered flannel jacket.

3            **MR. BIGGERS:**  Permission to approach the

4    witness, Your Honor, with the statement?

5            **THE COURT:**  Go ahead.

6    **BY MR. BIGGERS:**

7    **Q.**    This is the statement that you gave to the

8    Memphis police detectives, is that correct?

9    **A.**    Yes, it is.

10   **Q.**    Do you see a date as to when that statement

11   was taken from you?

12   **A.**    Tuesday, December 11th, 2012.

13   **Q.**    Within that statement do you see a

14   description that you gave to the Memphis police

15   detective of the actual suspect clothing?

16   **A.**    Yes, I do.

17   **Q.**    Does it mention the jacket?

18   **A.**    Yes, it does.

19   **Q.**    What does it say?

20   **A.**    It says, wearing a blue flannel jacket.

21   **Q.**    Is that what you actually provided to the

22   Memphis police detective when you gave a formal

23   statement, is that correct?

24   **A.**    Yes, sir, it was.

25   **Q.**    Now on the night of the robbery, attempted

1  robbery, December 7th, 2012, you did, in fact, tell

2  the officers that responded to the scene what you

3  saw?

4  **A.**     Yes, I did.

5  **Q.**     Okay.  Your testimony is you told them the

6  exact same thing, is that correct?

7  **A.**     Yes, I did.

8          **MR. BIGGERS:**  Would you please play that

9  video for me.

10         **A VOICE:**  One or two?

11         That -- that one.

12              (videotape playing.)

13         Would you pause it right there.

14  **BY MR. BIGGERS:**

15  **Q.**     Mr. Baker, is there any question in your mind

16  as to whether or not the jacket shown there in the

17  surveillance video and the jacket in Exhibit 10 that

18  I'm holding in my hand are the same jacket?

19  **A.**     There is no question at all in my mind.

20  **Q.**     And what are you basing that on?

21  **A.**     Based on that's -- that's the jacket that I

22  saw that night, the hood, the blue checkers, and the

23  flannel and the embroidering.

24          **MR. BIGGERS:**  No further questions, Your

25  Honor.

1          **THE COURT:**  Thank you.

2          And recross?

3          **MS. JERMANN-ROBINSON:**  Thank you.

4                    **RECROSS EXAMINATION**

5   **BY MS. JERMANN-ROBINSON:**

6   **Q.**      Mr. Baker --

7   **A.**      Yes, ma'am.

8   **Q.**      -- you just spoke that your statement that

9   you gave, I guess, on -- some days after the robbery

10  took place?

11  **A.**      Yes, ma'am.

12  **Q.**      And that is your statement?

13  **A.**      Yes, ma'am.

14  **Q.**      Okay.  And isn't it true that nowhere in this

15  statement do you say that there is any kind of

16  emblem on this jacket that you reported to the

17  police this man was wearing?

18  **A.**      Yes, ma'am, that's true.

19  **Q.**      No mention of that at all?

20  **A.**      No, ma'am.

21  **Q.**      That just comes up today?

22          Correct?

23  **A.**      Yeah, but I saw it that night.

24  **Q.**      Okay.

25          **MS. JERMANN-ROBINSON:**  Nothing further?

1          **THE COURT:**  All right.

2          Thank you, sir, for coming down today.

3   You can step down, you are excused.

4                    (Witness excused.)

5          **THE COURT:**  Go ahead and take a brief

6   recess about ten, 15 minutes or so and then we will

7   get back to it.  I would like to get on with the

8   next witness before lunch.

9          We will break at about 12:30 for lunch and

10  it will be plenty of time for everyone to get

11  lunch -- I was just double-checking, I forgot to let

12  y'all know yesterday that, you know, we try to get

13  lunch for you.  Okay.  And I'm not sure if it is in

14  yet, but, like I say, we will work until about

15  12:30.

16         Now you don't have to take the lunch if

17  you don't want to.  I mean, if you want to walk out

18  on the mall and get a burger or something like that,

19  you are free to do that, too.  Okay.

20         But we're going to go ahead and take a

21  brief recess for just a few minutes, like I say

22  about ten or 15 minutes.

23         Remember my instructions to you, leave

24  your notebooks in the chair.  Don't discuss the case

25  amongst yourselves or allow anyone to discuss it

1  with you on the break.

2          See you back in about ten or 15 minutes.

3          (Jury out at 11:30 a.m.)

4      **THE COURT:**  Okay.  We will be in recess.

5      **THE CLERK:**  The court stands in recess.

6          (Recess at 11:30 a.m.)

7      **THE COURT:**  All right.  Do we have a

8  request to turn off the light for the next showing

9  of the video, is that what it is?

10     **MR. BIGGERS:**  Yes -- not the next witness,

11 Your Honor, but it will be the second witness.

12     **THE COURT:**  All right.

13     **MR. BIGGERS:**  The second, third and fourth

14 witnesses.

15     **THE COURT:**  All right.  So you don't need

16 it for the next witness?

17     **MR. BIGGERS:**  Don't need it for the next

18 witness, Your Honor.

19     **THE COURT:**  Okay.  All right.  Unless

20 there's anything else, let's bring in the jury and

21 get started.

22         Okay.  Bring them in.

23         (Jury present at 11:48 a.m.)

24     **THE COURT:**  Okay, folks, we are ready to

25 get started again.  So I think we finished with the

last witness.

Mr. Biggers, Mr. Stringfellow, call the next witness.  The government calls Officer Sam Stewart.

**THE COURT:**  All right.

Okay, Officer, you are good right there.

Raise your right hand.

Do you solemnly swear or affirm, under the penalties of perjury, the testimony that you are about to provide the court and jury in the case now on trial to be the truth, the whole truth and nothing but the truth, so help you God?

**THE WITNESS:**  I do.

**THE COURT:**  Please have a seat right here.

1        **SAM STEWART,**

2   was thereupon called as a witness on behalf of the

3   Plaintiff, and having been first duly sworn,

4   was examined and testified as follows:

5                    **DIRECT EXAMINATION**

6   **BY MR. STRINGFELLOW:**

7   **Q.**     State and spell your name for the record.

8   **A.**     I'm sorry, sir.

9   **Q.**     State and spell your name for the record.

10  **A.**     Okay.  Sam Stewart, S-a-m S-t-e-w-a-r-t.

11  **Q.**     You work for MPD, Officer Stewart?

12  **A.**     I do.

13  **Q.**     What do you do?

14  **A.**     I'm in uniform patrol at Appling Farms.

15  **Q.**     How long have you worked with MPD?

16  **A.**     A little over eight years.

17  **Q.**     And what does a patrol officer do?

18  **A.**     We answer calls for service.

19  **Q.**     In December 7th, 2012, were you working as a

20  patrol officer that night?

21  **A.**     I was.

22  **Q.**     While working as a patrol office, did you all

23  receive a call about a robbery in progress?

24  **A.**     We did.

25  **Q.**     Where were you when you received that call?

**A.**     We were on patrol in our ward in the area of Cordova, Germantown area.

**Q.**     When the call came in, what did you all do?

**A.**     We responded appropriately with blue lights and sirens to the holdup.

**Q.**     Where was the call or what -- what area was the call coming from?

**A.**     It was coming from the Kentucky Fried Chicken at 8995 Highway 64.

**Q.**     How long did it take you to get to the Kentucky Fried Chicken?

**A.**     I don't have exacts, but less than five minutes.

**Q.**     When you all arrived, what did you do?

**A.**     When we arrive on something like that we park strategically for our safety in case the suspect is still on the scene.  We enter the business, make sure that -- you try to find out if the suspect is there or not, and secure the area.

**Q.**     Did you actually have a partner with you that night?

**A.**     I did.

**Q.**     And who was that?

**A.**     Officer Herbert.

**Q.**     Were you driving or was he?

1    **A.**     He was driving.

2    **Q.**     And when you all arrived, I'm showing you

3    Exhibit 30.

4    **A.**     Uh-huh.

5    **Q.**     Is that the KFC or the front of the KFC?

6    **A.**     That is.

7    **Q.**     And when you all arrived, would you please

8    point to where you all parked on this photograph?

9    **A.**     We parked, we came in from this side and we

10   parked over here to the -- be the east side.

11   **Q.**     Officer Stewart, it's actually a touch screen

12   so you can --

13   **A.**     Okay.  Be (indicating).

14   **Q.**     If you just mark an X.

15   **A.**     Okay.  (Indicating).

16   **Q.**     After you all parked, what did you do?

17   **A.**     We scanned the business to check and see if

18   there was anyone running, like a suspect or anything

19   like that.

20         And the lights were on inside and we could

21   know -- we could see that the employees were huddled

22   kind of in a group in the middle of the store.  And

23   so I made -- we made our way around to the entrance

24   and they had to unlock the door and let us in.

25   **Q.**     Is that the -- would you please indicate

1   which entrance you are referring to?

2   **A.**      Yes, it would be on the west side right here

3   (indicating).

4   **Q.**      I'm sorry, would you please indicate again?

5   **A.**      Okay.  On the west side (indicating).

6   **Q.**      And were you all the first on the scene?

7   **A.**      Yes.

8   **Q.**      When you all went inside the store, what were

9   the employees doing?

10  **A.**      They were all pretty much had gathered and

11  were talking about what had happened and were

12  physically, you know, mentally shaken about the

13  event that had occurred.

14  **Q.**      And what did they tell you happened?

15  **A.**      That we've been robbed, you know.

16  **Q.**      Did you talk to the individual who was

17  working the cash register?

18  **A.**      Yes.  Yes.

19  **Q.**      What did he tell you?

20          **MS. JERMANN-ROBINSON:**  Objection, Your

21  Honor, hearsay.

22          **THE COURT:**  How do you respond to hearsay

23  objection?

24          **MR. STRINGFELLOW:**  Your Honor, we are not

25  offering it for its truth but to show the steps he

1   took during the course of the investigation.

2         **THE COURT:** Then ask him what he did as

3   far as when he was on the scene there investigating.

4         At this point I will sustain the

5   objection.

6   **BY MR. STRINGFELLOW:**

7   **Q.**     When you go inside -- what -- what did you do

8   as part of your investigation?

9   **A.**     On -- the first thing we do is we try to find

10   the -- the person, the employee or the manager or

11   whoever was on duty that interacted with the

12   suspect. They're our best help with getting a

13   description.

14         So after a brief walk-thru and talk to the

15   employees we discovered that Mr. Jesse Baker, who

16   was the clerk, had had the most contact with the

17   suspect. And so we began asking him, you know, what

18   happened.

19   **Q.**     What condition was Mr. Baker in when you all

20   got there?

21   **A.**     Well, he was -- he was visibly shaken, upset,

22   almost looked like in mild shock, you know, a lot of

23   victims get that way when they've had a weapon

24   pointed at them.

25   **Q.**     Did he provide you with a description of the

1  suspect?

2  **A.**    He did.

3  **Q.**    What was that?

4        **MS. JERMANN-ROBINSON:**  Objection, Your

5  Honor.  Calls for hearsay.

6        **THE COURT:**  Sustained.

7  **BY MR. STRINGFELLOW:**

8  **Q.**    After talking with Mr. Baker, did you have a

9  name of a suspect?

10 **A.**    No.

11 **Q.**    Did you have a face, did he see the face?

12 **A.**    No.

13 **Q.**    What did you have?

14 **A.**    Clothing description.

15 **Q.**    And did he -- more specifically, what type of

16 clothing?

17        **MS. JERMANN-ROBINSON:**  Your Honor, I'm

18 going to object again.  It still calls for hearsay.

19        **THE COURT:**  Sustained.

20 **BY MR. STRINGFELLOW:**

21 **Q.**    So he's given you -- you don't have a name,

22 you don't have a face but he gave you a description

23 of the clothing.

24        Did you then broadcast that description?

25 **A.**    I did.

1    **Q.**    And after broadcasting that description, what

2    did you do?

3    **A.**    After -- our policy, when he make the scene

4    on a robbery like that, what we are trained to do is

5    put out that broadcast because that enables the

6    other cars in the area, we immediately notify the

7    area that we've got the scene, the suspect has left

8    and we need those other cars to check the area for

9    the suspect.  That's our best chance of catching

10   him.

11        So as quickly as we can, that's our number

12   one priority besides making sure everyone is safe is

13   get that broadcast out.

14        After I did that, I immediately -- to the

15   west there after we were advised that's the way that

16   the robber ran, that's my area, I know the employees

17   up at the Pizza Hut and the Circle K, so I

18   immediately went up there asking for help in

19   determining, you know, more of a physical

20   description on this guy, and maybe if he had a

21   vehicle or what he did.

22        While my partner Herbert went to the -- went

23   with the manager to try to view video to help us,

24   also.

25   **Q.**    Did you take a written statement from

Mr. Baker?

**A.**     I did not, no.

**Q.**     Why not?

**A.**     That wasn't part of my investigation at that time.

**Q.**     And you said that your partner spoke to the manager?

**A.**     Uh-huh.  Or whoever was in charge that was able to -- to get -- to try to operate the video equipment.

**Q.**     Are you aware after watching the video that what was seen on the video was consistent with the victim's description of the suspect?

**A.**     That's what I was told, yes.

          **MR. STRINGFELLOW:**  Your Honor, may I have a moment?

          **THE COURT:**  All right.

**BY MR. STRINGFELLOW:**

**Q.**     Office Stewart, just a few more questions.

          Was any money taken during this robbery?

**A.**     No.

**Q.**     Were any of the other employees able to provide any information about the robbery suspect?

**A.**     None that was -- that I can recall.

**Q.**     Do you know if any fingerprints were taken?

1  **A.**    There was no fingerprints taken.

2  **Q.**    And why is that?

3  **A.**    Because after my partner advised, he viewed

4  the video, the suspect had on gloves.

5          **MR. STRINGFELLOW:**  No further questions,

6  Your Honor.

7          **THE COURT:**  Thank you.

8          And is there cross.

9          **MS. JERMANN-ROBINSON:**  Can I have just one

10  moment, Your Honor?

11         **THE COURT:**  All right.

12         **MS. JERMANN-ROBINSON:**  No questions, Your

13  Honor.

14         **THE COURT:**  Thank you.

15         Patrolman Stewart, you can step down, you

16  are excused.

17         **THE WITNESS:**  All right.

18             (Witness excused.)

19         **THE COURT:**  I think we will go ahead and

20  break a little early for lunch today, we're going to

21  break now at noon.  The reason is that your lunch is

22  here.  Okay.  And if it was sandwiches, I was going

23  to say we could work a little longer, but they say

24  it is hot and you have to microwave if -- and all of

25  that, so I give in, so we are going to have lunch

1    just a little earlier.  Okay.

2            So we are going to start, we'll come,

3    let's make it 1:15 rather than one o'clock because

4    you have to go to where the lunch is and things like

5    that that, should give you plenty of time.  Okay.

6            So remember the instructions, they are

7    always the same, leave your notebooks in the chairs,

8    don't discuss the case when you are out and about,

9    don't let anyone discuss it with you.  And when you

10   are finished, go directly back into the jury room

11   and we will get started right at 1:15.  Okay.

12           All right.  Go ahead and excuse the jury

13   at this time.

14           (Jury out at 12:00 o'clock p.m.)

15       **THE COURT:**  Okay.  Anything from either

16   side before we break for lunch?

17           If not --

18       **MR. BIGGERS:**  Nothing from the government,

19   Your Honor.

20           **MS. JERMANN-ROBINSON:**  No, Your Honor.

21       **THE COURT:**  Okay.  We will be in recess

22   until 1:15.

23           **THE CLERK:**  Court stands in recess.

24       **THE COURT:**  About how many more witnesses

25   do you all have?

1          I know at least three more.

2          **MR. BIGGERS:**  Four.

3          **THE COURT:**  Four more.

4          **MR. BIGGERS:**  And, Your Honor, I should

5  tell counsel, I anticipate the next two will be

6  probably as quickly as the last witness.  The one

7  after that will probably be the lengthy and the last

8  one is the interstate nexus.

9          **THE COURT:**  All right.  And, Ms. Robinson,

10  start thinking about defense and how many witnesses

11  you all are going to have.

12          **MS. JERMANN-ROBINSON:**  Two.

13          **THE COURT:**  Two witnesses.

14          Good, hoping to get all of the proof on

15  today.

16          (Lunch recess at 12:02 p.m.)